EXHIBIT  NUMBER

"1"

PLAINTIFF´S PROPOSED SECOND AMENDED CIVIL COMPLAINT

EXHIBIT  NUMBER

"1"

PLAINTIFF´S PROPOSED SECOND AMENDED CIVIL COMPLAINT

**Terrance Walker**
Plaintiff, *in propria persona*
212 Hillcrest Drive # 1
Reno, NV 89509
Tel: +1.775.971.8679
Email: walkerbillion@gmail.com

**IN THE UNITED STATES DISTRICT COURT IN AND FOR NEVADA**

TERRANCE WALKER :
Plaintiff, : CASE NO. 3:18-CV-00132-MMD-CBC
v. :
Intelli-heart Services Inc., :
Danny Weisburg, :
Vannessa Parsons, :
Daniel Germain, :
Defendants. :

COMES NOW, Terrance Walker dba Walker Development & Trading Group[1] (" Walker") filing his SECOND AMENDED COMPLAINT and JURY DEMAND FOR tortious interference, aiding and abetting, and alter ego stating:

**SECOND AMENDED COMPLAINT**

Walker, brings this action for tortious interference under 28 U.S.C. § 1332 (Diversity Jurisdiction) and 28 U.S.C. § 1331 (Federal Question) to recover from Intelli-heart Services, Inc. ("Intelli-heart") all damages, penalties, and other remedies available and would show unto the Court the following:

**JURISDICTION**

1. This Court maintains subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (Diversity Jurisdiction) and 28 U.S.C. § 1331 (Federal Question)

2. Venue is proper in this Court under 31 U.S.C. § 3732(a) because Intelli-heart sells its services

1. Terrance Walker is a sole proprietor and has a DBA from Washoe County Nevada; "Walker Development & Trading Group"

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 3 of 153

throughout the United States and has caused Walker injury in this jurisdiction and venue. Furthermore, Defendants intended to cause (or caused) a tortious act to be done, or caused the consequences of the tortious act to occur, within the state of Nevada to Walker. The Subcontract of Walker (under James Winters) designates Nevada law will apply and Walker has a strong interest in litigating in Nevada. (See attached, and marked, Exhibit 1) Since Walker's contract designates Nevada law will apply, venue in Nevada is proper. The subcontract of Intelli-heart's contract with James Winters' does not designate which law will apply. (See attached, and marked, Exhibit 2) Since Winter's subcontract with Intelli-heart does not designate which law will apply, federal law will fill the void. e.g., American Pipe & Steel Corp. v. Firestone Co., 292 F.2d 640, 644 (9th Cir. 1961); New SD, Inc. v. Rockwell Inter. Corp., 79 F.3d 953, 955 (9th Cir. 1996).

3. Walker is the original source of and has direct and independent knowledge of all publicly disclosed information that the allegations herein are based upon.

4. Walker has personally gathered all the documentation substantiating the allegations herein.

5. Additionally, Walker has voluntarily provided all such information to the U.S. Government prior to the filing of this action.

**THE PARTIES**

6. Terrance Walker DBA Walker Development and Trading Group is a sole proprietor with its principal place of business at 212 Hillcrest Drive #1, Reno Nevada.

7. Walker provides a variety of professional services such as consulting, market research, registering companies to qualify for federal contracts, finding relevant solicitations, reviewing federal solicitations, preparing bids, compliance advising, advising on procurement regulations, and contract dispute resolution for U.S. government procurements. Walker is a bona fide agent[2] who has been providing these legitimate services for about 4 years.

8. Defendants Vanessa Parsons, Danny Weisburg, and Daniel Germain are sued in their individual capacities and are alleged to acted in concert with, or using as a mere façade (or cover for), the entity Intelli-heart Services Inc. in their fraudulent conduct alleged herein.

9. Defendant Intelli-heart is a California corporation that provides outpatient, remote heart

2. See 48 CFR 3.401

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 4 of 153

monitoring services for hospitals and similar medical institutions for those institutions' patients. Intelli-heart's principal place of business located at 10850 WILSHIRE BLVD. STE 740 LOS ANGELES CA 90024. Intelli-heart's agent for service of process is AMY OSRAN JACOBS, 360 N. BEDFORD DRIVE, STE 204 BEVERLY HILLS, CA 90210. Defendant Intelli-heart Services Inc. Is the sole Defendant referred to up until paragraph 118, below. After paragraph 118, the other Defendant, and Claims involving them, are mentioned.

10. Defendant Intelli-heart and their representatives Ms. Vanessa Parsons, Mr. Danny Weisburg (Parson's paramour), and Ms. Hillary Peckos (operations manager) are employees and/or officers and/or contractors of Intelli-heart. The California Secretary of State lists them as such. (See attached, and marked, Exhibits 3, 4, 5) Emails also list them as such. (See attached and marked, Exhibit 6) Intelli-heart's principal place of business located at 10850 WILSHIRE BLVD. STE 740 LOS ANGELES CA 90024. Intelli-heart's agent for service of process is AMY OSRAN JACOBS, 360 N. BEDFORD DRIVE, STE 204 BEVERLY HILLS, CA 90210.

11. An agency that was involved (though not a party) is the U.S. Department of Veteran Affairs ("VA", or "Government"). The VA is federal Cabinet-level agency that provides near-comprehensive healthcare services to eligible military veterans at VA medical centers and outpatient clinics located throughout the country. Ms. Arlene Jorgensen-Hilestad; Ms. Marchelle Peyton; Mr. Kevin Cochran; and Ms. Patrice Bond (formerly handled by Ms. Roberta Deweese) are contracting officers for the VA (of the VA contracts at issue) and are located in (or near) St. Paul, Minnesota; Hampton, Virginia; Murfreesboro, TN; Milwaukee, Wisconsin, respectively. Each contracting officer is responsible for soliciting for, and managing, the VA contracts that are the subject of this action in their respective VA regions.

## NATURE OF ACTION

12. Walker seeks a decision in writing or other appropriate action on these Claims, such as penalties and damages.

13. Federal Government contracts that are tangentially involved in this Complaint are identified

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 5 of 153

by VA contract award ID's VA69D17D0167[3], VA26317D0109[4], VA24617C0183[5], VA24918C10329[6] ("VA Contracts" or "VA Contract").

14. These VA Contracts are small business set-aside contracts for heart monitoring.

15. The VA Contracts are each single source, commercial item, fixed-unit price, indefinite delivery/indefinite quantity ("IDIQ") contracts with base periods and 2-4 option years.

16. The VA Contracts are also small business set-asides (for small businesses determined by The NAICS code size standard of each respective solicitation).

17. Each VA contracts included explicit provisions which required that "The Contractor shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under this contract." See, for example, Contract VA69D17D0167 (See Exhibit 7, page 23, attached and marked). Each VA Contract also requires accelerated payments to subcontractors (See Exhibit 7, page 31, referencing FAR part 52-232.40)

18. Mr. James Winters ("Winters") is a sole proprietor, bona fide agent, and subcontractor that had an exclusivity contract with Intelli-heart to secure VA contracts.

19. Intelli-heart is the prime contractor (or "The Contractor") of the above VA Contracts. Walker is a subcontractor who had a subcontract with Winters to help him secure, manage, and help with consulting on the VA contracts.

20. Both Winters and Walker are classified as small businesses under the NAICS codes of the VA Contracts.

21. Defendants, through their misrepresentations (and omissions) to the VA and other actions, interfered with Walker's expected gain from the VA Contracts under the subcontract Walker had with Winters. Thus, this action proceeds.

**FEDERAL SUBCONTRACTOR RIGHTS (AND FEDERAL) LEGAL QUESTIONS**

**Prompt Payment Act and Accelerated Payments to Subcontractors (See e.g. FAR[7] part**

---

3. $2,325,675.00 from July. 24, 2017 to July 23, 2020 for the following VA's : Milwaukee, Capt Lov.FHCC, Ed Hines, Green Bay, Tomah, Madison, Oscar Johnson, and Jesse Brown.

4. $350,000.00 for the VA in Iowa City IA from Oct. 1, 2017 to Sept. 30, 2022
5. $281,750.00 for the VA in Richmond VA from March 22, 2017 to Sept. 30, 2022
6. $233,100.00 for the VA in Lexington KY from Oct. 1, 2017 to Sept. 30, 2022
7. The FAR is the primary regulation for use by all executive agencies in their acquisition of

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 6 of 153

**52.232-40), And Section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015, (Pub. L. 113-235)(See e.g. FAR part 52.203-19)**

22. In 2011-2012, the Obama administration provided guidance sought to address payment of small business subcontractors by calling for agencies to "accelerate payments to all prime contractors, in order to allow them to provide prompt payments to small business subcontractors."[8]

23. Subsequently, in November 2013, the Administration amended the Federal Acquisition Regulation (FAR) to implement the accelerated payment policy as to small business Subcontractors.[9]

24. As amended, the FAR requires that agencies' prime contracts include terms that obligate the contractor, [u]pon receipt of accelerated payments from the Government, [to] make accelerated payments to its small business subcontractors under this contract, to the maximum extent practicable and prior to when such payment is otherwise required under the applicable contract or subcontract.

25. The FAR amendment also requires that agencies' contracts include terms which obligate prime contractors to incorporate similar language in their subcontracts with small businesses (including those for the acquisition of commercial items), thereby binding themselves to make accelerated payments to their subcontractors. (codified at 48 C.F.R. §52.232-40(c))

26. The FAR Council put this provision into FAR 52.232-40 (Providing Accelerated Payments to Small Business Subcontractors) [ which was derived from Prompt Payment Act (31 U.S.C. 3903) and prompt payment regulations at 5 CFR part 1315] .

27. FAR 52.232-40 states: "(a) Upon receipt of accelerated payments from the Government, the Contractor shall make accelerated payments to its small business subcontractors under this contract, to the maximum extent practicable and prior to when such payment is otherwise

---

supplies and services with appropriated funds. See https://www.acquisition.gov/sites/default/files/current/far/pdf/FAR.pdf

8. Exec. Office of the President, Office of Mgmt. & Budget, Providing Prompt Payment to Small Business Subcontractors, July 11, 2012, available at http://www.whitehouse.gov/sites/default/files/omb/memoranda/2012/m-12-16.pdf

9. Dep't of Defense, Gen. Servs. Admin. & Nat'l Aeronautics & Space Admin., Federal Acquisition Regulation: Accelerated Payment to Small Business Subcontractors: Final Rule, 78 Federal Register 70477 (November 25, 2013).

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 7 of 153

required under the applicable contract or subcontract, after receipt of a proper invoice and all other required documentation from the small business subcontractor. (b) The acceleration of payments under this clause does not provide any new rights under the Prompt Payment Act. (c) Include the substance of this clause, including this paragraph (c), in all subcontracts with small business concerns, including subcontracts with small business concerns for the acquisition of commercial items.

28. FAR Council commentary on FAR part 52.232-40 states, "The rule is not limited to first-tier subcontractors, because that is inconsistent with the OMB memo that this rule implements, and would reduce the number of small entities that may benefit from this rule." (See https://www.federalregister.gov/documents/2013/11/25/2013-28053/federal-acquisition-regulation-accelerated-payments-to-small-business-subcontractors (paragraph 9)).

29. The commentary goes on to state that subcontractors should report the prime contractor to the contracting officer if they experience late payments, similar to the relief under FAR 32.11210; "The rule does not create any new remedies for subcontractor payment issues. Subcontractors would utilize existing remedies for non-payment similar, but not limited, to FAR 32.112. "[10], See Federal Register Id. para. 4 Prompt payment provisions and FAR 52.232-40 require accelerated payments to subcontractors within 15-30 days: "OMB policy now requires agencies to pay prime contractors as soon as possible with the goal of paying within 15 days of receiving a proper invoice OMB M-11-32 OMB M-14-10"

30. As also required by Jan 2017, FAR part 52.203-19(b) forbids compliance of a prime contractors' internal confidentiality agreement restricting a subcontractor's "reporting waste, fraud, or abuse related to the performance of a Government contract to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information". The Prime Contractors, in this case Defendant, was required to (as of Jan. 2017) "notify current employees and subcontractors that prohibitions and restrictions of any preexisting internal confidentiality agreements or statements covered by this clause, to the extent that such prohibitions and restrictions are inconsistent with the prohibitions of this clause, are no longer in effect." FAR part 52.203-19(c)

---

10. See FAR 32.112 provides the making of " assertion by a subcontractor or supplier of a Federal contractor that the subcontractor or supplier has not been paid in accordance with the payment terms of the subcontract" to the Contracting Officer.

## FACTS WHICH SUPPORT CLAIMS

31. Winters contracted with Intell-heart to provide VA sales to Intelli-heart for a total of 10% commission which started in late 2014.

32. Winters sought Walker's guidance on the contract and provided Walker with a copy (See Exhibit 2).

33. Shortly before, in Oct. 2014, Winters contracted with Walker to provide him government contract consulting as a bona fide agent to work on various aspects of government procurements with him in medical sales (Exhibit 1) .

34. Walker's subcontract (under Winters) covered doing this work for 50% of Winter's commissions for sales made by Intelli-heart to the VA. (Walker's commission is therefore a total of 5% of Intelli-heart's total gross earnings from the VA Contracts)

35. Both Winters' subcontract (with Intelli-heart) and Walker's subcontract included, in substance, payment terms which were within 30 days as dictated by FAR 52.232-40.

36. In fact, Walker's subcontract included Payment terms that indicated he was to be paid within 10 days of the payment made by Intelli-heart to Winters (See Exhibits 1 & 2)

37. Winters received procurement consultation from Walker on the solicitations underlying the VA Contracts of Intelli-heart.

38. From 2014 on, Winters (along with Walker's contracted consulting) helped Intelli-heart land about a dozen contracts with the VA. Those contracts required monthly invoicing by Intelli-heart.

39. Yet, each month Intelli-heart did not pay Winters monthly pursuant to FAR 52.232-40, their VA Contracts, and subcontract terms -- on an accelerated basis -- within 15-30 days.

40. About a dozen times, Intelli-heart paid Winters about 60-90 days apart (under their contract) with no detailed accounting payment data.

41. Walker complained to Winters about these late payments (and lack of accounting) every month from the time signing their subcontract in 2014 until November 2017. Each month Winters intimated to Walker that he, also, regularly complained to Intelli-heart.

42. Intelli-heart began paying Winters up to 120 days apart, starting in late March 2017.

43. Winter's subcontract payments for the VA Contract activity for July 2017, August 2017, and September 2017 was not paid until November 2017.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 9 of 153

44. Intelli-heart's Vanessa Parsons made a remark that failed to explain away this obvious contractual oversight[11]. Ms Parson stated that this was how their other non-federal contract reps/distributors were paid.

45. For the first time in years under Winter's subcontract, there was accounting data for this 10 % commission payment, covering the 3 months. (See Exhibit 8, attached and marked)

46. Winter forwarded this commission payment summary and Ms. Parson's email to Walker in order to be transparent as to why Walker's payment was late and below projected amounts.

47. Walker responded to Ms. Parson by email that Intelli-heart's payment was not within the 30 days according to the contracts, complained that Intelli-heart's holding money for 90 days was causing a breach. (See Exhibit 9, attached and marked, Parson's email and Walker's response)

48. In December 2017, Walker subsequently threatened legal action if Intelli-heart did not honor their contractual obligations and made it clear that their interference with Winters' help on the VA contracts, as well as their late payments, would be the cause of legal problems for them.

49. In December 2017 and January 2018, Walker made it clear to Intelli-heart (by emailing Defendants) that they may be subject to fraud (and other claims) for its late (and low) payments; the totals were far short of projected contract totals. (See Exhibits 10, 11, 12, 13, 14, attached and marked emails).

50. Contracting Officer Lance Davis of the VA was also copied on one of the emails after Intelli-heart they claimed innocence in the matter. (Exhibit 12)

51. Intelli-heart failed to make a payment to Winters in January 2018.

52. Danny Weisburg of Intelli-heart claimed, as Winters told Walker mid-January 2018, that everyone responsible at the VA was out on vacation in December 2017 when they invoiced.

53. Intelli-heart, however, never made the January 2018 or any payment to Winters thereafter, as told to Walker and Lapp (of the VA), by Winters by email and phone in Feb 2018.

**DEFENDANTS OTHER FALSE STATEMENTS & MISREPRESENTATIONS TO**

---

11. Prompt payment provisions and FAR 52.232-40 require accelerated payments to subcontractors within 15 days: "OMB policy now requires agencies to pay prime contractors as soon as possible with the goal of paying within 15 days of receiving a proper invoice OMB M-11-32 OMB M-14-10" See https://www.fiscal.treasury.gov/fsservices/gov/pmt/promptPayment/accelerated_payments.htm

## FEDERAL OFFICIALS

### A. CONTRACT VA24617C0183 and purported termination of Winter's subcontract

54. With total approval by Intelli-heart, Winters prepared the bid underlying award VA24617C0183, along with Walker's contracted consultation. Winters told Walker several days before the signing the award VA24617C0183 that Intelli-heart's officers agreed with the pricing, conditions, and terms therein (which included FAR 52.232-40).

55. Due to non-payment thereunder, On Feb 1, Feb. 8, and Feb. 12, 2018 Walker made assertions of non-payment pursuant to FAR 52.232-40 regarding VA Contract VA24617C0183 to the VA's Larry Lapp and Marchelle Peyton (See Exhibits 15 and 16, attached and marked). Walker sent over bank statements, other documentation showing a subcontractor chain to him, and Intelli-heart's 12 month history of late 60-90 day payments which filtered within 1-2 days, each time, through Winters.

56. Winters, in an email also sent to Walker, specifically told Mr. Lapp that Intelli-heart sent Winters a notification unilaterally terminating Winter's subcontract on Feb. 8, 2018.

57. Winters did not agree to said termination and stated that it appeared that Intelli-heart is merely trying to avoid its "payment obligations"[12] (See Exhibit 17, attached and marked).

58. Intelli-heart's unilateral termination of Winter's contract was a breach of contract.

59. Intelli-heart's President made misrepresentations, by email, to VA Contracting Officer Marchelle Peyton on Feb. 8, 2018 that Walker was not (at any time) a subcontractor of theirs under contract VA24617C0183, see statement March 12, 2018 of Marchelle Peyton. (Exhibit 18, attached and marked)

60. On Mar 12, 2018, relying upon these misrepresentations of the prime contractor (Intelli-heart) Larry Lapp and Marchelle Peyton of the VA found that Intelli-heart can avoid paying its subcontractors (Winters and Walker) under award VA24617C0183. (Exhibit 18)

### B. CONTRACT VA26317D0109

12. Winters states that Intelli-heart was only trying to "circumvent their payment obligations"(Exhibit 17)

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 11 of 153

61. With total approval by Intelli-heart, Winters prepared the bid underlying award VA26317D0109, along with Walker's contracted consultation.

62. Winters told Walker several days before the signing the award VA26317D0109 that Intelli-heart's officers agreed with the pricing, conditions, and terms therein (which included FAR 52.232-40).

63. Winters told Walker that he has also consulted with VA contracting specialist Arlene Jorgensen-Hilestad in regards to award VA26317D0109, thereafter.

64. Due to non-payment thereunder, on Feb. 2, 2018 (See Exhibit 19, attached and marked) Walker made assertions of non-payment pursuant to FAR 52.232-40 regarding VA Contract VA26317D0109 to the VA's Arlene Jorgensen-Hilestad and Ms. Fay Chiappione (See Exhibit ).

65. Walker sent over bank statements, documentation showing a subcontractor chain to him, and Intelli-heart's 12 month history of late 60-90 day payments which filtered within 1-2 days, each time, through Winters.

66. On Feb 8, 2018, Arlene Jorgensen-Hilestad, stated in an email to Terrance Walker, "It has come to our attention that you or your organization are not, according to the contractor, a subcontractor of the contractor. Accordingly, we regard this matter as closed." (See Exhibit 20, attached and marked)

67. Intelli-heart made misrepresentations to Arlene Jorgensen-Hilestad that Terrance Walker and James Winters were not subcontractors of theirs under contract VA26317D0109, as certified by Arlene Jorgensen-Hilestad's certified statement Feb. 23, 2018. (See Exhibit 21, attached and marked )

68. Relying upon these misrepresentations of the prime contractor (Intelli-heart) Arlene Jorgensen-Hilestad of the VA found that Intelli-heart can avoid paying its subcontractors (Winters and Walker) under award VA26317D0109. (Exhibit 21)

**C. CONTRACT VA69D17D0167**

69. With total approval by Intelli-heart, Winters prepared the bid underlying award VA69D17D0167, along with Walker's contracted consultation. Winters told Walker several days before the signing the award VA69D17D0167 that Intelli-heart's officers agreed with the pricing, conditions, and terms therein (which included FAR 52.232-40).

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 12 of 153

70. Winters told Walker that he has also consulted with VA contracting officer Roberta Deweese in regards to award VA69D17D0167, shortly thereafter.

71. Due to non-payment thereunder, on Feb. 12, 2018 and Feb. 19, 2018 Walker made assertions of non-payment pursuant to FAR 52.232-40 regarding VA Contract VA69D17D0167 to the VA's Patrice Bond (See Exhibit 22, attached and marked ).

72. Walker sent over bank statements, documentation showing a subcontractor chain to him, and Intelli-heart's 12 month history of late 60-90 day payments which filtered within 1-2 days, each time, through Winters.

72. On March 7, 2018 Patrice Bond stated in an email to Walker ".....I have spoken to Intelli-Heart and confirmed its separation from Winters. Additionally, I have confirmed that all payments due to Winters have been made by Intelli-Heart and that they were made in a timely manner. " (See Exhibit 23, attached and marked)

73. Intelli-heart made misrepresentations to the VA's Patrice Bond that Walker and James Winters were not subcontractors of theirs under contract VA69D17D0167, as certified by Patrice Bond's certified statement March 15, 2018. (See Exhibit 24, attached and marked)

74. Relying upon these misrepresentations of the prime contractor (Intelli-heart) Patrice Bond of the VA found that Intelli-heart can avoid paying its subcontractors (Winters and Walker) under award VA69D17D0167. (Exhibit 24)

**D. CONTRACT VA24918C10329**

75. With total approval by Intelli-heart, Winters prepared the bid underlying award VA24918C10329, along with Walker's contracted consultation.

76. Winters told Walker several days before the signing the award VA24918C10329 that Intelli-heart's officers agreed with the pricing, conditions, and terms therein (which included FAR 52.232-40)

77. Due to non-payment thereunder, on Feb 1, Feb 5, and Feb 19, 2018 Walker made assertions of non-payment pursuant to FAR 52.232-40 regarding VA Contract VA24918C10329 to the VA's Kevin Cochran (See Exhibit 25, attached and marked ).

78. Walker sent over bank statements, documentation showing a subcontractor chain to him, and Intelli-heart's 12 month history of late 60-90 day payments which filtered within 1-2 days, each

time, through Winters.

79. Cochran asked Ms. Parsons for the status of the payments to Walker on Feb. 6, 2018 (See Exhibit 25)

80. Intelli-heart made misrepresentations to the VA's Kevin Cochran that Terrance Walker and James Winters were not subcontractors of theirs under contract VA24918C10329.

81. On March 16, 2018 Kevin Cochran forwarded (to Walker) the February 2018 emails of Danny Weisburg (of Intelli-heart) exposing these misrepresentations. (See Exhibit 26, attached and marked )

82. In one of the forwarded email, Weisburg admitted to knowing of Walker weeks earlier but disavowed that Intelli-heart had a subcontract with Walker.

83. Weisburg omitting knowing that Walker was a subcontractor of Winters -- a fact in emails forwarded to him several times over the past few months (See e.g. Exhibit 12, a Jan. 31, 2018 email clearly denoting Walker was a "2nd tier subcontractor...under Winters" ); a fact that made Walker a subcontractor of Intelli-heart by definition FAR 44.101.

84. Weisburg also told Mr. Cochran to ignore Walker in violation of the right of subcontractors to communicate with Contracting officers.

85. Relying upon these misrepresentations of the prime contractor (Intelli-heart) Kevin Cochran of the VA, did not get Winters and Walker paid.

86. Instead, the VA seemingly is still paying its subcontractors (Winters and Walker) under award VA24918C10329 because the VA has not, to date, notified Walker that it is effectuating subcontractor payments.

87. On March 16, 2018, Walker informed Bond, Lapp, and Jorgensen-Hilestad, by email, that their prime contractor was violating the FCA because its statements were legally false on March 16, 2018 (See Exhibit 27, attached and marked)

**VA CONTRACT PAYMENTS AFTER FALSE STATEMENTS BY DEFENDANTS AND RESULTANT ACTIONABLE CONDUCT BY DEFENDANTS**

88. James Winters, who spoke with Vanessa Parsons and/or Danny Weisberg on, at least, a monthly basis since 2014 indicated to Walker in July 2017 that he had first-hand knowledge that Vanessa Parsons or Hillary Peckos would submit the certified invoices for payment under past

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 14 of 153

and present VA Contracts.

89. Intelli-heart would submit those invoices for payment online through a third-party website provided by the Tungsten Network, which is set up for submission of VA billings of various contracted services and products provided to the VA by federal contractors.

90. Since Intelli-heart is a small business, it was required to get accelerated payments and make sure Winters received an accelerated payment from them.

91. Since Walker is a small business, Walker was supposed to receive an accelerated payment from Winters.

92. Intelli-heart did not honor its obligations to provide accelerated payments to Winters and, thus, caused multiple payments to Walker to be made late over the past 3 years and still to this date.

93. Intelli-heart promised payment to Winters in January 2018 (due for VA Contract) but claimed they were using the money for an attorney who called Winters in February 2018, urging Walker and Winters to sign and give up rights to correspond with the VA regarding Intelli-heart's late payments. Winter's email was forwarded to the VA's Cochran, who asked Weisburg about it. (See Exhibit 26 )

94. Intelli-heart, apparently, did not stop invoicing and submitting claims for the VA to pay them. [Walker, however, is not privy to the billing frequency of Intelli-heart on the VA Contracts]

95. Since Winters hasn't been getting paid by Intelli-heart , Winters stopped paying Walker.

96. According to the VA contracts' values and the percentages due Walker (from Winters that is being held up by Intelli-heart), Walker is owed $154,916[13]

96. Intelli-heart, however, is still (apparently) certifying compliance with the terms[14] of their contract each time they invoice for services provided under the VA Contracts.

97. Intelli-hearts' actions constitute fraud, inducements of breaches of contract, conspiracy, and retaliation.

98. Each one of representations made to Federal Contracting Officers by the representatives of Intelli-heart were false or false by omission.

99. Intelli-hearts misrepresentations (and omissions) had a natural tendency to convince the VA

---

13. $159526.25 (5% of the value of the "VA contracts" at issue -- see footnotes 3-6) - $4610.25 (amount already paid to Walker on those "VA contracts")

14. FAR part 52.232-40 is included in all of Intelli-heart's contracts and mandates accelerated payments to subcontractors.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 15 of 153

officials to continue paying Intelli-heart.

100. Intelli-heart knowingly withheld information about its noncompliance with material contractual requirements of the VA Contracts under FAR part 52.232-40; its failure to pay subcontractors Winters and Walker on an accelerated basis or, lately, at all.

101. Intelli-heart's claims that it made all payments on time to subcontractors Walker and Winters were factually and legally false.

102. Intelli-heart's claims that Walker and Winters were not (and are not) subcontractors is factually and legally false.

103. Weisburg , President of Intelli-heart, and whoever else from Intelli-heart made these statements knew these statements to be false since they were explained, by email, that Walker was legally a subcontractor by definition by Walker, with legal references, prior to making these false statements to the Contracting Officers of the VA.

104. Weisburg , President of Intelli-heart, and others from Intelli-heart made these statements about Winters knew these statements to be false since Winters prepared their bids, signed a lot of their VA Contract awards, and had a contract with Intelli-heart concerning such -- prior to Intelli-heart making these false statements to the VA.

105. The head of Intelli-heart, Vanessa Parsons, who Winters told Walker was a lawyer in 2014, should know better.

106. Intelli-heart failed to disclose that they were not in compliance with payment of subcontractors and sought payments anyway under the VA Contracts, and contracts that they have had with the VA since 2014.

107. The government might not have paid any further claims (or invoices) absent defendant's false statements as to Winters and Walker's subcontractor status, that it has always made timely payments made to subcontractors Winters and Walker, or false statements that they are in compliance with the term of their contract; 52.232-40 (accelerated payments to subcontractors).

108. Each of Intelli-heart's representations (and omissions) had a natural tendency to influence the contracting officers and the VA to keep paying their claims (or invoices).

109. Intelli-heart has, apparently, made submissions and certifications for payment to the VA since making false statements to the VA.

110. Had Intelli-heart not made false representations (or omissions) about its compliance with making subcontractor payments, it may have had its payments from the VA (pursuant to the VA

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 16 of 153

Contracts) discontinued.

111. Intelli-heart's false statements and course of conduct caused the government to pay out money, even though it was not paying its subcontractors (including James Winters, who, in turn, was to pay Walker)

112. In February 2018, after Walker made a legally permissible complaint of non-payment, Intelli-heart claimed it terminated Winter's subcontract to avoid making payments thereunder.

113. No non- pretextual termination reason existed to terminate subcontractor Winters' contract and withhold payment for the VA Contracts.

114. Even assuming there was, no proper cure notice was provided to Winters for such.

115. The scheme concocted by Defendants also included trying to force Winters and Walker sign a contract under economic duress (in February 2018) while Defendants were withholding payment in an attempt to defraud Walker and Winters of legal protections ensured for subcontractors under Federal law.

116. Defendants' conduct was malicious, willful, and with a reckless disregard of the rights of Walker and caused him and his family tremendous stress and anxiety over the past year, including, but not limited to, interrupted sleep patterns, aggravation, and an absence of enjoyment of life.

**COUNT IV - under NEVADA LAW**

**Intentional interference with contractual relationship (Tortious Interference)**

117. Paragraphs 1 through 116 of this Complaint are incorporated in this Count by reference as if fully set forth herein.

118. Defendants intentionally interfered with the contractual relationship of Walker and Winters in that there was; i) A valid and existing contract between the Walker and Winters; ii) Defendants had knowledge of Walker and Winter's contract or had reason to know of its existence; iii) Defendants committed intentional acts intended or designed to disrupt the contractual relationship or to cause the contracting party Winters to breach the contract; iv) Defendants actually disrupted of the contract; iv) the breaches were caused by Defendants' wrongful and unjustified conduct; vi) Walker has financial losses stemming from the breaches of contract.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 17 of 153

**OTHER FACTS AND CLAIMS**

119. After one of the many times Walker received a late payment as a second-tier subcontractor (in Jan. 2018), he complained to the VA, as was his right as a federal subcontractor (EFC 4, para 22-30) under FAR 52.232-40 on about Feb. 6, 2018. [Note: Walker was a "consultant" of "another subcontractor" (Winters) and was, thus, a "subcontractor" FAR part 52.203-19(a)]

120. When responding to the VA Contracting Officers about the matter, Defendant made misrepresentations stating they did not know who Walker was and that he had no affiliation at all with Intelli-heart (disregarding Walker's 2nd tier contracting status of which they were made known) (EFC 4, para. 54-87).

121. To cover their tracks (and avoid their payment obligations), Defendant had a lawyer-friend Daniel Germain (they called "pal" ; See IHS-00161 in ECF 57-3 )(listed as working for the firm Rosman & Germain LLP 16311 Ventura Boulevard Suite 1200 Encino, CA 91436-2152 (IHS-00160 in 57-3)) to do their dirty work (IHS 0089, IHS-00144, IHS-00147, IHS-00159-IHS-00161 in 57-3). Daniel Germain made false representations (that Walker had no affiliation whatsoever with Intelli-heart) to the VA via email.

122. Defendant, Vanessa Parsons, Danny Weisburg, and Daniel Germain knew Walker was Winter's subcontractor before terminating Winter's contract, as even noted in the Feb. 8, 2018 termination letter sent to Winters(IHS-00176 in 57-3) , especially since two were lawyers.

123. Defendant, Vanessa Parsons, Danny Weisburg, and Daniel Germain knew Winters (with whom Walker was a subcontractor) had the right to freely subcontract, especially since Winter's distributor agreement had no anti-assignment clause AND Weisburg and Parsons are lawyers.

124. Defendant terminated Winters' Distributor agreement on Feb. 8, 2018 for fraudulent and illegal reasons. (IHS-00176 in 57-3) None of the alleged contractual deficiencies alleged of Winters have shown up in any other, prior, contemporaneous documents produced by Defendant.

125. Nor has Defendant produced any cure notices (or "30 day" notices as dictated by Winter's agreement with Defendant) (EFC 4, Ex. 2, unsigned copy)

126. Defendant, Vanessa Parsons, Danny Weisburg, and Daniel Germain, after Winter's contract termination came up with a scheme to make Winters disavow his contract with Walker so they

could submit this to the VA and other federal authorities to cover up their fraud in representing that Walker was not a subcontractor.

127. The pretext is clear behind Daniel Germain's involvement in Winter's termination, being as how Defendant produced no litigation hold. Defendant's fraud is glaringly obvious in the Temporal proximity between the Feb. 8, 2018 termination of Winter's distributor agreement AND

Walker's Feb. 6, 2018 assertion of non-payment made under FAR part 52.232-40. [Note: Defendant scrambles to have employees find Winter's distributor agreement a mere day before it was terminated, took it home to concoct false termination reasons for Winter's agreement (IHS-00139 in EFC 57-3), when none existed.]

128. If contractual deficiencies were an issue, Defendant would have been examining the contract and letting Winters know of deficiencies prior to its unilateral termination (at least 30 days prior).

129. The termination on Feb. 8, 2018 (IHS-00176 in EFC 57-3) was a ruse and an illegal scheme of the Defendant, Vanessa Parsons, Danny Weisburg, and Daniel Germain, and their lawyer-pal to tell false statements about Winters and Walker's contract to the VA officials and to try to use economic duress to coerce Winters into denying his contract with Walker.

130. A few months after the Feb. 8, 2018 breach of Winters distributor contract (See Exhibit 2, unsigned version) by Defendant Intelli-heart Services, this is when the Defendants combined in their scheme and had Andrew Simonion send Winters an email, requiring Winters to disavow his contracting relationship with Walker and make false representations to support Intelli-heart in its fraudulent statements to the VA surrounding Winters Distributor Agreement termination (See Exhibit 2, unsigned version).

131. Also, it has been learned that Defendant was getting paid monthly for most of 2016-2017 from the VA Contracts before the Contract termination of Winters, while only allowing Winters and Plaintiff payments only every 2-4 months. Yet, Winters was supposed to be paid monthly by Defendant. Then, Winters was to pay Walker (within 10 days).

132. Defendant did not observe any of the federal rights of subcontractors Winters and Walker.

133. Vanessa Parsons was operating her business without regard to any sound principles (financial or ethics) OR policies (especially as it concerns federal subcontractors Winters and Walker), as indicated by Defendant's discovery responses in this matter.

134. Defendant company (Intelli-heart Services Inc.) was basically Vanessa Parson's alter ego as she does what she wants with the company at her whim, without any adherence to federal subcontractor rights or any fixed internal policies or procedures. Intelli-heart Services Inc had no set training policies for Winters, no termination policies for Winters, no set payment policies for Winters, and did not even observe the contractual rights of Winters to subcontract (or of any of the Federal subcontracting rights mentioned above). Defendant company (Intelli-heart Services Inc.), at the direction of Vanessa Parsons, even conducted an investigation of Winters without any internal corporate policy or reason to do so – just because Winters effectuated a right to subcontract.

135. Defendants declared that Winters had no right to subcontract (without ANY anti-assignment clause appearing in their contract with Winters, forbidding such) and subjected Winters to an illegal confidentiality agreement which forbid him from sharing his own contract or earnings, even to federal officials.

136. Defendant Intelli-heart Services Inc. declared itself above the law in sanctioning Winter's and Walker's federal protections for reporting of Defendant's abuse of Authority. Also, upon breaching (or they say "terminating") Winters agreement, Defendant Intell-heart Services Inc, in a fit of tyrannically lawlessness, Defendant declared itself above the law in dictating that Winters could not communicate with their "customers"; the federal government -- the VA. The epitome of lawlessness was when Defendant used the assertion of Walker and Winter's federal and state rights to contract (and invocation of rights under FAR part 52.232-40 and FAR part 52.203-19) as a basis to terminate Winter's contract, depriving both Walker and Winters of any monetary downflow from the VA, thereafter. (See IHS-00176 in EFC 57-3).

137. Next, after withholding Winters and Walker's money for months in mid-2018, all of the Defendants tried using economic duress and coercion to get Winters to disavow his contracting relationship with Walker in writing -- so that they could present this to the VA (See IHS-0095 in EFC 57-3) to cover up their illegal, unlawful, and fraudulent activities.

138. Intelli-heart Services Inc. had to shut down operations for weeks to account for its financial activities after being reported for non-payment of subcontractors. (See IHS-0095 in EFC 57-3)

**COUNT V**

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 20 of 153

**Intentional interference with contractual relationship (Tortious Interference) -- Danny Weisburg in his personal capacity - NEVADA LAW**

139. Paragraphs 1 through 138 of this Complaint are incorporated in this Count by reference as if fully set forth herein.

140. Defendant Danny Weisburg intentionally interfered with the contractual relationship of Walker and Winters in that there was; i) A valid and existing contract between the Walker and Winters; ii) Danny Weisburg had knowledge of Walker and Winter's contract or had reason to know of its existence; iii) Danny Weisburg committed intentional acts intended or designed to disrupt the contractual relationship or to cause the contracting party Winters to breach the contract; iv) Danny Weisburg actually disrupted of the contract; iv) the breaches were caused by Danny Weisburg's wrongful and unjustified conduct; vi) Walker has financial losses stemming from the breaches of contract.

**COUNT VI**

**Alter ego of Intelli-heart Services Inc --VANESSA PARSONS in her personal capacity**

141. Paragraphs 1 through 140 of this Complaint are incorporated in this Count by reference as if fully set forth herein.

142. There is unity of interest and ownership that the separate personalities of the corporation and the individuals no longer exist such that the corporate fiction of Intelli-heart Services Inc cannot be held to maintain a separate entity status: (i ) There is an apparent commingling of funds between Vanessa Parsons and Intelli-heart Services Inc; (ii) Intelli-heart Services Inc. is undercapitalized such that it cannot pay its subcontractors on time and/or is financially insolvent and/or is comingling funds with Vanessa Parsons; (iii) Intelli-heart Services Inc. has engaged in an unauthorized diversion of funds that should have been set aside for its subcontractors; (iv) Vanessa Parsons treats of corporate assets of Intelli-heart Services Inc. as the individual's own; (v) Intelli-heart Services Inc. failed to observe corporate formalities and has used the corporation to commit fraud (v) Intelli-heart Services Inc. has no structured accounting system in place.

143. The adherence to the corporate fiction of a separate entity (Intelli-heart Services Inc.) would,

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 21 of 153

under the circumstances, sanction fraud or promote injustice.

**COUNT VII**

**Aiding and Abetting Intentional interference with contractual relationship (Tortious Interference) - Daniel Germain in his personal capacity - NEVADA LAW**

144. Paragraphs 1 through 142 of this Complaint are incorporated in this Count by reference as if fully set forth herein.

145. i) Defendant Intelli-heart Services Inc, Danny Weisburg, and/or Vanessa Parsons committed tortious interference with Walker's contract and contractual rights ii) Daniel Germain was aware of its role in promoting this tort at the time he provided assistance, and (iii) Daniel Germain knowingly and substantially assisted or encouraged the other Defendant(s) in committing the conduct

**COUNT VIII**

**QUANTUM MERUIT (UNJUST ENRICHMENT) - NEVADA LAW**

146. Paragraphs 1 through 145 of this Complaint are incorporated in this Count by reference as if fully set forth herein.

147. i) Defendants Intelli-heart Services Inc and/or Vanessa Parsons received the benefits of VA CONTRACTS due to the work of PLAINTIFF, ii) Defendants Intell-heart Services Inc and/or Vanessa Parsons appreciated such benefit, and iii) Defendants Intelli-heart Services and/or Vanessa Parsons accepted and retained such benefit.

**PRAYER**

For the reasons set forth above, Walker, respectfully requests this Court to find that Defendants have damaged Walker as a result of its conduct described above. Walker prays that judgment enter against Defendants for all applicable damages, including but not limited to the following:

a. Actual damages in an amount sufficient to cover the payments not made by Defendants,

b. civil Penalties,

c. Punitive damages,

d. Compensatory damages, including emotional distress, loss of enjoyment of life, professional standing, etc.

e. Expectancy damages,

f. Pre-judgment and post judgment interest,

g. All other relief on behalf of the Walker to which they may be entitled at law or equity.

The undersigned certifies that the foregoing facts are true and correct as I believe under the penalty of perjury in the United States on this Feb. 22, 2019.

/s/ TERRANCE WALKER

Signed, Terrance Walker

WHEREFORE, Walker requests a jury trial and a judgment awarding Walker damages and other monies due him in accordance with applicable law, plus interest, costs and other such relief as the Court may deem appropriate.

Dated: Feb. 22, 2019

Respectfully submitted,

/s/ TERRANCE WALKER

RESPECTFULLY SUBMITTED,

/s/ Terrance Walker

Terrance Walker Dated Feb.22, 2019

CERTIFICATE OF SERVICE

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 23 of 153

The undersigned certifies that the undersigned is over the age of 18 and that on Feb 20, 2019, that he personally served all parties to this case by the electronic filing system one copy of this filing to the parties at the address listed below.

/s/ TERRANCE WALKER

signed, Terrance Walker/s/ TERRANCE WALKER

Copy to: Will Geddes, Esq. THE GEDDES LAW FIRM, P.C. 8600 Technology Way, Suite 107 Reno, Nevada 89521

Phone: (775) 853-9455 Fax: (775) 853-6899 E-Mail: Will@TheGeddesLawFirm.com

**EXHIBIT 1**

James Winter's contract with Walker

**EXHIBIT 1**

**EXHIBIT 1**

# WALKER DEVELOPMENT & TRADING GROUP

**561 Keystone #158 □ Reno, NV 89503**
**Phone: 775-971-8679 Fax: 270-513-8566**
**www.walkertrade.com**

## CONSULTING, CONFIDENTIALITY, NON-CIRCUMVENT AGREEMENT

THIS CONSULTING AGREEMENT is executed this 15th day of October 2014, by and between James Winters (hereinafter the "Consultee") and Terrance Walker of Walker Development & Trading Group of Reno NV and Terrance Walker for Governmental Contract Consulting in regards to selling medical supplies and services to governmental entities.

(Hereafter, both individuals above are referred to as the "Parties" or, individually, "Party").

**Services:** Services provided by Walker Development & Trading Group are provided as followed:

**Government marketing plan development** - We'll work with you to plan an integrated governmental marketing strategy, from the identification of solicitations to detailed and (realistic) competitive price points, and address issues such as competition, market conditions, and procedures to secure contract awards.

**Consulting** - We will explain the various issues necessary to conduct your bid, such as the details necessary to effectuate the bid, getting registered, sales contracts (though we defer technical legalities to legal counsel), transactions, and any other issues which may affect it.

**Government liaison** - On a "with" or "on-behalf-of" basis, we will help you stay in touch with key government departments, as deemed necessary, and make sure key people in government stay in touch with you when it concerns an issue involving your bid, as well as to secure payment.

**Terms:** The terms of the contract are as follows:

**Contract Length-** For the above services, the contract time will last 5 years (1825 days) from this date.

**Compensation** - For his work, Terrance Walker will be compensated by the Consultee, listed above, a total of 50% of his compensation from the end supplier of medical services/supplies (whose bid we are securing). Said compensation will be payable to Terrance Walker within ten(10) days of the receipt of each Consultee's payment from the end medical supplier. All payments shall be made via bank wire to Terrance Walker at his Bank of America bank account (submitted in separate attachment ) or via check to the address listed above, unless banking or address information is given with prior notice via email/mail to the other party.

**Renewal & Termination** Said 5 year period will automatically renew upon completion of a winning bid to a governmental entity in said time-frame. Thereafter, a termination of the contract can be secured by either party delivering notice to the other, via certified mail, within 30 days of the expiration date. Otherwise, another 5 year period will automatically be renewed, again, upon completion of a winning bid to a governmental entity in said time-frame. Termination provisions will, likewise, apply thereafter again.

Initials: Terrance Walker TW Initials: James Winters JW

CONFIDENTIALITY AND NON-CIRCUMVENT AGREEMENT

THIS CONFIDENTIALTY AND NON-CIRCUMVENT AGREEMENT is executed this 15th day of October 2014, by and between Terrance Walker of Walker Development & Trading Group of Reno NV and James Winters for consulting on Governmental Contract Consulting on selling medical services and supplies.

WHEREAS, the Parties are contemplating certain business arrangements surrounding the sale of medical services and supplies to government entities; and

WHEREAS, JAMES WINTERS is an authorized seller of medical services and supplies for end suppliers and TERRANCE WALKER is a Government bidding consultant and each party desires to receive from the Each Other Confidential Information such as trade secrets, supplier sources, buyer sources, and industry knowledge.

NOW, THEREFORE, in consideration of the promises and covenants herein and any other good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged, the Parties mutually agree as follows:

1. Each party shall not give any of its employees or associates access to, or allow any of its employees or associates to receive, any Confidential Information unless such access or receipt is necessary for the evaluation or implementation by such party of the business arrangements being contemplated by the Parties to this Confidentiality Agreement, and such employees or associates are bound by all provisions of this Agreement.

2. Each party shall not record, reproduce or otherwise copy any Confidential Information without the Each Other's prior written consent. Upon the request of either party, the other shall immediately return to the requesting party all Confidential Information and all other notes, writings, recordings and documents which embody or relate to any Confidential Information.

3. Both Parties agree that, should third parties request either party to submit Proprietary Information to them pursuant (the "Recipient Party"), they will promptly notify the Other Party (the "Non-Recipient Party") upon receipt of such receipt. ~~If the Non-Recipient Party timely objects to the release of the Proprietary Information, the Recipient Party will permit counsel chosen by the Non-Recipient Party and acceptable to the Recipient Party to represent the Recipient Party will pay the Recipient Party in order to resist release of the Proprietary Information. The Non-Recipient Party will pay the Recipient Party for any reasonable expenses incurred by the Recipient Party, including all related attorney fees and expenses in connection with resisting the release of the Proprietary Information.~~

TW 10-15-14

JL 10-22-14

4. Each party's obligations under this Confidentiality Agreement with respect to any Proprietary Information shall continue until and unless such item becomes part of the public domain through no act or omission of the party receiving Confidential Information.

Initials: Terrance Walker TW Initials: James Winters JL

5. Without prejudice to any rights and remedies otherwise available to either party, either party shall be entitled to equitable relief by way of injunction if the other party breaches any provision of this Agreement. No failure or delay by the breached party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

6. The rights and obligations under this Agreement shall inure to, and be binding upon, the heirs, successors and assigns of each company, its affiliates, and subsidiaries; provided, however, that this Agreement shall not be assigned, whether wholly or in part, by either party without the prior written consent of the other party.

7. This Agreement may not be waived, superseded, amended or modified except by written agreement of the Parties hereto.

8. The Parties hereto warrant that they have the full power and authority to enter into and perform this Agreement and that the person signing this Agreement on behalf of each party has been properly authorized and empowered to enter into this Agreement.

9. This Agreement and all questions relating to its validity, interpretation, performance and enforcement shall be governed by and construed in accordance with the laws of the State of Nevada, other than conflicting choice of law provisions and without the aid of any canon, custom or rule requiring construction against the drafting party.

10. It is likewise agreed that Terrance Walker will not release James Winters' supplier information to any other party except for work in securing bids under this contract. James Winters will not release any buyer information to the end supplier without adhering to compensation terms set forth above. Each party also agrees not to circumvent each other (by consulting with each other's supplier or buyer connections) directly or indirectly for a period of 5 years from the date of signing this agreement. These terms and the 5 year terms and renewals, above, will also apply if Terrance Walker introduces the Consultee with a new governmental buyer OR if JAMES WINTERS introduces Terrance Walker to a new medical supplier.

Initials: Terrance Walker_______ Initials: James Winters_______

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 28 of 153

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date and year above.

State of Nevada
County of Washoe

This instrument was acknowledged before me on 10-22-14 by Terrance Walker
On this 22ND day of OCTOBER, 2014

(Seal) [signature]
Signature, Notary

NOTARY PUBLIC
STATE OF NEVADA
County of Washoe
PAUL M. HULETT
No: 05-96485-2
My Appointment Expires May 4, 2017

Terrance Walker DBA Walker Development & Trading Group (Consultant)
**561 Keystone #158 Reno, NV 89503 Phone: 775-971-8679**
By: Terrance Walker
Signed: [signature]

STATE OF IOWA

COUNTY OF POLK

On this 15th day of October, 2014, before me, a Notary Public, personally appeared James Ryan Winters, to me known to be the person named in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their voluntary act and deed.

[signature] Print Name: Suada Zulic

Notary Public (Seal)

SUADA ZULIC
Commission Number 750649
My Commission Expires
January 9, 2017

By: James Winters
(Consultee)
Signed: [signature]

Address: 1710 NW Pine Rd City: Ankeny State: IA Zip: 50023

Phone: 515-681-4149

Initials: Terrance Walker TW Initials: James Winters JW

**EXHIBIT 2**

James Winter's copy of contract with Intelli-heart Services Inc. provided to Walker

**EXHIBIT 2**

**EXHIBIT 2**

# Intelli-Heart Services Distributor Agreement:

This Independent Distributor Agreement ("Agreement") is made effective as of ___________, 20____ (the "Effective Date"),

**BETWEEN:** **James Winters**
(the "Distributor"),
an individual with his main address at:

**1710 NW Pine Rd**
**Ankeny, IA 50023**

**AND:** **Intelli-Heart Services, Inc** (the "IHS"), a corporation organized and existing under the laws of California with its head office located at:

10850 Wilshire Blvd., Ste 740
Los Angeles, Ca 90024

**RECITALS**

A. IHS is engaged in the business of outpatient Cardiac Monitoring.

B. Distributor is willing to be an independent Distributor for IHS, on the terms, covenants, and conditions set forth in this Agreement.

In consideration of the matters described above, and of the mutual benefits and obligations set forth in this Agreement, the parties agree as follows:

**INDEPENDENT DISTRIBUTOR**

A. IHS grants to Distributor the right as a regional sales Distributor to market and support IHS Services as outlined in this Agreement, and Distributor accepts and agrees to such engagement subject to the terms of this Agreement.

B. Distributor shall perform such other duties as are customarily performed by one holding such position in other, same, or similar businesses or enterprises as that engaged in by IHS, and shall also additionally render such other and unrelated services and duties as may be assigned to him/her from time to time by IHS.

**DEFINITIONS**

IHS Services shall collectively mean all Intelli-Heart Services, Inc.'s rights for IHS Holter Services ("Holter"), IHS Cardiac Event Services ("Cardiac Event") and IHS Real-time Outpatient Cardiac Telemetry Services (ROCT).

Software shall mean all the software products IHS has rights to market within the United States of America in object code or machine-readable or interpreted form and such other software as made available from time to time to Distributor customers.

Products shall collectively mean the FDA 510(k) approved DM Software Holter Digital Recorders including the Holter DMS 300-3a, combo Holter/Cardiac Event DMS 300-2 recorder, and combo Holter/ Cardiac Event/ Outpatient Telemetry DMS 300-2Wifi Recorder, and/or DMS CardioScan/ CardioVision Premier Software Kits, which IHS makes available to Distributor's customers. Products shall also include any IHS provided Computers, Printers, and Related Materials.

Related Materials shall mean all material other than the Software furnished by IH Services in conjunction with such Software and this Agreement and including, but not limited to, operating instructions, input information, or format specifications, instructional and other documentation including all guides, power point presentations, and manuals.

Proprietary Information shall mean any material, including corrections, modifications, revisions and copies thereof, containing information which is the property of and is confidential to IHS and/or its licensors and is designated as proprietary or confidential.

IHS Marketing Materials shall collectively mean all marketing materials and associated materials in marketing the IHS Services.

IHS Trademarks shall mean the trademarks, trade names and service marks of IHS which IHS may use for time to time to identify its products, services and/or businesses.

Customers shall mean all customers, including, but not limited to, physicians, hospitals, medical groups, clinics, and the like, that are referred to IHS by Distributor.

IHS Customer List shall mean all information or documentation describing IHS or Distributor customers including, but not limited to, physicians, hospitals, medical groups, clinics, and the like, that are referred to IHS by the Distributor.

Maintaining Distributor Customers shall mean Distributor providing reasonable after sale customer support in order to maintain customers using IHS Services and all monitor in-services (i.e. customer support for patients' use of monitors) as outlined in this Agreement. Per commercial reasonableness, accounts shall require Distributors to perform ongoing maintenance for so long as the facility uses IHS services.

**TERMS OF AGREEMENT**

**I. Distributor Fees:** Distributor fees shall be determined by each patient monitor in-service pursuant to Attachment "A". Fees shall be calculated at the time the monitor in-service is completed and billed by IHS, excluding all non-billable services (Medicaids, No Charges, Blanks, etc). Distributor shall be paid monthly for each previous month's total calculations. Fees are congruent with the amount of time Distributor shall need to put into securing, maintaining an account and monitor in-services.

1. **Maintain Accounts:** To qualify for Fees, Distributor must maintain his/her accounts. To maintain Customers, Distributor must provide reasonable and ongoing after sale customer support in order to maintain customers using IH Services. Reasonable after sale customer support shall include, but is not limited to, assisting with the installation of new software and software updates, training of new product usage, periodic office visits including visiting each account on a monthly basis, and availability to assist IH with various issues such as subsequent equipment placement and retrieval, general consistent knowledge of account viability and contentment with IHS services, and customer services. As the number of accounts, the size of an account, and actual monitor in-services increase, Distributor's duties to maintain will increase as well.

2. **Activity:** Activity accounted for in any given month is defined as the aggregate of patient monitor in-services that have completed and billed out for in any month period. Thus activity will not be based on the date the monitor in-service was performed, but actually the date it was billed out for, typically within one to five days of in-service completion. However, facilities that are slow to close out a monitor in-service or get billing information to IHS may delay this process. Although IHS does everything it can to increase efficiency with the facilities, upon notice in writing to the Distributor via email, it is the Distributor's responsibility to help get requested missing information IHS needs to conclude monitor in-services and get them billed out.

3. **National VA Sales Manager**: In addition to maintaining local account, Distributor shall receive exclusive rights as National VA Sales Manager. To qualify for fees described in Attachment A, Distributor shall:

   a. Track all applicable VA solicitations nationwide and provide notification to Intelli-Heart Services when new opportunities arise.
   b. Assist in the processing and submission of all VA bids, contracts, and addendum to ensure that submissions are timely and without error.
   c. Subsequent to award of contracts, coordinate with all necessary parties (ie. Intelli-Heart, Contracting Officer, and Site Officer, Billing Manager, etc) to facilitate seamless contract initiation, in-service training, and verification of urgent notification criteria and protocols.
   d. Provide, coordinate or facilitate the provision of onsite in-service training and necessary and/or requested periodic site visits. However, site visitation and account maintenance shall ultimately be the responsibility of the local IHS Distributor and IHS.

**II. Additional Allowances and Bonus Payments:**

1. **Monthly Expense Reimbursement:**
    i. Distributor shall not make any monetary payments to any physician, facility or any entity associated with the physician as this would be a violation of the federal Stark rules. Thus, although IHS will allow lunches, dinners, or other food gifts, along with coffee mugs and other small items are commonly provided to referring physicians, Distributor agrees that such expenses for a facility shall not exceed $392.00 per physician per the 2015 calendar year. For each following year, Distributor agrees that such expenses for a facility shall not exceed the CPI-U updates for any given year. Distributor also agrees that any expenses for medical staff members shall be less than $33.00 per occurrence per the 2015 calendar year, and not to exceed the CPI-U update for any given year thereafter.
    ii. On a monthly basis, Distributor must provide IHS with a detailed accounting of all reimbursable expenditures including receipts. Expenditures in the aggregate in excess of $100 per month require prior written approval via email.

2. Distributor's shall receive Intelli-Heart business cards within 30 days of request.

3. **Referrals**: Distributors who refer a new Referred Distributor to Intelli-Heart Services will qualify for a finder's fee of 10% of Referred Distributors monthly compensation payments for up to 12 months from the date such Referred Distributor signs a contract to do business with IHS. Thus, if Referred Distributor receives a monthly compensation check for a total of $2,500.00, Distributor that referred the Referred Distributor shall receive a $250 finder's fee that month. If the next month Referred Distributor receives a monthly compensation check for $5,000.00, Distributor finder's fee is $500.00, and so on for the first 12 months.

4. **Bonuses**: Bonuses may be provided to outstanding Distributors from time to time for their work excellence. IHS will send written notices when Bonuses are available and the details on how to qualify.

**III. Other Distributor Requirements and Responsibilities:**

1. Payments to Distributor shall be made by IHS within thirty (30) days after the closing of the previous month.

2. While this Agreement is in effect, Distributor and its owners shall not distribute to, distribute for, sell to, sell for, promote, represent or disseminate information to any direct competitor of Holter, Cardiac Event and/or CARDIAC AMBULATORY TELEMETRY service of the IHS Services.

3. Distributor further agrees that Distributor will not, directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, person, or other entity producing, designing, providing, soliciting orders for, selling, distributing, or marketing, products, goods, equipment or services that directly or indirectly compete with the IHS's products, services or business including with respect to Holter Service, Cardiac Event and/or CARDIAC AMBULATORY TELEMETRY service.

4. For local area sales and services, Distributor shall maintain adequate service representation to provide after sale service to the purchasers/users of the products/service sold, at no cost to the customer. Distributor shall be responsible for installation of equipment and software, in-service instructions for setting up IHS Service's equipment and training personnel of new customers in using the IHS Services, at no cost to the customer. Distributor shall also provide reasonable ongoing after sale customer support in order to maintain customers using the IHS Services. Ongoing customer support will include frequent customer care calls, additional on-site training or services if requested to do so, and other support services that the customers or IHS may require or request.

5. As National VA Sales Manager, shall perform all duties outlined in Section I(3) above.

6. Distributor shall use best efforts in referring all sales prospects and orders for the IHS Services it receives that are outside Distributor's area to IHS.

7. Distributor shall take all reasonable steps to protect the trademarks, patents, copyrights and other intellectual property rights of IHS.

8. IHS's competitive success depends upon the proper safeguarding of trade secrets and confidential information developed within IHS or entrusted to by its customers. Some of the information Distributor's receive also may involve the privacy interests of individuals and must be safeguarded for that reason as well. Distributor promises to preserve the confidentiality of IHS's trade secrets and commercially useful confidential information learned through Distributor at IHS and to use all such information only as necessary and appropriate for IHS's legitimate business purposes. Distributor also promises to safeguard against disclosure without the consent of affected persons all information touching on the privacy interests of employees of IHS or customers or employees of customers. Such trade secrets, commercially useful confidential information, proprietary and/or private information include without limitation (1) information about IHS's marketing strategies, (2) financial information about IHS, its shareholders, customers, or prospective customers, (3) the identity of IHS's customers and/or contact persons at such customers or prospective customers, (4) communications between IHS and any customers or potential customers, (5) the contents of IHS's business plans, its products or its proposals to present to potential customers, (6) the names, locations, practices or requirements of any vendors, suppliers,

personnel or any other persons having a business relationship with IHS, (7) any confidential or secret development or research work of IHS, including information concerning any future or proposed services or products, (8) all of IHS's accountings, costs, revenue and other financial records and documents, as well as the contents thereof, (9) IHS's documents, contracts, agreements, correspondence and all other similar business records, and (10) any other confidential or secret aspect of the business of IHS, or its subsidiaries, affiliates or divisions.

9. Distributor further agrees that upon the termination of this Agreement with IHS, Distributor will immediately return to IHS all documents and property of IHS, including but not limited to files, correspondence, photographs, video recordings, samples, reports, manuals, customer lists, computer programs, cell phones, computers, and all other materials and copies thereof relating in any way to IHS's business or in any way obtained by you during the course of your business relationship with IHS. Distributor further agrees that Distributor will not retain copies, notes or abstracts of any of the above.

10. **Distributor agrees he/she is aware that it is illegal to offer any inducements to physicians, medical groups, or their agents in the form of cash, gifts and/or like manner to perform any medical tests on patients for which payment will be made by Medicare, Medicaid, TRICARE, Champus, or any other federally funded health care program. Distributor hereby verifies to never make such inducement to a physician or medical group for any reason and that such an inducement shall result in immediate notification by IHS to the Office of Inspector General and may result in fines and imprisonment. PLEASE INITIAL HERE:(______)**

11. **Distributor's Marketing Practices.** Distributor will:

    i. conduct business in a manner that reflects favorably at all times on IHS Products and Services and the good name, goodwill and reputation of IHS;

    ii. make no false or misleading representations with regard to IHS Services or IHS Products;

    iii. not publish or cooperate in the publication or utilization of any misleading or deceptive advertising material;

    iv. make no representations, warranties, or guarantees to anyone with respect to the specifications, features or capabilities of IHS or IHS Products that are inconsistent with the warranties made by IHS; and

    v. not engage in illegal or deceptive trade practices.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 36 of 153

12. Distributor shall not market IHS Services directly to individual prospective patients including, without limitation, the use of any advertising, telemarketing, or direct mail programs directed at individual patients.

13. Upon a customer's termination of the IHS Services, Distributor agrees that it is the Distributor's responsibility to make a best efforts attempt to collect all equipment placed in such office and return such equipment to IHS within 30 days.

14. **Distributor's Inability to Contract for IHS:** In spite of anything contained in this Agreement to the contrary, Distributor shall not have the right to make any contracts or commitments for or on behalf of IHS without first obtaining the express written consent of IHS.

15. Distributor represents that in accepting this offer of this Agreement with IHS, Distributor will not be breaching any agreement with employer (past or present) or third party, and that in the performance of Distributor's duties for IHS, Distributor will not use or disclose to IHS any proprietary, trade secret or confidential information that Distributor is bound not to disclose.

**IV. Distributor Territory: Areas:**

1. Distributor shall have the non-exclusive right to sell the above described IHS Services in the following geographic areas of the United States: The region of Iowa.

2. Distributor shall have the exclusive right as National VA Sales Manager throughout all 50 states of the US. However, Distributor agrees to waive rights to the Oklahoma VA.

3. Minimum Requirements: In order to keep this Agreement in effect, Distributor shall secure one new customer/facility each month per each region Distributor has the right to sell in. IHS recognizes that the start-up of securing business does take some time and thus, the Distributor has a 3 month start-up time after the date this Agreement is signed before this requirement takes effect. In the event a hospital or facility has multiple offices, each office will be recognized separately for purposes of this section. Also, in the event Distributor secures multiple customers/facilities in one month, he/she can credit the additional customers/distributors to the subsequent months.

**V. Termination:**

1. Distributor may terminate this Agreement with or without cause on thirty (30) days written notice to IHS.

2. IHS may terminate this Agreement under the following conditions:

a. Immediately with thirty (30) day notice upon violation of Distributor of CAUSE. CAUSE shall be a violation by Distributor of any portion of Section III of this Agreement. Upon violation of Section III of this Agreement, IHS shall discontinue all compensation payments to Distributor within thirty (30) days notice. However, if this Agreement is terminated upon cause attributed to Distributor's violation of any Federally mandated Stark rules and Anti-kickback statutes outlined in this Agreement, IHS shall discontinue all compensation immediately, as well as IHS shall immediately report to the Office of Inspector General any fraud, abuse, or improper payments between Distributor and the physicians which may induce those physicians to use the IHS services described in this Agreement.

b. In the event that Distributor fails to produce minimum requirements outlined in this Agreement, then the territory granted to Distributor shall be deemed month-to-month and IHS shall have the right to terminate the right to market IHS Services in such territory outlined is this Agreement with thirty (30) days written notice.

c. In the event this Agreement is terminated without CAUSE as outlined in this Agreement, Distributor's compensation described in Attachment A shall continue so long as Distributor maintains his/her accounts in accordance with the terms of this Agreement.

**VI.** **<u>Effect of Partial Invalidity</u>:** The invalidity of any portion of this Agreement will not and shall not be deemed to affect the validity of any other provision. In the event that any provision of this Agreement is held to be invalid, the parties agree that the remaining provisions shall be deemed to be in full force and effect as if they had been executed by both parties subsequent to the expungement of the invalid provision.

**VII.** **<u>Choice of Law</u>:** It is the intention of the parties to this Agreement that this Agreement and the performance under this Agreement, and all suits and special proceedings under this Agreement, be construed in accordance with and under and pursuant to the laws of the State where Distributor primarily performs work under this Agreement.

**VIII.** **<u>No Waiver</u>:** failure of either party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, shall not be construed as thereafter waiving any such terms and conditions, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.

**IX.** **<u>Integrated Agreement</u>:** This Agreement integrates and supersedes all other prior and contemporaneous written and oral agreements and understandings of every character between Distributor and IHS, and comprises the entire agreement between Distributor and IHS. This Agreement may be amended only by a further express written agreement, and cannot be amended by informal discussions or written communications from either of us to the other. No waiver of any rights or obligations under these agreements shall be deemed to have occurred unless in writing signed by

the party against whom such waiver is asserted and no waiver shall be deemed to waiver of any other or subsequent rights or obligations.

**X.** **Arbitration:** Distributor and IHS agree that any controversy or claim arising out of or relating to Distributor's Agreement with IHS, shall be exclusively and finally settled by arbitration in accordance with the Arbitration Rules and Mediation Procedures of the American Arbitration Association (**with no right to a jury trial**), and judgment upon the award rendered by the arbitrator may be rendered in any court having jurisdiction thereof. The arbitration shall be conducted before a single arbitrator. Such arbitrator shall issue a written decision reflecting the arbitrator's essential findings and conclusions upon which the award is based. The arbitrator's fees, and any administrative fees in excess of those that Distributor would have been required to pay if the action were brought in civil court, shall be borne by IHS if the arbitration is conducted under California law, and shall be equally shared between the parties in other states where permitted by law. Except for any sanctions the arbitrator may issue in conjunction with enforcing his/her orders and regulating the proceedings, each party shall bear its own attorney's fees and costs including, without limitation, costs of any experts. In any event, no claim shall be arbitrated that otherwise would be barred by the statute of limitations in a judicial proceeding.

Notwithstanding any other provisions of this Agreement, IHS and Distributor agree that breaches of either Distributor's or IHS's obligations concerning trade secrets and/or confidential information cannot adequately be remedied at law or in arbitration, and either IHS or Distributor may seek and upon proper proof obtain from a court with proper jurisdiction, injunctive relief, including damages in the event of breach by IHS or Distributor of any such obligations set out in this Agreement. Any such injunctive proceedings shall be without prejudice IHS's or Distributor's rights under this Agreement to obtain relief in arbitration with respect to such matters.

**XI.** **Effectiveness:** This Agreement shall become effective only after it has been signed by both Distributor and IHS. IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective the ____day of___________, 20__.

IN WITNESS HEREOF, the parties have caused it to be executed on the date indicated above.

| ____________________________ | INTELLI-HEART SERVICES, INC. |
|---|---|
| Distributor | |
| ____________________________ | ____________________________ |
| Distributor Authorized Signature | Authorized Signature |
| ____________________________ | ____________________________ |
| Print Name and Title | Print Name and Title |

Case 3:18-cv-00132-MMD-CBC   Document 79-1   Filed 02/22/19   Page 39 of 153

**EXHIBIT 3**

Secretary of State of California listings for Intelli-heart Services Inc.

**EXHIBIT 3**

**EXHIBIT 3**

# State of California
## Secretary of State

**S**

### Statement of Information
**(Domestic Stock and Agricultural Cooperative Corporations)**
**FEES (Filing and Disclosure): $25.00.**
**If this is an amendment, see instructions.**
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**FH70861**

**FILED**

**In the office of the Secretary of State of the State of California**

**DEC-27 2016**

This Space for Filing Use Only

1. **CORPORATE NAME**
INTELLI-HEART SERVICES, INC.

2. **CALIFORNIA CORPORATE NUMBER**
C3063915

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**

☑ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 17**.

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | | |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | | | |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/ | | | | |
| 8. SECRETARY | | | | |
| 9. CHIEF FINANCIAL OFFICER/ | | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10. NAME | | | | |
| 11. NAME | | | | |
| 12. NAME | | | | |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS

15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** CITY STATE ZIP CODE

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |
|---|---|---|---|
| 12/27/2016 | HILARY TATE PECKOS | OPERATIONS MANAGER | |

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 42 of 153

**EXHIBIT 4**

Secretary of State of California listings for Intelli-heart Services Inc.

**EXHIBIT 4**

**EXHIBIT 4**



Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 43 of 153

# State of California
## Secretary of State

**S**

**E-H31266**

**FILED**

In the office of the Secretary of State of the State of California

**Nov - 4 2011**

This Space For Filing Use Only

### Statement of Information
**(Domestic Stock and Agricultural Cooperative Corporations)**

**FEES (Filing and Disclosure): $25.00. If amendment, see instructions.**
**IMPORTANT - READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1. **CORPORATE NAME**
C3063915
INTELLI-HEART SERVICES, INC.

**Due Date:**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 2 and 3 cannot be P.O. Boxes.)

2. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | CITY | STATE | ZIP CODE
10850 WILSHIRE BLVD. STE 740 LOS ANGELES CA 90024

3. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | CITY | STATE | ZIP CODE
10850 WILSHIRE BLVD., STE 740 LOS ANGELES CA 90024

4. MAILING ADDRESS OF THE CORPORATION, IF DIFFERENT THAN ITEM 2 | CITY | STATE | ZIP CODE

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

5. CHIEF EXECUTIVE OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE
VANESSA ANN PARSONS 10850 WILSHIRE BLVD., STE 740 LOS ANGELES, CA 90024

6. SECRETARY | ADDRESS | CITY | STATE | ZIP CODE
LORYN BAILEY 10850 WILSHIRE BLVD., STE 740 LOS ANGELES, CA 90024

7. CHIEF FINANCIAL OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE
GILBERTO GARAY 10850 WILSHIRE BLVD., STE 740 LOS ANGELES CA 90024

**Names and Complete Addresses of All Directors, Including Directors Who Are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

8. NAME | ADDRESS | CITY | STATE | ZIP CODE
VANESSA ANN PARSONS 10850 WILSHIRE BLVD., STE 740 LOS ANGELES, CA 90024

9. NAME | ADDRESS | CITY | STATE | ZIP CODE

10. NAME | ADDRESS | CITY | STATE | ZIP CODE

11. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** (If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California street address (a P.O.Box address is not acceptable). If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 13 must be left blank.)

12. NAME OF AGENT FOR SERVICE OF PROCESS
AMY OSRAN JACOBS

13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** | CITY | STATE | ZIP CODE
360 N. BEDFORD DRIVE, STE 204 BEVERLY HILLS, CA 90210

**Type of Business**

14. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
INDEP. DIAG. TESTING FACILITY

15. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 11/04/2011 | VANESSA ANN PARSONS | OWNER | |
|---|---|---|---|
| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |

SI-200 C (REV 10/2010)

APPROVED BY SECRETARY OF STATE

**EXHIBIT 5**

Secretary of State of California listings for Intelli-heart Services Inc.

**EXHIBIT 5**

**EXHIBIT 5**

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 45 of 153

# State of California

## Secretary of State

S

## Statement of Information

**(Domestic Stock and Agricultural Cooperative Corporations)**
**FEES (Filing and Disclosure): $25.00.**
**If this is an amendment, see instructions.**
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

FT72841

**FILED**

In the office of the Secretary of State of the State of California

JAN-16 2018

This Space for Filing Use Only

1. **CORPORATE NAME**

INTELLI-HEART SERVICES, INC.

2. **CALIFORNIA CORPORATE NUMBER**

C3063915

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**

☑ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 17**.

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | | |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/ | | | | |
| 8. SECRETARY | | | | |
| 9. CHIEF FINANCIAL OFFICER/ | | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10. NAME | | | | |
| 11. NAME | | | | |
| 12. NAME | | | | |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** | | | |

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 01/16/2018 | VANESSA ANN PARSONS | OWNER | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

SI-200 (REV 01/2013) APPROVED BY SECRETARY OF STATE

**EXHIBIT 6**

Email of Intelli-heart

**EXHIBIT 6**

**EXHIBIT 6**



**Terrance Walker <walkerbillion@gmail.com>**

---

## VA24918C10329: Notification of subcontractor payment more than 90 days past due & proof that ALL subcontract ARE NOT required OVER $700k

---

**Cochran, Kevin** <Kevin.Cochran2@va.gov> Fri, Mar 16, 2018 at 6:15 AM
To: Terrance Walker <walkerbillion@gmail.com>, "Worsham, Charles W." <Weston.Worsham@va.gov>

Mr. Walker,

Please see he attached email.

Vr

Kevin J. Cochran

Contracting Specialist

Network Contracting Office 9

1639 Medical Center Parkway, Suite 400

Murfreesboro, TN 37129

Phone: 615-225-6479

Fax: 615-849-3769

Kevin.cochran2@va.gov



**"Delivering Client Centered Acquisition Solutions"**
***FY18 Back to Basics – Achieving Better Contracts***
***B2B – ABC***

"INTEGRITY, COMMITMENT, ADVOCACY, RESPECT, and EXCELLENCE – these are our Core Values."

As our client, please take a few moments and let us know how we did by completing the attached SURVEY

**From:** Terrance Walker [mailto:walkerbillion@gmail.com]
**Sent:** Friday, March 16, 2018 2:14 AM
**To:** Cochran, Kevin; Worsham, Charles W.
**Subject:** [EXTERNAL] VA24918C10329: Notification of subcontractor payment more than 90 days past due & proof that ALL subcontract ARE NOT required OVER $700k

[Quoted text hidden]

---------- Forwarded message ----------
From: Danny Weisberg <dweisberg@intelli-heart.com>
To: "Cochran, Kevin" <Kevin.Cochran2@va.gov>
Cc:
Bcc:
Date: Wed, 21 Feb 2018 16:55:33 +0000
Subject: [EXTERNAL] Fwd: Extortionist type tactics by Intelli-heart on awards VA24918C10329, VA24918C10329, VA26317D0109
Good afternoon.

Earlier today we were copied on the email below which was sent to you from an individual named Terrance Walker. Mr. Walker apparently contends that he is an agent or subcontractor for Intelli-Heart Services, Inc. ("Intelli-Heart"). Please be advised that Mr. Walker is not now, nor has he ever been, a distributor, contractor, agent, or representative of Intelli-Heart. Moreover, Mr. Walker has no contract or agreement of any kind with Intelli-Heart. In fact, until a few weeks ago, we had never heard of Terrance Walker, when he began sending communications to the VA. While we sincerely regret this unpleasant situation, we cannot prevent him from attempting to contact you. However, we request that you avoid corresponding or communicating with him as it will only encourage him to continue to harass and annoy our customers.

Again, we apologize for this inconvenience. If you have any questions, please do not hesitate to contact me.

Best, Danny Weisberg

---------- Forwarded message ----------
From: **Terrance Walker** <walkerbillion@gmail.com>
Date: Fri, Feb 9, 2018 at 12:17 PM
Subject: Extortionist type tactics by Intelli-heart on awards VA24918C10329, VA24918C10329, VA26317D0109
To: James Winters <jameswinters12345@yahoo.com>, "Cochran, Kevin" <kevin.cochran2@va.gov>, "Lapp, Larry D NCO 6" <larry.lapp@va.gov>, arlene.jorgensenhillestad@va.gov, Vanessa Parsons <vparsons@intelli-heart.com>, Danny Weisberg <dweisberg@intelli-heart.com>, Hilary Peckos <hpeckos@intelli-heart.com>

To the CO's /CS's emailed with awards VA24918C10329, VA24918C10329, VA26317D0109 ,

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 49 of 153

Notice of COERCION attempt by Intelli-heart to get subcontractors to waive their federal rights under the Prompt Payment Act.

Now they are attempting, Extortionist type tactics regarding payments owed to subs on awards VA24918C10329, VA24918C10329, VA26317D0109

As of today no payment has been received, though promises to pay have been made multiple times over the past month.

Be on notice, attempts to shackle this federal subcontractor will be unsuccessful.

The rights and obligations under the existing contracts are clear -- pay every thirty days or less.

There are no "terminate" provisions in either subcontract simply because Intelli-heart does not want to pay its subs or is aggravated they are being reported for their non-compliance with federal law/regulations.

Our federal rights as subcontractors to seek payments owed are NOT negotiable, CO's please proceed with haste on halting payments
if Intelli-heart continues on it's extortionist tactics described in the email below and doesn't pay.

Terrance

On Fri, Feb 9, 2018 at 10:35 AM, James Winters <jameswinters12345@yahoo.com> wrote:

> I just got off the phone with an attorney representing Intelli-Heart Services Inc.
>
> If I can get a contract in place with assured payments moving forward in the future will you back off from corresponding to the VA's?
>
> Can payments owed from past present and future get you to stop all correspondence now and in the future as long as all payments are sent in a timely, transparent fashion.
>
> Let me know. If agreed to do so, we can draw something up contractually so that everyone is on the same page with a commission payment schedule and not end up losing the contracts.
>
> James Winters
> jameswinters12345@yahoo.com

--
**Danny Weisberg**
*Intelli-Heart Services, Inc*
10850 Wilshire Blvd., Ste 740
Los Angeles, CA 90024
Phone: 877-898-8680
Fax: 310-470-0477

---

**noname.eml**
26K

**EXHIBIT 7**

Contract VA69D17D0167 - pricing redacted

**EXHIBIT 7**

**EXHIBIT 7**

# SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS
## OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30

1. REQUISITION NO.:

PAGE 1 OF 44

2. CONTRACT NO.: VA69D-17-D-0167

3. AWARD/EFFECTIVE DATE: 07-24-2017

4. ORDER NO.:

5. SOLICITATION NUMBER: VA69D-17-Q-0725

6. SOLICITATION ISSUE DATE:

7. FOR SOLICITATION INFORMATION CALL:
a. NAME: Roberta "Bobbie" DeWeese
b. TELEPHONE NO. (No Collect Calls): 414-844-4829

8. OFFER DUE DATE/LOCAL TIME:

9. ISSUED BY — CODE 36C252
Department of Veterans Affairs
Great Lakes Acquisition Center (GLAC)
115 S 84th Street, Suite 101

Milwaukee WI 53214-1476

10. THIS ACQUISITION IS
- [ ] UNRESTRICTED OR [X] SET ASIDE: 100 % FOR:
- [X] SMALL BUSINESS
- [ ] HUBZONE SMALL BUSINESS
- [ ] SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS
- [ ] WOMEN-OWNED SMALL BUSINESS (WOSB) ELIGIBLE UNDER THE WOMEN-OWNED SMALL BUSINESS PROGRAM
- [ ] EDWOSB
- [ ] 8(A)

NAICS: 621999

SIZE STANDARD: $15 Million

11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED
- [X] SEE SCHEDULE

12. DISCOUNT TERMS

13a. [ ] THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700)

13b. RATING: N/A

14. METHOD OF SOLICITATION
- [X] RFQ [ ] IFB [ ] RFP

15. DELIVER TO — CODE 36C252
Great Lakes Acquisition Center (GLAC)
Department of Veterans Affairs
115 S 84th Street, Suite 101

Milwaukee WI 53214-1476

16. ADMINISTERED BY — CODE 36C252
Department of Veterans Affairs
Great Lakes Acquisition Center (GLAC)
115 S 84th Street, Suite 101

Milwaukee WI 53214-1476

17a. CONTRACTOR/OFFEROR — CODE — FACILITY CODE
INTELLI-HEART SERVICES, INC.

10850 WILSHIRE BLVD STE 740

LOS ANGELES CA 90024

TELEPHONE NO. — DUNS: 021765760 DUNS+4:

- [ ] 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER

18a. PAYMENT WILL BE MADE BY — CODE
Department of Veterans Affairs
Financial Services Center
PO Box 149971

Austin TX 78714-9971

PHONE: 877-353-9791 FAX: 512-460-5540

18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED
- [ ] SEE ADDENDUM

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | Cardiac Arrhythmia Monitoring Services for VISN 12 medical facilities including: Jesse Brown VAMC, Captain James A. Lovell FHCC, Edward Hines VAH, Oscar G. Johnson VAMC, William S. Middleton VAH, Tomah VAMC, Clement J. Zablocki VAMC, Milo C. Huempfner HCC/CBOC in accordance with the specifications, pricing, terms and conditions herein. | | | | |

(Use Reverse and/or Attach Additional Sheets as Necessary)

25. ACCOUNTING AND APPROPRIATION DATA

26. TOTAL AWARD AMOUNT (For Govt. Use Only)

- [ ] 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA [ ] ARE [ ] ARE NOT ATTACHED.
- [ ] 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA [ ] ARE [ ] ARE NOT ATTACHED

- [X] 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN ONE COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED
- [ ] 29. AWARD OF CONTRACT: REF. ______ OFFER DATED ______. YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN IS ACCEPTED AS TO ITEMS:

30a. SIGNATURE OF OFFEROR/CONTRACTOR: James Winters

30b. NAME AND TITLE OF SIGNER (TYPE OR PRINT): Intelli-Heart James Winters Chief of VA Relations

30c. DATE SIGNED: 7-24-2017

31a. UNITED STATES OF AMERICA (SIGNATURE OF CONTRACTING OFFICER): Roberta J. DeWeese

31b. NAME OF CONTRACTING OFFICER (TYPE OR PRINT): ROBERTA J. DeWEESE NC01215L2-70372

31c. DATE SIGNED: 07/24/2017

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE

STANDARD FORM 1449 (REV. 2/2012)
Prescribed by GSA - FAR (48 CFR) 53.212

## SECTION B - CONTINUATION OF SF 1449 BLOCKS

### B.1    CONTRACT ADMINISTRATION DATA

1.  Contract administration matters will be handled by:

    **a.  CONTRACTOR'S NAME/ADDRESS/CITY-STATE-ZIP:**

    Intelli-Heart Services, Inc.

    10850 Wilshire Blvd., Suite 740

    Los Angeles, CA  90024

    Contractor Point of Contact (POC)/Title        James Winters, Chief of VA Relations

    Telephone Number  515-681-4144    Fax Number 310-470-9470   Email  jwinters@intelli-heart.com

    DUNS Number:                          021765766

    Contractor Performance Assessment Reporting System (CPARS) past performance point of contact:

    Name/Title:     James Winters – Chief of VA Relations     email:    jwinters@intelli-heart.com

    **b.  GOVERNMENT:**

    Roberta J. "Bobbie" DeWeese
    Contracting Officer (GLAC)
    Department of Veterans Affairs
    Great Lakes Acquisition Center
    115 S. 84th Street, Suite 101
    Milwaukee, WI  53214-1476
    (414) 844-4829
    Fax (414) 844-4891

2.  **CONTRACTOR REMITTANCE ADDRESS**:  All payments by the Government to the contractor will be made in accordance with Federal Acquisition Regulation (FAR) Clause 52.232-33, Payment by Electronic Funds Transfer – System for Award Management (31 U.S.C. 3332).

3.  **INVOICES**:   In order to comply with the Improper Payment Elimination and Recovery Act of 2010 (IPERA), the VA has mandated electronic invoice submission to the Veterans Affairs Financial Services Center (VAFSC). VAFSC has partnered with Tungsten Corporation e-Invoicing network, for submissions of all electronic invoices to VA. Tungsten Network electronic invoicing is free to all VA vendors.  In order to submit electronic invoices, all VA vendors must register with Tungsten Network by submitting an email to Tungsten Network VA.Registration@tungsten-network.com or calling 877-752-0900 option 2 for Enrollment.

    Contractor shall submit an electronic invoice by the tenth (10th) of the following month services were performed to the Veterans Affairs Financial Services Center (VAFSC) e-Invoice through the website at https://portal.tungsten-network.com/login.aspx. For questions regarding the submission of VA electronic invoices, Tungsten Network customer service may be contacted at 877-489-6135.

    The invoice sent to Tungsten Network shall reference the vendor name and address, customer name, contract number, appropriate obligation/funding order number, patient unique identifier, description of services / monitoring type provided, unit price, and total invoice cost.  Invoices shall also include any payment discount terms.

    For questions regarding invoice receipt or payment, please call VAFSC directly at 877-353-9791 or email vafsccshd@va.gov. Payments shall be made monthly in arrears upon receipt of a properly prepared invoice.

**4. SUBCONTRACTING MONITORING AND COMPLIANCE:**

a. **Subcontracting Commitments**: This contract includes VAAR 852.215-70, Service-Disabled Veteran-Owned and Veteran-Owned Small Business Evaluation Factors, and VAAR 852.215-71, Evaluation Factor Commitments. Accordingly, any subcontract resulting from this contract will include these clauses. The contractor is advised in performing contract administration functions, the Contracting Officer (CO) may use the services of a support contractor(s) to assist in assessing contractor compliance with the subcontracting commitments incorporated into the contract.

b. **Support Contractors:** Support contractors may be required to access the contractor's business records or other proprietary data to review such business records regarding contract compliance with this requirement. All support contractors conducting this review on behalf of VA will be required to sign an “Information Protection and Non-Disclosure and Disclosure of Conflicts of Interest Agreement” to ensure the contractor's business records or other proprietary data reviewed or obtained in the course of assisting the CO in assessing the contractor for compliance are protected to ensure information or data is not improperly disclosed or other impropriety occurs. Furthermore, if VA determines any services the support contractor(s) will perform in assessing compliance are advisory and assistance services as defined in FAR 2.101, Definitions, the support contractor(s) must also enter into an agreement with the contractor to protect proprietary information as required by FAR 9.505-4, Obtaining access to proprietary information, paragraph (b). The contractor is required to cooperate fully and make available any records as may be required to enable the CO to assess the contractor compliance with the subcontracting commitments and subcontracting plan.

[*End of CONTRACT ADMINISTRATION DATA*]

## B.2 SCHEDULE OF SERVICES AND PRICE

*Authority***:** This procurement is being conducted under the authority of 38 U.S.C. 8153, *Sharing of Health Care Resources.* The Great Lakes Acquisition Center is contracting for Health Care Resources in support of VISN 12 medical facilities.

*Purpose***:** To provide Cardiac Arrhythmia Monitoring Services in support of the Jesse Brown VA Medical Center (VAMC), the Captain James A. Lovell Federal Health Care Center (FHCC or Lovell FHCC), the Edward Hines Jr. VA Hospital (VAH), the Oscar G. Johnson (Iron Mountain) VAMC, the William S. Middleton Memorial (Madison) VAH, the Tomah VAMC, the Clement J. Zablocki (Milwaukee) VAMC and the Milo C. Huempfner Health Care Center (HCC) – Green Bay.

*Ordering Period***:** The estimated ordering period will be three (3) years with an anticipated start date of July 24, 2017. The quantities listed in Exhibits 1 through 8 – identified by facility station number and contained under Section D, CONTRACT DOCUMENTS, EXHIBITS OR ATTACHMENTS – are the Government’s estimated annual volumes. The Government does not guarantee to order these quantities.

*General Ordering Authority & Process***:** An order is deemed placed when complete patient registration data has been placed by authorized Government personnel into Contractor’s ordering system.

*Pricing***: F**irm-fixed (unit) pricing with estimated annual volumes of Contract Line Item Numbers (CLINs) are contained on Exhibits 1-8 for Years 1 through 3. Cumulative annual totals are listed below. The CLIN unit prices will apply to the quantities actually ordered by each facility.

**PRICE SCHEDULE**

Estimated Total Year 1 (Stations 537, 556, 578, 585, 607, 676, 695 and 695GD): **$**

Estimated Total Year 2 (Stations 537, 556, 578, 585, 607, 676, 695 and 695GD): **$**

Estimated Total Year 3 (Stations 537, 556, 578, 585, 607, 676, 695 and 695GD): **$**

**Estimated Grand Total (Years 1 – 3) $ 2,325,675.00**

The Government’s guaranteed minimum during the life of this contract is $69,869.00. The Government’s contract ceiling amount during the life of this contract is $3,144,084.00.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 54 of 153

This acquisition is being processed in accordance with FAR 13.5 - *Simplified Procedures for Certain Commercial Items* and therefore, will utilize simplified procedures for soliciting competition, evaluation, award documentation, and notification.

[End of *SCHEDULE OF SERVICES AND PRICE*]

## B.3 STATEMENT OF WORK (SOW)

Contractor shall provide equipment (including monitoring devices), supplies, labor, and management required to perform cardiac arrhythmia monitoring services consistent with the four (4) CLINs specified on Exhibits 1 through 8 – (up to) 48-hour (Holter); (up to) 30-day memory loop (event); (up to) 10-day ambulatory cardiac telemetry (ACT or telemetry) and 11- to 30-day ambulatory cardiac telemetry to VISN 12 VA medical facilities and FHCC as specified, for patients experiencing infrequent symptomatic cardiac events. Services shall be provided twenty-four (24) hours a day, seven (7) days a week, including federal holidays on an on-demand/as-needed basis. Reports and tracings shall also be available to VA/FHCC staff 24 hours per day, seven days per week, 365 days per year via the internet, facsimile (fax) or other electronic method.

### 1. ORDERING/REQUEST FOR SERVICES:

Each facility's cardiac unit personnel will separately place orders by registering patients for cardiac arrhythmia monitoring services. Registration via secure website is preferable though registration via telephone or secure facsimile (fax) is acceptable. Contractor shall retain separate files for each facility's registered patients.

Government personnel will provide the contractor with patient and physician-specific information necessary to register the individual for monitoring services. Information should, as a minimum, include the following:

a. Referring/primary physician name and phone number
b. Referring/primary physician's orders/monitoring and reporting criteria
c. Account ID (referring Station) number (per Exhibits), name, address and phone number
d. Patient name, address, phone number and consult (or equivalent) number

***NOTE:*** *The consult number, preceded by zeros to bring total number of digits to nine (9), (or equivalent – e.g., phone number minus the first digit of the area code) shall consist of the same number characters as,* ***and be used instead of****, the patient's social security number.*

e. Alternate/supplemental patient contact information and relationship to patient
f. Government emergency/on-call designate number(s)
g. Account/administrative contact person's name, title, direct phone number and email address
h. Account secondary phone number
i. Account fax number for reports
j. Type of monitoring required

### 2. TRACINGS/ NOTIFICATIONS/REPORTS

Contractor shall be staffed with trained clinicians and/or certified cardiac technicians. The contractor will be required to provide two different types of reports – interim and summary (end of service). Upon receipt of recorded data, Contractor personnel shall perform preliminary interpretation of ECG/EKG tracings and compile interim or summary reports as specified in this section.

Tracings are the raw data that are generated by contractor monitoring devices and are used as backup documentation for reports. Reports (interim and summary) are the interpretation of the raw data at various intervals as clinically necessary.

**Interim reports**: Contractor shall provide interim reports only when clinically necessary. Contractor shall immediately notify appropriate Government personnel of adverse events in accordance with 3. IMMEDIATE NOTIFICATIONS, below, followed up with an interim report supported by pertinent tracings – including tracings showing preceding activity and subsequent activity for said adverse event – within 30 minutes of notification. Additionally, Contractor shall notify Government personnel at the originating station when there are occurrences of "no tracings" for 12 consecutive hours.

**Summary reports**: Contractor shall compile a summary report upon conclusion of each patient's monitoring service. Contractor shall provide any and all associated recorded data – including tracings cited as "not pertinent" or "unclear" by Contractor clinical personnel – upon request for further assessment by the Government. Contractor shall make summary reports available to VA/FHCC personnel within 24 hours after receipt of recorded data. These reports must be in MSWord or .pdf format and available for electronic download/fax transmission via a secure site/line. Summary reports must contain the following:

a. Minimum and maximum sinus rates;

b. Average heart rate;

c. Basic conduction statement with pause duration;

d. Percent of ventricular and atrial ectopy;

e. Strips of all ventricular tachycardia and representative supraventricular tachycardia events.

f. Percentage of time in tachycardia and bradycardia; and,

g. Comments regarding manual transmissions (i.e., "There were no manual transmissions" or "Manual transmissions are documented").

Although not mandatory, individual symptom statement with "rhythm at that time" mentioned therein accompanied by the strips is desirable.

Contractor shall send electronic alert to appropriate Government personnel within 24 hours of availability when a report is queued or available for download/transmittal.

Authorized medical personnel at the respective Government facilities will review the preliminary interpretation and will enter final diagnostic interpretation into the Computerized Patient Record System (CPRS).

### 3. IMMEDIATE NOTIFICATIONS

If VA/FHCC patients experience an event/recording(s) deemed immediate/emergent during non-business hours or on a federal holiday, Contractor personnel shall follow the notification process outlined below.

Due to differences in organizational structure and staffing, Government contact and emergency instructions may vary. Contractor must be able to follow the criteria specific to the applicable facility and referring physician provided during patient registration. In cases of discrepancies between the referring physician's instructions/criteria and this contract, the referring physician's instructions/criteria shall take precedence. The contact information and numbers provided herein represent current standard operating procedure associated with Government notification.

Contractor shall research and incorporate into individual patient records, the contact information for non-VA emergency medical response team (EMT) local to any Government referred patient. Should Contractor personnel be unsuccessful after three attempts in a fifteen-minute period to reach appropriate Government medical personnel to report an emergent condition, Contractor shall notify the non-VA emergency medical response team (EMT) local to the veteran experiencing the medical emergency.

**JESSE BROWN VAMC (537):** *Office hours: Monday – Friday 8:00 a.m. – 4:30 p.m*

*During office hours: Jesse Brown VAMC (JBVAMC) Heart Station @ 312-569-6616*
***Emergent,** after hours, weekends and holidays: Cardio-Care Unit (CCU) fellow pager @ 312-839-4259 **AND** the Administrative Officer of the Day (AOD) @ 312-569-8387*

**LOVELL FHCC (556):** *Office hours: Monday – Friday 7:30 a.m. – 4:00 p.m*

*During office hours: Cardiology Department @ 224-610-8206 or 224-610-8207*
***Emergent,** after hours, weekends and holidays: AOD @ 224-610-3747 who will page the cardiology fellow on-call.*

**HINES VAH (578)**: *Office hours: Monday – Friday 8:00 a.m. – 4:30 p.m.*

*During Office hours: TBD @ time of registration per referring/primary physician*
*After hours, weekends and holidays: TBD @ time of registration per referring/primary physician*
***Emergent** - Primary/referring physician and the alternate contact TBD per patient registration.*

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 56 of 153

**IRON MOUNTAIN VAMC (585):** *Office hours: Monday – Friday 7:30 a.m. – 3:30 p.m.*

*During office hours: Iron Mountain Stress Lab @ 906-774-3300 ext. 32735*
***Emergent**, after hours, weekends and holidays: contact main number @ 906-774-3300 and request Iron Mountain AOD who will page the Emergency Department.*

NOTE: Iron Mountain main number forwards to Madison VAH after hours.

**MADISON VAH (607):** *Office hours: Monday – Friday 7:00 a.m. – 4:00 p.m.*

*During office hours: VAH Cardiology Department @ 608-256-1901 ext. 17003*
***Emergent**, after hours, weekends and holidays: Contact the facility Emergency Department (ED) @ 608-256-1901 ext. 17012 and request the AOD.*

**TOMAH VAMC (676):** *Office hours: Monday – Friday 8:00 a.m. – 4:30 p.m.*

*During Office hours: Respiratory Therapy @ 608-372-3971*
***Emergent**, after hours, weekends and holidays: Contact the Madison VAH Emergency Department (ED) @ 608-256-1901 ext. 17012 and request the AOD.*

**MILWAUKEE VAMC (695):** *All hours:*

*Contact Primary Care Physician (TBD per enrollment/registration) first. If Primary Care Physician is not available, please go through the main operator @ 414-384-2000 to page the cardiology fellow on-call for that shift.*
***Emergent** – Contact the ordering physician by page via the VA operator @ 414-384-2000. If no response in 15 minutes, then contact the VA Cardiology fellow on-call.*

**GREEN BAY HCC (695GD):** *Office hours: Monday - Friday 8:00 a.m.- 4:30 p.m.*

*During office hours: Green Bay HCC Cardiology Department @ 920-431-2500 x 72538*
***Emergent,** after Hours, weekend and holidays: Contact the Nurse Advice Line @ 888-469-6614 x 46345 Facsimile (fax) 920-431-2975*

***NOTIFICATION CRITERIA – IMMEDIATE/EMERGENT***

Contractor shall immediately verbally notify the Government of any recordings/events of an emergent nature. Contractor shall follow up with a written interim report, accompanied by the incident recorded data, within thirty (30) minutes. Unless specified to the contrary in the referring physician's instructions, emergent criteria shall be as indicated below.

a. (Sinus/Superventricular) Tachycardia – 150 beats per minute (BPM) [or 180 BPM – dependent upon primary/referring physician] with duration of 30 seconds or greater
b. Sustained Wide Complex Tachycardia 120 BPM or greater
c. Sustained Bradycardia (all rhythms with Bradycardic rate including averaged Atrial Fibrillation/ Atrial Flutter) 35 BPM or less (or 40 BPM – dependent upon primary/referring physician).
d. Atrial Fibrillation/Flutter
    1) New onset (as documented by contractor with duration of 30 seconds or greater)
    2) Ventricular response 180 BPM or greater (or 150 BPM or greater – dependent upon primary/referring physician) with duration of 30 seconds or greater
e. Ventricular fibrillation/flutter
f. Complete AV block
g. Asystole
h. Idioventricular rhythm
i. Junctional rhythm sustained for 30 seconds or more
j. Syncope/disturbance of consciousness with rhythm change
k. Torsade de pointes

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 57 of 153

**4. CUSTOMER SUPPORT**

Contractor shall provide customer support to Government personnel including:

*Training* – Contractor shall provide on-site training at no charge on use of its service, equipment, system and processes, as requested, to authorized Government personnel. Contractor shall provide additional on-site training, if required and at no charge, to address system, software or processing changes/upgrades as they are implemented.

*Phone Support* - Contractor shall provide direct line phone numbers (bypassing menus, recorded messages, etc.) providing authorized Government personnel immediate access to contractor customer service personnel 24/7/365. Voice/live response to customer and patient calls shall not exceed thirty (30) seconds.

*Email Support* – Non-automated response to customer email or website inquiry. Contactor response time shall not exceed four (4) hours from time of inquiry/email.

*Local Area Account Representatives* – Contractor shall assign a local area account representative and alternate representative to provide direct and on-site support for each of the Government facilities after contract award.

**5. CUSTOMER SERVICE**

Contractor shall provide customer service support 24/7/365 days per year to VA/FHCC patients under this contract. Contractor cardiac technicians (certified preferred) must be available to discuss patient symptoms and then correlate the symptoms with the ECG/EKG findings. Patients provided with monitoring devices may make an unlimited number of symptomatic calls to contractor service center(s). Contractor shall not, under any circumstances, furnish reports directly to patients. Contractor shall instruct patients, when applicable, to contact the referring Government physician for all post monitoring follow-up care. Contractor shall, for complications occurring within 48 hours of a completed monitoring service, instruct patients to contact their Government physician or the nearest medical facility offering emergency services.

Contractor shall also assist patients (or their authorized designee) with obtaining, understanding and operating contractor monitoring devices. Contractor shall, if required (due to remoteness or inaccessibility of patient to Government medical facilities), instruct/educate patients on use, care and return of monitoring devices.

**6. EQUIPMENT/INFORMATION TECHNOLOGY REQUIRED**

*Equipment* – All monitoring devices provided in the performance of this contract must be FDA approved. Contractor shall provide and replace any hardware, software, peripherals, instructions and manuals required to support its data collection/reporting system at no charge. Contractor shall provide at no additional charge any dedicated lines, docking stations, related equipment, electronics and interfaces, as well as any associated labor to integrate contractor-owned equipment and electronics with Government equipment if necessary to successful download and upload of recorded data. This shall include, at a minimum, the following:

a. Event/Holter recorders which must be lightweight, and simple for patients to use;

b. Event/memory loop recorders which can be used to record, then accurately, easily and clearly transmit to the contractor via land line or cell phone;

c. Any hardware (e.g., docking stations; card readers, etc.), software, dedicated lines, as well as any related equipment, cables, manuals/instructions, and site codes required for downloading, transmitting and uploading the "up to 48-hour" Holters' recorded data to contractor cardiac clinicians. NOTE: Contractor personnel shall coordinate installation/integration with appropriate Government information technology personnel to ensure line security and successful software installation and functionality.

d. Accessory patches, wires, batteries, wires, etc. and all other supplemental/peripheral items to operate equipment – i.e., batteries, covers, diodes, electrodes, instructions, cell phone, telephonic hookup and baseline on the device, etc.

e. Ambulatory Cardiac Telemetry (ACT) equipment provided under this contract shall include:

   1) Sensor(s) and cell phone/transmitter;

   2) An embedded algorithm and cellular communication technology capable of monitoring in real time/near real time;

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 58 of 153

3) A telemetry service that provides auto-trigger and auto-send functionality automatically and instantly detecting and transmitting both symptomatic and asymptomatic arrhythmia *without the necessity of any patient intervention;*

4) An auto-trigger for atrial fibrillation, tachycardia, bradycardia, and pause;

5) A feature permitting patients to manually activate and transmit the ECG data to the contractor monitoring facilities; and,

6) Equipment shall enable contractor to pull ECG/EKG data at any point during the period of service while patient wears the device and provide a full Holter, memory loop/event, or ACT analysis including HR variability, PVC count, AF burden summary and other key metrics.

f. Contractor shall retain title and ownership to all equipment provided to the Government during the performance of this contract.

g. Contractor will, when requested by the applicable Government facility, ship the equipment "kit" directly to remote patients unable to access their medical facility. Additionally, contractor Customer Service personnel shall follow up to confirm receipt of equipment.

*Website/Internet Portal* – Contractor's website or internet portal to accept, report or transmit patient data, must meet all requirements described herein and, at a minimum, contain the features listed below.

a. Secure internet/website with protection and data accuracy compliant with HIPPA and the Government standards.

b. Direct links to the website for both patient and physician information on the service and monitors.

c. Convenient access to patient reports with sorting and printing capabilities ( either individually or in a batch mode, as requested).

d. Mandatory unique authentication and identification (logon) access to data.

e. Direct line contact information permitting patients and facility personnel to communicate directly with Contractor customer service personnel 24/7/365.

f. Audit/reporting function within contractor electronic system permitting VA/FHCC Information Security personnel, upon request, remote access to contract-related records/data.

**7. INVENTORY LEVELS**

*Government Inventory* – Contractor shall place equipment and related peripheral supplies at each Cardiology ECG/EKG Department within fifteen (15) days of contract award to establish the inventory levels stated below. These inventory levels will be maintained by Contractor via replacement shipment within 24 hours of patient registration. Tracking information shall be provided to appropriate Government contact upon shipment.

| | **Up to 48-hour** | **Up to 30-day** | **ACT/Telemetry** |
|---|---|---|---|
| Jesse Brown | 24 | 0 | 48 |
| FHCC | 10 | 0 | 5 |
| Hines | 0 | 5 | 10 |
| Iron Mountain | 5 | 5 | 1 |
| Madison | 8 | 10 | 5 |
| Tomah | 10 | 5 | 2 |
| Milwaukee | 12 | 6 | 5 |
| Green Bay HCC | 4 | 0 | |

4

*Contractor Inventory* – Contractor shall maintain dedicated inventory levels in sufficient quantities to handle projected workload as specified in Exhibits 1 through 8.

**8. MAINTENANCE**

a. Contractor will perform all preventive maintenance and quality control of all Holter, memory loop/event and ACT equipment used in performance of this contract to ensure and maintain maximum accuracy. Proper documentation of maintenance results and corrective action taken, as necessary, must be available to the Government.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 59 of 153

b. In the event of an equipment failure of the (up to) 30-day memory loop/event or Ambulatory Cardiac Telemetry (ACT) monitors, contractor shall ship a replacement monitor to the patient within 24 hours and the defective monitor will be mailed back to contractor in the prepaid envelope for return via U.S. mail by the patient. In turn, patient shall ensure cell phone remains charged, batteries for the sensor are changed, if needed, and device is shipped back to contractor in a timely manner.

[End of *STATEMENT OF WORK (SOW)*]

## B.4 SPECIAL CONTRACT REQUIREMENTS

### 1. SERVICES

a. The services specified herein may be changed by written modification to this contract. The Contracting Officer will prepare the modification (reference FAR clause 52.212-4(c), Changes) and, prior to becoming effective, shall be signed by both parties. Only the Contracting Officer is authorized to make commitments or issue changes that affect price, quantity, or quality of performance of this contract. In the event the Contractor effects any such change at the direction of any person other than the Contracting Officer, the change shall be considered unauthorized and no adjustment will be made in the contract price to cover any increase in costs incurred as a result thereof.

b. This is a non-personal services contract as defined in FAR 37.101. There is no employer-employee relationship between the Government and the contractor or the contractor's employee(s). Contractor personnel are not subject to the supervision and control of a Government officer or employee. Rather contractor personnel perform their duties in accordance with the Statement of Work. Supervisory functions such as hiring, firing, directing, and counseling of contractor personnel are not performed by the Government. The healthcare provider(s) who furnish services under this contract is/are subject to Government technical oversight of the services. The Government retains the right to reject services for contractual non-performance.

c. The Government may evaluate the quality of professional and administrative services provided, but retains no control over the medical, professional aspects of services rendered.

d. Contractor is required to maintain medical liability insurance for the duration of this contract. Medical liability insurance must cover the provider(s) for services in all states where services are rendered by the provider and updated certification submitted to CO upon renewal.

e. The services to be performed by the contractor will be performed in accordance with VA policies, procedures, regulations, and the medical staff bylaws of the VA facility (copies and/or links will be provided upon request). In all cases, dignity of the patient shall be given the highest regard and the precepts of the American Hospital Association's "Bill of Rights for Patients" shall be observed.

f. Contractor shall provide the required services listed herein throughout the contract period. Other necessary personnel for the operation of the services contracted for at the VA will be provided by the contractor at levels mutually agreed upon which are compatible with the safety of the patient and personnel and with quality medical care programming.

g. Contractor shall, in writing, keep the Contracting Officer informed of any unusual circumstances in conjunction with the contract.

h. Contractor shall not, under any circumstances, furnish reports directly to patients.

### 2. TERM OF CONTRACT

This contract is effective for an ordering period of three (3) years from the effective date of award.

### 3. FEDERAL HOLIDAYS

Contractor will be required to provide services on Federal holidays, as scheduled by patient registration data.

The 10 holidays observed by the Federal Government are: New Year's Day (January 1st), Martin Luther King's Birthday (3rd Monday in January), Presidents' Day (3rd Monday in February), Memorial Day (last Monday in May), Independence Day (July 4th), Labor Day (1st Monday in September), Columbus Day (2nd Monday in October), Veterans Day (November 11), Thanksgiving Day (4th Thursday in November), Christmas Day (December 25th) and any other day specifically declared by the President of the United States to be a national holiday.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 60 of 153

When one of the above designated legal holidays falls on a Sunday, the following Monday will be observed as a legal holiday. When a legal holiday falls on a Saturday, the preceding Friday is observed as a holiday by U.S. Government agencies.

#### 4. Qualifications of Contractor/Contractor Personnel

Personnel assigned by the contractor to perform the services covered by this contract must meet basic minimum criteria/qualifications of contractor and:

a. Personnel assigned by the contractor to perform the services covered by this contract shall be proficient in written and spoken English (38 USC 7402).

b. Contractor personnel will be required to complete annual Privacy/HIPAA training, which may be provided by their organization. Successful completion of such training shall be validated annually by contractor written statement submitted to the Contracting Officer.

c. Any new requirements for mandatory education and/or competency reassessment that occur during the contract period must be completed by the individual contractor employee(s) within established timeframes.

d. Successful completion of applicable ANSI/ISO/IEC 17024 or equivalent semi-annual certification for contractor medical personnel assigned to monitor, interpret ECG/EKG data, compile interim/preliminary reports, and/or provide direct customer service to Government staff and patient is preferred, but not required.

#### 5. Contractor's Facility(ies)

A change in contractor's location, website access, customer service/support, registration or bill to/pay to address(es) or other elements affecting performance under this contract shall be **promptly** reported to the Contracting Officer and subject to Government approval.

#### 6. HHS/OIG

To ensure that the individuals providing services under the contract have not engaged in fraud or abuse regarding Sections 1128 and 1128A of the Social Security Act regarding federal health care programs, the contractor is required to check the Health and Human Services - Office of Inspector General (HHS/OIG), List of Excluded Individuals/Entities on the OIG Website (www.hhs.gov/oig) for each person providing services under this contract. The parties and entities assigned by contractor to perform under this contract may not receive Federal Health Care program payments due to fraud and/or abuse of the Medicare and Medicaid programs. During the performance of this contract the contractor is prohibited from using any individual or business listed on the List of Excluded Individuals/Entities. Any healthcare provider or entity that employ or enter into contracts with excluded individuals or entities may have a Civil Monetary Penalty (CMP) imposed against them. By signing this offer, the contractor certifies that all persons or entities identified by contractor to work under this contract have been compared against the OIG list and are NOT listed as of the date the offer was signed.

#### 7. Joint Commission Standards

Joint Commission accreditation, although not required, is preferred. The contractor shall perform the required work in compliance with Joint Commission Standards. A copy of these standards may be obtained from Joint Commission, One Renaissance Blvd., Oakbrook Terrace, IL 60181.

The contractor will be responsible to ensure the contractor employees or subcontractors providing work on this contract are fully trained and completely competent to perform the required work. Contractor will gather all credentialing documents requested by the VA/FHCC as well as any other documentation that the carrying out of this contract may require. However, the contractor is not able to nor is the contractor required to make clinical competence determinations on behalf of the VA/FHCC.

#### 8. Personnel Policy

a. Contractor shall be responsible for protecting its personnel furnishing services under this contract. To carry out this responsibility, to the extent required by law, the contractor shall provide the following for its employees:

- Workers compensation
- Professional liability insurance
- Health examinations
- Income tax withholding, and
- Social security payments.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 61 of 153

b. The parties agree that the contractor, its employees, agents and subcontractors shall not be considered Government employees for any purpose.

c. The VA shall notify the Contractor of any significant communicable disease exposure as appropriate. The Contractor shall adhere to current CDC/HICPAC Guidelines for Infection Control in health care personnel (AIJC 1998: 26:2890354) for disease control. The Contractor shall provide follow up documentation of clearance to return to the workplace prior to contractor's or subcontractor's employee(s) return.

**9. RECORD KEEPING – CONTRACTOR**

Contractor must establish a record keeping system of Government patients by referring facility (customer account number); type/duration of monitoring, accurate diagnoses and billing/payment. These records shall not be comingled with other customer records and must be available to the Contracting Officer (CO) or the Contracting Officer Representative (COR) of any facility covered by this contract upon request within three (3) business days.

**10. MEDICAL RECORDS**

Medical records of Government patients monitored by contractor under this contract belong to the Government and contractor personnel will not have access to those records. Contractor shall retain all patient monitoring documentation in a secure electronic format as required and provide copies of patient monitoring documentation, if requested by authorized VA/FHCC personnel. That data will be retained for no less than ten (10) years made available to VA/FHCC authorized personnel within three (3) business days at no charge.

Clinical or other medical records of VA/FHCC veteran patients monitored by Contractor under this contract are VA/FHCC records and will be mailed to the VA/FHCC at no additional cost. Mail shall be sent in accordance with VA Directive 6609, *Mailing of Sensitive Personal Information.* Contractor may obtain a copy of VA Directive 6609 at the following website: *http://www1.va.gov/vhapublications/index.cfm*. Data gathered by contractor devices and resulting reports generated by contractor personnel in the performance of this contract belong to contractor.

If a subpoena or court order is received for the production of a medical record, the contractor shall refer the subpoena or court order to the Contracting Officer.

**11. CONFIDENTIALITY OF PATIENT RECORDS**

a. The contractor is a Government contractor and will assist in the provision of health care to patients seeking such care from or through VA. As such, the contractor is considered as being part of the Department health care activity. Contractor is considered to be a Government contractor for purposes of the Privacy Act, Title 5 U.S.C. 552a. Further, for the purpose of VA/FHCC records access and patient confidentiality, contractor is considered to be a Government contractor for the following provisions: Title 38 U.S.C. 5701, 5705, and 7332, relative to the generation of patient medical data and resulting reports relayed to the Government facilities to provide diagnostic assistance. Contractor will not have access to patient medical records including patient treatment records to perform its contractual responsibilities.

b. The records referred to above shall remain the property of VA/FHCC and shall not be removed or transferred from VA/FHCC except in accordance with U.S.C. 551a (Privacy Act), 38 U.S.C. 5701 (Confidentiality of claimants records), 5 U.S.C. 552 (FOIA), 38 U.S.C. 5705 (Confidentiality of Medical Quality Assurance Records) 38 U.S.C. 7332 (Confidentiality of certain medical records) and federal laws, rules and regulations.

**12. HIPAA COMPLIANCE**

Contractor must adhere to the provisions of Public Law 104-191, Health Insurance Portability and Accountability Act (HIPAA) of 1996 and the National Standards to Protect the Privacy and Security of Protected Health Information (PHI). As required by HIPAA, the Department of Health and Human Services (HHS) has promulgated rules governing the security and use and disclosure of protected health information by covered entities, including the Department of Veterans Affairs (VA)/FHCC.

Contractor is performing cardiac monitoring diagnostic services on behalf of the VA/FHCC, therefore, the Contractor is not required to enter into a Business Associate Agreement (BAA) with VA/FHCC.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 62 of 153

**13. DESIGNATION OF CONTRACT OFFICER REPRESENTATIVE (COR)**

The name and contact information for the Contracting Officer Representatives (CORs) designated to represent the Contracting Officer (CO) will be provided upon contract award. The CORs will furnish technical guidance and advice regarding the work being performed under this contract. The foregoing is not to be construed as authorization to interpret or furnish advice and information to the contractor relative to the financial or legal aspects of the contract. Enforcement of these segments is vested in and is the responsibility of the Contracting Officer. The extent and limitations of this designation will be provided in the COR Delegation Memo.

**14. CONTRACT PERFORMANCE MONITORING**

a. Monitoring of Contractor's performance shall be demonstrated through clinical and administrative record reviews. Contracting Officer Representatives (CORs) will be responsible for verifying contract compliance. CORs will designate appropriate VA/FHCC personnel to monitor services through one or a combination of the following mechanisms:

   1) Departments being served will monitor contractor performance to ensure that services called for in the contract have been received by VA/FHCC in a timely manner. Any incidents of contractor noncompliance as evidenced by the monitoring procedures will be forwarded immediately to the Contracting Officer.

   2) Documentation of services performed will be reviewed prior to certifying payment. The CORs will perform periodic spot checks and document with the using service to ensure records monitoring. The Government will pay only for services actually provided, and in strict accordance with the Price Schedule. Contract monitoring and recordkeeping procedures will be sufficient to ensure proper payment and allow audit verification that services were provided.

   3) Chief of Staff's office reviews monitoring data. An internal record of veterans registered for cardiac monitoring, devices requested, days monitored and reports submitted will be reviewed against monthly invoices for verification of services.

   4) The Contractor shall transmit copies of monthly invoices with applicable backup data to the Contracting Officer Representative (COR) via secure facsimile (fax). The administrative office then verifies services were actually performed against VA/FHCC internal records and logs. Only after verification are invoices certified for payment.

   5) The using service, through the COR, will provide a written statement to the Contracting Officer to include a summary of Contractor actions and a statement that all requirements of the contract have been fulfilled as agreed. This summary evaluation will be submitted 45 days prior to expiration of contract or annually, as applicable.Contractor employee(s) may not certify bills for payment.

**15. QUALITY ASSURANCE MONITORING**

a. Contractor shall maintain a Quality Control Program related to the cardiac monitoring services covered under this contract. The results of all Quality Improvement activities performed by the Contractor involving VA/FHCC patients will be shared with VA/FHCC facility staff. This will include, but not be limited to, quality improvement plans, minutes of staff meetings where quality improvement has been discussed and which include practitioner-specific findings, conclusions, recommendations, written plans for actions taken in response to such conclusions and recommendations, and evaluation of those actions taken. Monitors should reflect at a minimum, issues related to quality care and appropriateness of referral.

b. The Contractor will meet or communicate with the VA/FHCC facility staff for process review and improvement of contract performance on an "as needed" basis.

c. Quality factors that the Government may consider when monitoring quality of care include, but are not limited to: compliance with VA/FHCC security/privacy requirements; availability, patient satisfaction, adverse event reporting, turn-around times, quality of devices and reports, timeliness and accuracy of invoices, training and upgrades, and patient registration process/issues.

d. Other performance evaluation factors that will be monitored include: patient customer service comments; provider and Contractor relationship with hospital staff/government contracting personnel; accurate maintenance of records; etc.

**16. PROHIBITION OF CONTRACT PERFORMANCE OUTSIDE THE U.S.**

The entire performance of the contract shall be within the borders of the United States of America, the District of Columbia and/or Puerto Rico. The Contractor shall not access any VA data/information (for example, by remote computer access) from locations that are outside the above-stated borders. Furthermore, the Contractor shall not send, transfer, mail or otherwise transmit any VA data/information to locations outside the above-stated borders.

**17. CONTRACTOR CERTIFICATION – CITIZENSHIP RELATED REQUIREMENTS**

The Contractor certifies that the Contractor shall comply with any and all legal provisions contained in the Immigration and Nationality Act of 1952, as amended; its related laws and regulations that are enforced by Homeland Security, Immigration and Customs Enforcement and the U.S Department of Labor as these may relate to non-immigrant foreign nationals working under contract or subcontract for the Contractor while providing services to Department of Veterans Affairs/FHCC patient referrals.

While performing services for the Department of Veterans Affairs, the Contractor shall not knowingly employ, contract or subcontract with an illegal alien; foreign national non-immigrant who is in violation their status, as a result of their failure to maintain or comply with the terms and conditions of their admission into the United States. Additionally, the Contractor is required to comply with all "E-Verify" requirements consistent with "Executive Order 12989" and any related pertinent Amendments, as well as applicable Federal Acquisition Regulations.

If the Contractor fails to comply with any requirements outlined in the preceding paragraphs or its Agency regulations, the Department of Veterans Affairs may, at its discretion, require that the foreign national who failed to maintain their legal status in the United States or otherwise failed to comply with the requirements of the laws administered by Homeland Security, Immigration and Customs Enforcement and the U.S Department of Labor, shall be prohibited from working at the Contractor's place of business that services Department of Veterans Affairs patient referrals; or other place where the Contractor provides services to veterans who have been referred by the Department of Veterans Affairs; and shall form the basis for termination of this contract for breach.

This certification concerns a matter within the jurisdiction of an agency of the United States and the making of a false, fictitious, or fraudulent certification may render the maker subject to prosecutions under 18 U.S.C. 1001.

The Contractor agrees to obtain a similar certification from its subcontractors. The certification shall be made as part of the offerors response to the solicitation using the subject attachment (Attachment A) in Section D of the solicitation document.

**18. REQUIRED REGISTRATION WITH CONTRACTOR PERFORMANCE ASSESSMENT SYSTEM (CPARS)**

a. As prescribed in Federal Acquisition Regulation (FAR) Part 42.15, the VA evaluates contractor past performance on all contracts that exceed the thresholds outlined in FAR Part 42.15, and shares those evaluations with other Federal Government contracting specialists and procurement officials through the Past Performance Information Retrieval System (PPIRS). The FAR requires that the contractor be provided an opportunity to comment on past performance evaluations prior to the posting of each report. To fulfill this requirement the Government uses an online database, CPARS. CPARS database information is uploaded to the PPIRS database, which is available to all Federal agencies.

b. Each contractor whose contract award is estimated to exceed the thresholds outlined in FAR Part 42.15 is required to provide to the contracting officer contact information for the contractor's representative with their response to the solicitation. The contractor is responsible to notify the contracting officer of any change to the contractor's representative during the contract performance period. Contractor's representative contact information consists of a name and email address.

c. The Government will register the contract within thirty days after contract award. For contracts with a period of one year or less, the contracting officer will perform a single evaluation when the contract is complete. For contracts exceeding one year, the contracting officer will evaluate the contractor's performance annually. Intermediate reports will be filed each year until the last year of the contract, when the final report will be completed. Each report shall be forwarded in CPARS to the contractor's designated representative for comment. The contractor's representative will have thirty days to submit any comments and return the report to the VA Contracting Officer. Failure by the contractor to respond within those thirty days will result in the Government's evaluation being placed on file in PPIRS without contractor's comments.

**19. PAYMENT**

a. The Government agrees to reimburse the contractor for services performed, minus any adjustments, paid monthly in arrears, upon receipt of a properly prepared invoice submitted by the contractor.

b. Payments made by the Government under this contract shall constitute the total cost of services provided by the contractor.

c. The contractor hereby agrees that in no event shall contractor bill, charge, collect a deposit from, seek compensation, remuneration, or reimbursement from, or have any recourse against the beneficiary, the beneficiary's family, private insurer, Medicare or any other entity acting on the beneficiary's behalf, for services provided pursuant to this contract. Billings rendered by the contractor to the Government for services furnished to a VA/FHCC beneficiary under the terms of this contract shall be billings in full. This provision shall survive the termination or ending of the contract.

[End of *SPECIAL CONTRACT REQUIREMENTS*]

## B.5 CONTRACT SECURITY REQUIREMENTS

**1. GENERAL**

Contractors, contractor personnel, subcontractors, and subcontractor personnel shall be subject to the same Federal laws, regulations, standards, and Government Directives and Handbooks as VA/FHCC personnel regarding information and information system security.

**2. CONTRACTOR PERSONNEL SECURITY REQUIREMENTS**

Failure to comply with the contractor personnel security requirements may result in termination of the Contract for default.

Contractor and its subcontractors shall have a current process in place for conducting employee screening/ background checks as a condition of employment with the contractor or subcontractor. Contractor shall also provide a certification memo indicating that all of its employees and subcontractor employees having access to VA sensitive information (i.e. cardiac technicians, cardiologists, clinicians and administrative personnel) during the performance of this contract have successfully passed through this process to their standards. The certification memo shall be provided to the Contracting Officer (CO) and COR(s) on an annual basis (employee screening/background checks are not required to be re-conducted annually).

**3. SECURITY TRAINING**

Due to the increased emphasis on privacy and information security, the following special contract requirements are established and hereby made part of the contract entered into with the Government.

Privacy Training: Contractor and their sub-contractors assigned work under the contract are required to receive annual training on patient privacy as established by HIPAA statutes. Training must meet VA's/FHCC's and the Department of Health and Human Services Standards for Privacy of Individually-identifiable health information. Contractor shall provide documented proof to the VA upon request that all employees assigned work and/or having access to Protected Health Information have received annual training. For contractors and sub-contractors who do not have access to VA/FHCC computer systems, this requirement is met by receiving VA/FHCC National Privacy Training, other VA/FHCC approved privacy training or contractor furnished training that meets the requirements of the HHS standards.

**4. COMPUTER SECURITY**

a. VA/FHCC may provide contractor and subcontractor, if any, with access to VA/FHCC automated patient records and general files maintained on VA/FHCC computer systems. Contractor, contractor's employees, and contractor's subcontractors (if any) shall maintain, access, release, and otherwise manage the information contained in the automated patient record and general file system in accordance with all federal laws governing that information, including federal laws applicable to federal agency records. Contractor shall take reasonable safeguards, both physical and electronic, to safeguard the information and prevent unauthorized disclosures. Contractor, contractor's employees, and contractor's subcontractors (if any) shall follow all VA/FHCC policies governing access to, release of, and management of the information maintained

in the automated system. Contractor shall take steps to ensure that its employees and subcontractors (if any) are bound by this requirement and subject to adverse action, up to and including termination of the relationship with contractor, for failure to follow these requirements and that its employees and subcontractors, if any, meet the same requirements as VA/FHCC employees for access to information contained in the automated record system. Contractor will utilize computers that are consistent with VA/FHCC requirements and upgrade its computers if instructed to do so by VA/FHCC in order to ensure compatibility with the VA/FHCC system.

b. In performing this contract, contractor shall be considered a part of VA/FHCC for purposes of 5 U.S.C. §552a, 38 U.S.C. §§5701 and 7332. Contractor's employees and agents may have access to patient medical records and general files to the extent necessary to perform this contract. Notwithstanding any other provision of this contract, contractor and/or its employees may not disclose information contained in general files and patient records and or other individually identified patient information, including information and records generated by the contractor in performance of this contract, except pursuant to explicit instructions from the VA/FHCC. For the purposes of this paragraph, instruction to disclose may be provided by these officials only: Contracting Officer, Contracting Officer Technical Advisor, the Release of Information supervisor, or VA/FHCC attorneys.

c. Records created by contractor in the course of performing this contract are the property of the VA/FHCC and shall not be accessed, released, transferred, or destroyed except in accordance with applicable federal law, regulations, and policy. Access to data will be limited to the minimum necessary for performance of the contract. Contractor will take steps to ensure that access is limited to those employees who need access to the data to perform the contract. Contractor will not copy information contained in the system, either by printing to paper or by copying to another digital format, without the express permission of one of the officials listed in paragraph (b), above, except as is necessary to make single copies in the ordinary course of providing patient care. Contractor will not commingle the data from the system with information from other sources. Contractor shall report any unauthorized disclosure of VA/FHCC information to the officials listed in paragraph (b).

d. If this contract is terminated for any reason, contractor will provide the VA/FHCC with all individually-identified VA/FHCC patient treatment records or other information in its possession, as well as any copies made pursuant to paragraph (c), above within seven (7) days of the termination of the contract.

e. Certain information available from the database and other records created by the contractor under this Contract are medical quality assurance records protected by 38 U.S.C. §5705; it's implementing regulations at 38 U.S.C. §§17.500-511; and VHA Directive 98-016,4.b.(1)(d), 4.6(2)(c) and 4.6(4). These records may be disclosed only as authorized by 38 U.S.C. §5705 and the VA regulations. Disclosure of these records in violation of §5705 is a criminal offense under 38 U.S.C. §5705(e).

f. Contractor shall follow all VA/FHCC policies regarding the retention of records. In the alternative, contractor may deliver the records to VA/FHCC for retention.

g. Any changes in the law or regulations governing the information covered by this contract during the term of this contract shall be deemed to be incorporated into this contract. Contractor shall educate its employees and subcontractors, if any, of the requirements of this section and shall advise its employees and subcontractors, if any, of any changes as they occur. On contractor's request, VA/FHCC will provide trainers who can educate contractor's employees and subcontractors, if any, of their obligations under this section

h. Contractor shall make its internal policies and practices regarding the safeguarding of medical and/or electronic information available to federal agencies with enforcement authority over the maintenance of those records upon request.

**5. VA/FHCC INFORMATION CUSTODIAL LANGUAGE**

a. Information made available to contractor/subcontractor by VA/FHCC for performance or administration of this contract or information developed by contractor/subcontractor in performance or administration of the contract shall be used only for those purposes and shall not be used in any other way without the prior written consent of the VA/FHCC. This clause expressly limits the contractor's/subcontractor's rights to use data as described in Rights in Data - General, FAR 52.227-14(d) (1).

b. VA/FHCC information should not be co-mingled, if possible, with any other data on contractor/ subcontractor information systems or media storage systems to ensure VA/FHCC requirements related

to data protection and media sanitization can be met. If co-mingling must be allowed to meet requirements of the business need, the contractor must ensure that Government's information is returned to the VA/FHCC or destroyed in accordance with the Government's sanitization requirements. The Government reserves the right to conduct on-site inspections of contractor and subcontractor IT resources to ensure data security controls, separation of data and job duties, and destruction/media sanitization procedures are in compliance with VA/FHCC directive requirements.

c. Prior to termination or completion of this contract, contractor/subcontractor must not destroy information received from the Government, or gathered/created by the contractor in the course of performing this contract without prior written approval by the cognizant Government (VA or FHCC) facility. Any data destruction done on behalf of VA/FHCC by a contractor/subcontractor must be done in accordance with National Archives and Records Administration (NARA) requirements as outlined in VA Directive 6300, *Records and Information Management* and its Handbook 6300.1 *Records Management Procedures*, applicable VA/FHCC Records Control Schedules, and VA Handbook 6500.1, *Electronic Media Sanitization*. Self-certification by the contractor that the data destruction requirements above have been met must be sent to the Contracting Officer within 30 days of termination of the contract.

d. The contractor/subcontractor must receive, gather, store, back up, maintain, use, disclose and dispose of VA/FHCC information only in compliance with the terms of the contract and applicable Federal and VA/FHCC information confidentiality and security laws, regulations and policies. Should any VA/FHCC information confidentiality and security laws, regulations and policies, or updates to FIPS or Special Publications (SP) issued by NIST, become applicable after execution of the contract, the parties agree to negotiate in good faith to implement the information confidentiality and security laws, regulations and policies in this contract.

e. The contractor/subcontractor shall not make copies of VA/FHCC information except as authorized and necessary to perform the terms of the agreement or to preserve electronic information stored on contractor/subcontractor electronic storage media for restoration in case any electronic equipment or data used by the contractor/subcontractor needs to be restored to an operating state. If copies are made for restoration purposes, after the restoration is complete, the copies must be appropriately destroyed.

f. If the Government determines that the contractor has violated any of the information confidentiality, privacy, and security provisions of the contract, it shall be sufficient grounds for VA/FHCC to withhold payment to the contractor or third party or terminate the contract for default or terminate for cause under Federal Acquisition Regulation (FAR) part 12.

g. If a VHA/FHCC contract is terminated for cause, any associated BAA must also be terminated and appropriate actions taken in accordance with VHA Handbook 1600.01, *Business Associate Agreements*. Absent an agreement to use or disclose protected health information, there is no business associate relationship.

h. The contractor/subcontractor must store, transport, or transmit VA/FHCC sensitive information in an encrypted form, using VA/FHCC-approved encryption tools that are, at a minimum, FIPS 140-2 validated.

i. The contractor/subcontractor's firewall and Web services security controls, if applicable, shall meet or exceed VA/FHCC, as well as HIPPA, minimum requirements. VA/FHCC Configuration Guidelines are available upon request.

j. Except for uses and disclosures of VA/FHCC information authorized by this contract for performance of the contract, the contractor/subcontractor may use and disclose VA/FHCC information only in two other situations: (i) in response to a qualifying order of a court of competent jurisdiction, or (ii) with VA's/FHCC's prior written approval. The contractor/subcontractor must refer all requests for, demands for production of, or inquiries about, VA/FHCC information and information systems to the Contracting Officer for response.

k. Notwithstanding the provision above, the contractor/subcontractor shall not release VA/FHCC records protected by Title 38 U.S.C. 5705, confidentiality of medical quality assurance records and/or Title 38 U.S.C. 7332, confidentiality of certain health records pertaining to drug addiction, sickle cell anemia, alcoholism or alcohol abuse, or infection with human immunodeficiency virus. If the contractor/subcontractor is in receipt of a court order or other requests for the above mentioned information, that contractor/subcontractor shall immediately refer such court orders or other requests to the Contracting Officer for response.

l. For service that involves the storage, generating, transmitting, or exchanging of VA/FHCC sensitive information but does not require C&A or an MOU-ISA for system interconnection, the contractor/subcontractor must complete a Contractor Security Control Assessment (CSCA) on a yearly basis and provide it to the COR.

## 6. Information System Hosting, Operation, Maintenance or Use

For information systems that are hosted, operated, maintained, or used on behalf of VA/FHCC at non-Government facilities, contractors/subcontractors are fully responsible and accountable for ensuring compliance with all HIPAA, Privacy Act, FISMA, NIST, FIPS, and VA/DoD security and privacy directives and handbooks. This includes conducting compliant risk assessments, routine vulnerability scanning, system patching and change management procedures, and the completion of an acceptable contingency plan for each system. The contractor's security control procedures must be equivalent, to those procedures used to secure VA systems.

## 7. VA/FHCC sensitive information & Data Security Requirements

a. Paper, plastic or other similar based media containing VA/FHCC sensitive data that is not returned to the VA/FHCC will be properly disposed of by the contractor by methods such as shredders with no larger than 1/8 inch width cuts and then cross cut. This media will be destroyed such that information may not be retrieved. Media with small print, such as microfilm will be completely destroyed such as to render the information unrecoverable.

b. The contractor will take due diligence to make sure that VA/FHCC sensitive information and data that is viewed, faxed or similarly transmitted, or discussed verbally is protected from unapproved disclosure.

c. VA/FHCC sensitive information and data may not be transmitted across the Internet unencrypted (including email and instant messaging) and must be protected by (VA-VPN) VA Virtual Private Network or VA/FHCC approved encryption process (Example: PKI - Public Key Infrastructure).

d. VA/FHCC sensitive information may not reside on non-VA/FHCC systems or devices unless specifically designated and approved as appropriate for the terms of the contract. All systems that store or process VA/FHCC data will be protected with VA/FHCC approved encryption (FIPS 140-2 compliant).

e. Any security violations or suspected violations shall be immediately reported to the VA Contracting Officer and the VA/FHCC Information Security Officer (ISO).

## 8. Security Incident Investigation

a. The term "security incident" means an event that has, or could have, resulted in unauthorized access to, loss or damage to VA/FHCC assets, or sensitive information, or an action that breaches VA/FHCC security procedures. The contractor/subcontractor shall immediately notify the COR and simultaneously, the designated ISO and Privacy Officer for the contract of any known or suspected security/privacy incidents, or any unauthorized disclosure of sensitive information, including that contained in system(s) to which the contractor/subcontractor has access.

b. To the extent known by the contractor/subcontractor, the contractor/subcontractor's notice to the Government shall identify the information involved, the circumstances surrounding the incident (including to whom, how, when, and where the VA/FHCC information or assets were placed at risk or compromised), and any other information that the contractor/subcontractor considers relevant.

c. With respect to unsecured protected health information, the business associate is deemed to have discovered a data breach when the business associate knew or should have known of a breach of such information. Upon discovery, the business associate must notify the covered entity of the breach. Notifications need to be made in accordance with the executed business associate agreement.

d. In instances of theft or break-in or other criminal activity, the contractor/subcontractor must concurrently report the incident to the appropriate law enforcement entity (or entities) of jurisdiction, including the VA/FHCC OIG and Security and Law Enforcement. The contractor, its employees, and its subcontractors and their employees shall cooperate with the Government and any law enforcement authority responsible for the investigation and prosecution of any possible criminal law violation(s) associated with any incident. The contractor/subcontractor shall cooperate with the Government in any civil litigation to recover VA/FHCC information, obtain monetary or other compensation from a third party for damages arising from any incident, or obtain injunctive relief against any third party arising from, or related to, the incident.

**9. LIQUIDATED DAMAGES FOR DATA BREACH**

a. Consistent with the requirements of 38 U.S.C. §5725, a contract may require access to sensitive personal information. If so, the contractor is liable to VA/FHCC for liquidated damages in the event of a data breach or privacy incident involving any SPI the contractor/subcontractor processes or maintains under this contract. It is the policy of the VA/FHCC, however, to forego collection of liquidated damages in the event the contractor provides payment of actual damages in an amount determined to be adequate by the agency.

b. The Contractor/subcontractor shall provide notice to VA/FHCC of a "security incident" as set forth in the Security Incident Investigation section above. Upon such notification, VA/FHCC must secure from a non-Department entity or the VA/DoD Office of Inspector General (OIG) an independent risk analysis of the data breach to determine the level of risk associated with the data breach for the potential misuse of any sensitive personal information involved in the data breach. The term 'data breach' means the loss, theft, or other unauthorized access, or any access other than that incidental to the scope of employment, to data containing sensitive personal information, in electronic or printed form, that results in the potential compromise of the confidentiality or integrity of the data. Contractor shall fully cooperate with the entity performing the risk analysis. Failure to cooperate may be deemed a material breach and grounds for contract termination.

c. Each risk analysis shall address all relevant information concerning the data breach, including the following:

   1) Nature of the event (loss, theft, unauthorized access);

   2) Description of the event, including:

      a) date of occurrence;

      b) data elements involved, including any PII, such as full name, social security number, date of birth, home address, account number, disability code;

   3) Number of individuals affected or potentially affected;

   4) Names of individuals or groups affected or potentially affected;

   5) Ease of logical data access to the lost, stolen or improperly accessed data in light of the degree of protection for the data, e.g., unencrypted, plain text;

   6) Amount of time the data has been out of VA/FHCC control;

   7) The likelihood that the sensitive personal information will or has been compromised(made accessible to and usable by unauthorized persons);

   8) Known misuses of data containing sensitive personal information, if any;

   9) Assessment of the potential harm to the affected individuals;

   10) Data breach analysis as outlined in 6500.2 Handbook, *Management of Security and Privacy Incidents*, as appropriate; and

   11) Whether credit protection services may assist record subjects in avoiding or mitigating the results of identity theft based on the sensitive personal information that may have been compromised.

d. Based on the determinations of the independent risk analysis, the contractor shall be responsible for paying to the VA liquidated damages in the amount of $37.50 per affected individual to cover the cost of providing credit protection services to affected individuals consisting of the following:

   1) Notification;

   2) One year of credit monitoring services consisting of automatic daily monitoring of at least three (3) relevant credit bureau reports;

   3) Data breach analysis;

   4) Fraud resolution services, including writing dispute letters, initiating fraud alerts and credit freezes, to assist affected individuals to bring matters to resolution;

   5) One year of identity theft insurance with $20,000.00 coverage at $0 deductible; and

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 69 of 153

6) Necessary legal expenses the subjects of SPI data breach may incur to repair falsified or damaged credit records are not included in the liquidated damages, which the Contractor should anticipate as among the costs of doing business and should consider it in developing its price estimate.

### 10. SECURITY CONTROLS COMPLIANCE TESTING

On a periodic basis, VA/FHCC, including the Office of Inspector General, reserves the right to evaluate any or all of the security controls and privacy practices implemented by the contractor under the clauses contained within the contract. With ten (10) working-days' notice, at the request of the Government, the Contractor must fully cooperate and assist in a government-sponsored security controls assessment at each location wherein VA/FHCC information is processed or stored, or information systems are developed, operated, maintained, or used on behalf of VA/FHCC, including those initiated by the Office of Inspector General. The Government may conduct a security control assessment on shorter notice (to include unannounced assessments) as determined by VA/FHCC in the event of a security incident or at any other time.

[End of *CONTRACT SECURITY REQUIREMENTS*]

## SECTION C - CONTRACT CLAUSES

### C.1  52.212-4  CONTRACT TERMS AND CONDITIONS—COMMERCIAL ITEMS (JAN 2017)

(a) *Inspection/Acceptance.* The Contractor shall only tender for acceptance those items that conform to the requirements of this contract. The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance. The Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price. If repair/replacement or reperformance will not correct the defects or is not possible, the Government may seek an equitable price reduction or adequate consideration for acceptance of nonconforming supplies or services.  The Government must exercise its post-acceptance rights—

(1) Within a reasonable time after the defect was discovered or should have been discovered; and

(2) Before any substantial change occurs in the condition of the item, unless the change is due to the defect in the item.

(b) *Assignment.* The Contractor or its assignee may assign its rights to receive payment due as a result of performance of this contract to a bank, trust company, or other financing institution, including any Federal lending agency in accordance with the Assignment of Claims Act (31 U.S.C. 3727). However, when a third party makes payment (e.g., use of the Governmentwide commercial purchase card), the Contractor may not assign its rights to receive payment under this contract.

(c) *Changes.* Changes in the terms and conditions of this contract may be made only by written agreement of the parties.

(d) Disputes. This contract is subject to 41 U.S.C. chapter 71, Contract Disputes. Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at FAR 52.233-1, Disputes, which is incorporated herein by reference. The Contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.

(e) *Definitions.* The clause at FAR 52.202-1, Definitions, is incorporated herein by reference.

(f) *Excusable delays.* The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

(g) Invoice.

(1) The Contractor shall submit an original invoice and three copies (or electronic invoice, if authorized) to the address designated in the contract to receive invoices. An invoice must include—

(i) Name and address of the Contractor;

(ii) Invoice date and number;

(iii) Contract number, line item number and, if applicable, the order number;

(iv) Description, quantity, unit of measure, unit price and extended price of the items delivered;

(v) Shipping number and date of shipment, including the bill of lading number and weight of shipment if shipped on Government bill of lading;

(vi) Terms of any discount for prompt payment offered;

(vii) Name and address of official to whom payment is to be sent;

(viii) Name, title, and phone number of person to notify in event of defective invoice; and

(ix) Taxpayer Identification Number (TIN). The Contractor shall include its TIN on the invoice only if required elsewhere in this contract.

(x) Electronic funds transfer (EFT) banking information.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 71 of 153

(A) The Contractor shall include EFT banking information on the invoice only if required elsewhere in this contract.

(B) If EFT banking information is not required to be on the invoice, in order for the invoice to be a proper invoice, the Contractor shall have submitted correct EFT banking information in accordance with the applicable solicitation provision, contract clause (e.g., 52.232-33, Payment by Electronic Funds Transfer—System for Award Management, or 52.232-34, Payment by Electronic Funds Transfer—Other Than System for Award Management), or applicable agency procedures.

(C) EFT banking information is not required if the Government waived the requirement to pay by EFT.

(2) Invoices will be handled in accordance with the Prompt Payment Act (31 U.S.C. 3903) and Office of Management and Budget (OMB) prompt payment regulations at 5 CFR part 1315.

(h) *Patent indemnity.* The Contractor shall indemnify the Government and its officers, employees and agents against liability, including costs, for actual or alleged direct or contributory infringement of, or inducement to infringe, any United States or foreign patent, trademark or copyright, arising out of the performance of this contract, provided the Contractor is reasonably notified of such claims and proceedings.

(i) Payment.—

(1) *Items accepted.* Payment shall be made for items accepted by the Government that have been delivered to the delivery destinations set forth in this contract.

(2) *Prompt payment.* The Government will make payment in accordance with the Prompt Payment Act (31 U.S.C. 3903) and prompt payment regulations at 5 CFR part 1315.

(3) *Electronic Funds Transfer (EFT).* If the Government makes payment by EFT, see 52.212-5(b) for the appropriate EFT clause.

(4) *Discount.* In connection with any discount offered for early payment, time shall be computed from the date of the invoice. For the purpose of computing the discount earned, payment shall be considered to have been made on the date which appears on the payment check or the specified payment date if an electronic funds transfer payment is made.

(5) *Overpayments.* If the Contractor becomes aware of a duplicate contract financing or invoice payment or that the Government has otherwise overpaid on a contract financing or invoice payment, the Contractor shall—

(i) Remit the overpayment amount to the payment office cited in the contract along with a description of the overpayment including the—

(A) Circumstances of the overpayment (e.g., duplicate payment, erroneous payment, liquidation errors, date(s) of overpayment);

(B) Affected contract number and delivery order number, if applicable;

(C) Affected line item or subline item, if applicable; and

(D) Contractor point of contact.

(ii) Provide a copy of the remittance and supporting documentation to the Contracting Officer.

(6) *Interest.*

(i) All amounts that become payable by the Contractor to the Government under this contract shall bear simple interest from the date due until paid unless paid within 30 days of becoming due. The interest rate shall be the interest rate established by the Secretary of the Treasury as provided in 41 U.S.C. 7109, which is applicable to the period in which the amount becomes due, as provided in (i)(6)(v) of this clause, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

(ii) The Government may issue a demand for payment to the Contractor upon finding a debt is due under the contract.

(iii) *Final decisions.* The Contracting Officer will issue a final decision as required by 33.211 if—

(A) The Contracting Officer and the Contractor are unable to reach agreement on the existence or amount of a debt within 30 days;

(B) The Contractor fails to liquidate a debt previously demanded by the Contracting Officer within the timeline specified in the demand for payment unless the amounts were not repaid because the Contractor has requested an installment payment agreement; or

(C) The Contractor requests a deferment of collection on a debt previously demanded by the Contracting Officer (see 32.607-2).

(iv) If a demand for payment was previously issued for the debt, the demand for payment included in the final decision shall identify the same due date as the original demand for payment.

(v) Amounts shall be due at the earliest of the following dates:

(A) The date fixed under this contract.

(B) The date of the first written demand for payment, including any demand for payment resulting from a default termination.

(vi) The interest charge shall be computed for the actual number of calendar days involved beginning on the due date and ending on—

(A) The date on which the designated office receives payment from the Contractor;

(B) The date of issuance of a Government check to the Contractor from which an amount otherwise payable has been withheld as a credit against the contract debt; or

(C) The date on which an amount withheld and applied to the contract debt would otherwise have become payable to the Contractor.

(vii) The interest charge made under this clause may be reduced under the procedures prescribed in 32.608-2 of the Federal Acquisition Regulation in effect on the date of this contract.

(j) *Risk of loss.* Unless the contract specifically provides otherwise, risk of loss or damage to the supplies provided under this contract shall remain with the Contractor until, and shall pass to the Government upon:

(1) Delivery of the supplies to a carrier, if transportation is f.o.b. origin; or

(2) Delivery of the supplies to the Government at the destination specified in the contract, if transportation is f.o.b. destination.

(k) *Taxes.* The contract price includes all applicable Federal, State, and local taxes and duties.

(l) *Termination for the Government's convenience.* The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

(m) *Termination for cause.* The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

(n) *Title.* Unless specified elsewhere in this contract, title to items furnished under this contract shall pass to the Government upon acceptance, regardless of when or where the Government takes physical possession.

(o) *Warranty.* The Contractor warrants and implies that the items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract.

(p) *Limitation of liability.* Except as otherwise provided by an express warranty, the Contractor will not be liable to the Government for consequential damages resulting from any defect or deficiencies in accepted items.

(q) *Other compliances.* The Contractor shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under this contract.

(r) *Compliance with laws unique to Government contracts.* The Contractor agrees to comply with 31 U.S.C. 1352 relating to limitations on the use of appropriated funds to influence certain Federal contracts; 18 U.S.C. 431 relating to officials not to benefit; 40 U.S.C. chapter 37, Contract Work Hours and Safety Standards; 41 U.S.C. chapter 87, Kickbacks; 41 U.S.C. 4712 and 10 U.S.C. 2409 relating to whistleblower protections; 49 U.S.C. 40118, Fly American; and 41 U.S.C. chapter 21 relating to procurement integrity.

(s) *Order of precedence.* Any inconsistencies in this solicitation or contract shall be resolved by giving precedence in the following order:

(1) The schedule of supplies/services.

(2) The Assignments, Disputes, Payments, Invoice, Other Compliances, Compliance with Laws Unique to Government Contracts, and Unauthorized Obligations paragraphs of this clause;

(3) The clause at 52.212-5.

(4) Addenda to this solicitation or contract, including any license agreements for computer software.

(5) Solicitation provisions if this is a solicitation.

(6) Other paragraphs of this clause.

(7) The Standard Form 1449.

(8) Other documents, exhibits, and attachments

(9) The specification.

(t) *System for Award Management (SAM)*.

(1) Unless exempted by an addendum to this contract, the Contractor is responsible during performance and through final payment of any contract for the accuracy and completeness of the data within the SAM database, and for any liability resulting from the Government's reliance on inaccurate or incomplete data. To remain registered in the SAM database after the initial registration, the Contractor is required to review and update on an annual basis from the date of initial registration or subsequent updates its information in the SAM database to ensure it is current, accurate and complete. Updating information in the SAM does not alter the terms and conditions of this contract and is not a substitute for a properly executed contractual document.

(2)(i) If a Contractor has legally changed its business name, "doing business as" name, or division name (whichever is shown on the contract), or has transferred the assets used in performing the contract, but has not completed the necessary requirements regarding novation and change-of-name agreements in FAR subpart 42.12, the Contractor shall provide the responsible Contracting Officer a minimum of one business day's written notification of its intention to (A) change the name in the SAM database; (B) comply with the requirements of subpart 42.12; and (C) agree in writing to the timeline and procedures specified by the responsible Contracting Officer. The Contractor must provide with the notification sufficient documentation to support the legally changed name.

(ii) If the Contractor fails to comply with the requirements of paragraph (t)(2)(i) of this clause, or fails to perform the agreement at paragraph (t)(2)(i)(C) of this clause, and, in the absence of a properly executed novation or change-of-name agreement, the SAM information that shows the Contractor to be other than the Contractor indicated in the contract will be considered to be incorrect information within the meaning of the "Suspension of Payment" paragraph of the electronic funds transfer (EFT) clause of this contract.

(3) The Contractor shall not change the name or address for EFT payments or manual payments, as appropriate, in the SAM record to reflect an assignee for the purpose of assignment of claims (see Subpart 32.8, Assignment of Claims). Assignees shall be separately registered in the SAM database. Information provided to the Contractor's SAM record that indicates payments, including those made by EFT, to an ultimate recipient other than that Contractor will be considered to be incorrect information within the meaning of the "Suspension of payment" paragraph of the EFT clause of this contract.

(4) Offerors and Contractors may obtain information on registration and annual confirmation requirements via SAM accessed through https://www.acquisition.gov.

(u) *Unauthorized Obligations*.

(1) Except as stated in paragraph (u)(2) of this clause, when any supply or service acquired under this contract is subject to any End User License Agreement (EULA), Terms of Service (TOS), or similar legal instrument or agreement, that includes any clause requiring the Government to indemnify the Contractor or any person or entity for damages, costs, fees, or any other loss or liability that would create an Anti-Deficiency Act violation (31 U.S.C. 1341), the following shall govern:

(i) Any such clause is unenforceable against the Government.

(ii) Neither the Government nor any Government authorized end user shall be deemed to have agreed to such clause by virtue of it appearing in the EULA, TOS, or similar legal instrument or agreement. If the EULA, TOS, or similar legal instrument or agreement is invoked through an “I agree” click box or other comparable mechanism (e.g., “click-wrap” or “browse-wrap” agreements), execution does not bind the Government or any Government authorized end user to such clause.

(iii) Any such clause is deemed to be stricken from the EULA, TOS, or similar legal instrument or agreement.

(2) Paragraph (u)(1) of this clause does not apply to indemnification by the Government that is expressly authorized by statute and specifically authorized under applicable agency regulations and procedures.

(v) *Incorporation by reference*. The Contractor’s representations and certifications, including those completed electronically via the System for Award Management (SAM), are incorporated by reference into the contract.

(End of Clause)

***ADDENDUM to FAR 52.212-4 CONTRACT TERMS AND CONDITIONS—COMMERCIAL ITEMS***

The following clauses are incorporated into 52.212-4 as an addendum to this contract:

### C.2 52.203-17 CONTRACTOR EMPLOYEE WHISTLEBLOWER RIGHTS AND REQUIREMENT TO INFORM EMPLOYEES OF WHISTLEBLOWER RIGHTS (APR 2014)

(a) This contract and employees working on this contract will be subject to the whistleblower rights and remedies in the pilot program on Contractor employee whistleblower protections established at 41 U.S.C. 4712 by section 828 of the National Defense Authorization Act for Fiscal Year 2013 (Pub. L. 112–239) and FAR 3.908.

(b) The Contractor shall inform its employees in writing, in the predominant language of the workforce, of employee whistleblower rights and protections under 41 U.S.C. 4712, as described in section 3.908 of the Federal Acquisition Regulation.

(c) The Contractor shall insert the substance of this clause, including this paragraph (c), in all subcontracts over the simplified acquisition threshold.

(End of Clause)

### C.3 52.203-99 PROHIBITION ON CONTRACTING WITH ENTITIES THAT REQUIRE CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS (DEVIATION) (FEB 2015)

(a) The Contractor shall not require employees or contractors seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or subcontractors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

(b) The contractor shall notify employees that the prohibitions and restrictions of any internal confidentiality agreements covered by this clause are no longer in effect.

(c) The prohibition in paragraph (a) of this clause does not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

(d)(1) In accordance with section 743 of Division E, Title VII, of the Consolidated and Further Continuing Resolution Appropriations Act, 2015 (Pub. L. 113-235), use of funds appropriated (or otherwise made available) under that or any other Act may be prohibited, if the Government determines that the Contractor is not in compliance with the provisions of this clause.

(2) The Government may seek any available remedies in the event the contractor fails to comply with the provisions of this clause.

(End of Clause)

### C.4 52.204-4 PRINTED OR COPIED DOUBLE-SIDED ON RECYCLED PAPER (MAY 2011)

(a) *Definitions.* As used in this clause—

"Postconsumer fiber" means— (1) Paper, paperboard, and fibrous materials from retail stores, office buildings, homes, and so forth, after they have passed through their end-usage as a consumer item, including: used corrugated boxes; old newspapers; old magazines; mixed waste paper; tabulating cards; and used cordage; or

(2) All paper, paperboard, and fibrous materials that enter and are collected from municipal solid waste; but not

(3) Fiber derived from printers' over-runs, converters' scrap, and over-issue publications.

(b) The Contractor is required to submit paper documents, such as offers, letters, or reports that are printed or copied double-sided on paper containing at least 30 percent postconsumer fiber, whenever practicable, when not using electronic commerce methods to submit information or data to the Government.

(End of Clause)

### C.5 52.204-21 BASIC SAFEGUARDING OF COVERED CONTRACTOR INFORMATION SYSTEMS (JUN 2016)

(a) *Definitions*. As used in this clause—

*Covered contractor information system* means an information system that is owned or operated by a contractor that processes, stores, or transmits Federal contract information.

*Federal contract information* means information, not intended for public release, that is provided by or generated for the Government under a contract to develop or deliver a product or service to the Government, but not including information provided by the Government to the public (such as on public Web sites) or simple transactional information, such as necessary to process payments.

*Information* means any communication or representation of knowledge such as facts, data, or opinions, in any medium or form, including textual, numerical, graphic, cartographic, narrative, or audiovisual (Committee on National Security Systems Instruction (CNSSI) 4009).

*Information system* means a discrete set of information resources organized for the collection, processing, maintenance, use, sharing, dissemination, or disposition of information (44 U.S.C. 3502).

*Safeguarding* means measures or controls that are prescribed to protect information systems.

(b) *Safeguarding requirements and procedures*. (1) The Contractor shall apply the following basic safeguarding requirements and procedures to protect covered contractor information systems. Requirements and procedures for basic safeguarding of covered contractor information systems shall include, at a minimum, the following security controls:

(i) Limit information system access to authorized users, processes acting on behalf of authorized users, or devices (including other information systems).

(ii) Limit information system access to the types of transactions and functions that authorized users are permitted to execute.

(iii) Verify and control/limit connections to and use of external information systems.

(iv) Control information posted or processed on publicly accessible information systems.

(v) Identify information system users, processes acting on behalf of users, or devices.

(vi) Authenticate (or verify) the identities of those users, processes, or devices, as a prerequisite to allowing access to organizational information systems.

(vii) Sanitize or destroy information system media containing Federal Contract Information before disposal or release for reuse.

(viii) Limit physical access to organizational information systems, equipment, and the respective operating environments to authorized individuals.

(ix) Escort visitors and monitor visitor activity; maintain audit logs of physical access; and control and manage physical access devices.

(x) Monitor, control, and protect organizational communications (i.e., information transmitted or received by organizational information systems) at the external boundaries and key internal boundaries of the information systems.

(xi) Implement subnetworks for publicly accessible system components that are physically or logically separated from internal networks.

(xii) Identify, report, and correct information and information system flaws in a timely manner.

(xiii) Provide protection from malicious code at appropriate locations within organizational information systems.

(xiv) Update malicious code protection mechanisms when new releases are available.

(xv) Perform periodic scans of the information system and real-time scans of files from external sources as files are downloaded, opened, or executed.

(2) *Other requirements*. This clause does not relieve the Contractor of any other specific safeguarding requirements specified by Federal agencies and departments relating to covered contractor information systems generally or other Federal safeguarding requirements for controlled unclassified information (CUI) as established by Executive Order 13556.

(c) *Subcontracts*. The Contractor shall include the substance of this clause, including this paragraph (c), in subcontracts under this contract (including subcontracts for the acquisition of commercial items, other than commercially available off-the-shelf items), in which the subcontractor may have Federal contract information residing in or transiting through its information system.

(End of Clause)

### C.6 52.216-18 ORDERING (OCT 1995)

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued from the effective date of the contract through expiration date of active contract period of performance.

(b) All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

(c) If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally, by facsimile, or by electronic commerce methods only if authorized in the Schedule.

(End of Clause)

### C.7 52.216-22 INDEFINITE QUANTITY (OCT 1995)

(a) This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the quantity of supplies or services designated in the Schedule as the "minimum."

(c) Except for any limitations on quantities in the Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; *provided*, that the Contractor shall not be required to make any deliveries under this contract after expiration of active period of performance.

(End of Clause)

### C.8 52.217-8 OPTION TO EXTEND SERVICES (NOV 1999)

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within ten (10) calendar days of the expiration of the ordering period. The specific rates under this clause will be those rates in effect under the contract each time an option is exercised under this clause.

(End of Clause)

### C.9 52.224-1 PRIVACY ACT NOTIFICATION (APR 1984)

The Contractor will be required to design, develop, or operate a system of records on individuals, to accomplish an agency function subject to the Privacy Act of 1974, Public Law 93-579, December 31, 1974 (5 U.S.C. 552a) and applicable agency regulations. Violation of the Act may involve the imposition of criminal penalties.

(End of Clause)

### C.10 52.224-2 PRIVACY ACT (APR 1984)

(a) The Contractor agrees to—

(1) Comply with the Privacy Act of 1974 (the Act) and the agency rules and regulations issued under the Act in the design, development, or operation of any system of records on individuals to accomplish an agency function when the contract specifically identifies—

(i) The systems of records; and

(ii) The design, development, or operation work that the contractor is to perform;

(2) Include the Privacy Act notification contained in this contract in every solicitation and resulting subcontract and in every subcontract awarded without a solicitation, when the work statement in the proposed subcontract requires the design, development, or operation of a system of records on individuals that is subject to the Act; and

(3) Include this clause, including this subparagraph (3), in all subcontracts awarded under this contract which requires the design, development, or operation of such a system of records.

(b) In the event of violations of the Act, a civil action may be brought against the agency involved when the violation concerns the design, development, or operation of a system of records on individuals to accomplish an agency function, and criminal penalties may be imposed upon the officers or employees of the agency when the violation concerns the operation of a system of records on individuals to accomplish an agency function. For purposes of the Act, when the contract is for the operation of a system of records on individuals to accomplish an agency function, the Contractor and any employee of the Contractor is considered to be an employee of the agency.

(c) (1) "Operation of a system of records," as used in this clause, means performance of any of the activities associated with maintaining the system of records, including the collection, use, and dissemination of records.

(2) "Record," as used in this clause, means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, education, financial transactions, medical history, and criminal or employment history and that contains the person's name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a fingerprint or voiceprint or a photograph.

(3) "System of records on individuals," as used in this clause, means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

(End of Clause)

### C.11 52.227-14 RIGHTS IN DATA—GENERAL (MAY 2014)

(a) *Definitions*. As used in this clause—

"Computer database" or "database" means a collection of recorded information in a form capable of, and for the purpose of, being stored in, processed, and operated on by a computer. The term does not include computer software.

"Computer software"—

(1) Means

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 78 of 153

(i) Computer programs that comprise a series of instructions, rules, routines, or statements, regardless of the media in which recorded, that allow or cause a computer to perform a specific operation or series of operations; and

(ii) Recorded information comprising source code listings, design details, algorithms, processes, flow charts, formulas, and related material that would enable the computer program to be produced, created, or compiled.

(2) Does not include computer databases or computer software documentation.

"Computer software documentation" means owner's manuals, user's manuals, installation instructions, operating instructions, and other similar items, regardless of storage medium, that explain the capabilities of the computer software or provide instructions for using the software.

"Data" means recorded information, regardless of form or the media on which it may be recorded. The term includes technical data and computer software. The term does not include information incidental to contract administration, such as financial, administrative, cost or pricing, or management information.

"Form, fit, and function data" means data relating to items, components, or processes that are sufficient to enable physical and functional interchangeability, and data identifying source, size, configuration, mating and attachment characteristics, functional characteristics, and performance requirements. For computer software it means data identifying source, functional characteristics, and performance requirements but specifically excludes the source code, algorithms, processes, formulas, and flow charts of the software.

"Limited rights" means the rights of the Government in limited rights data as set forth in the Limited Rights Notice of paragraph (g)(3) if included in this clause.

"Limited rights data" means data, other than computer software, that embody trade secrets or are commercial or financial and confidential or privileged, to the extent that such data pertain to items, components, or processes developed at private expense, including minor modifications.

"Restricted computer software" means computer software developed at private expense and that is a trade secret, is commercial or financial and confidential or privileged, or is copyrighted computer software, including minor modifications of the computer software.

"Restricted rights", as used in this clause, means the rights of the Government in restricted computer software, as set forth in a Restricted Rights Notice of paragraph (g) if included in this clause, or as otherwise may be provided in a collateral agreement incorporated in and made part of this contract, including minor modifications of such computer software.

"Technical data", means recorded information (regardless of the form or method of the recording) of a scientific or technical nature (including computer databases and computer software documentation). This term does not include computer software or financial, administrative, cost or pricing, or management data or other information incidental to contract administration. The term includes recorded information of a scientific or technical nature that is included in computer databases. (See 41 U.S.C. 116).

"Unlimited rights" means the rights of the Government to use, disclose, reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, in any manner and for any purpose, and to have or permit others to do so.

(b) Allocation of rights.

(1) Except as provided in paragraph (c) of this clause, the Government shall have unlimited rights in—

(i) Data first produced in the performance of this contract;

(ii) Form, fit, and function data delivered under this contract;

(iii) Data delivered under this contract (except for restricted computer software) that constitute manuals or instructional and training material for installation, operation, or routine maintenance and repair of items, components, or processes delivered or furnished for use under this contract; and

(iv) All other data delivered under this contract unless provided otherwise for limited rights data or restricted computer software in accordance with paragraph (g) of this clause.

(2) The Contractor shall have the right to—

(i) Assert copyright in data first produced in the performance of this contract to the extent provided in paragraph (c)(1) of this clause;

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 79 of 153

(ii) Use, release to others, reproduce, distribute, or publish any data first produced or specifically used by the Contractor in the performance of this contract, unless provided otherwise in paragraph (d) of this clause;

(iii) Substantiate the use of, add, or correct limited rights, restricted rights, or copyright notices and to take other appropriate action, in accordance with paragraphs (e) and (f) of this clause; and

(iv) Protect from unauthorized disclosure and use those data that are limited rights data or restricted computer software to the extent provided in paragraph (g) of this clause.

(c) Copyright—

(1) Data first produced in the performance of this contract.

(i) Unless provided otherwise in paragraph (d) of this clause, the Contractor may, without prior approval of the Contracting Officer, assert copyright in scientific and technical articles based on or containing data first produced in the performance of this contract and published in academic, technical or professional journals, symposia proceedings, or similar works. The prior, express written permission of the Contracting Officer is required to assert copyright in all other data first produced in the performance of this contract.

(ii) When authorized to assert copyright to the data, the Contractor shall affix the applicable copyright notices of 17 U.S.C. 401 or 402, and an acknowledgment of Government sponsorship (including contract number).

(iii) For data other than computer software, the Contractor grants to the Government, and others acting on its behalf, a paid- up, nonexclusive, irrevocable, worldwide license in such copyrighted data to reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly by or on behalf of the Government. For computer software, the Contractor grants to the Government, and others acting on its behalf, a paid- up, nonexclusive, irrevocable, worldwide license in such copyrighted computer software to reproduce, prepare derivative works, and perform publicly and display publicly (but not to distribute copies to the public) by or on behalf of the Government.

(2) *Data not first produced in the performance of this contract.* The Contractor shall not, without the prior written permission of the Contracting Officer, incorporate in data delivered under this contract any data not first produced in the performance of this contract unless the Contractor—

(i) Identifies the data; and

(ii) Grants to the Government, or acquires on its behalf, a license of the same scope as set forth in paragraph (c)(1) of this clause or, if such data are restricted computer software, the Government shall acquire a copyright license as set forth in paragraph (g)(4) of this clause (if included in this contract) or as otherwise provided in a collateral agreement incorporated in or made part of this contract.

(3) *Removal of copyright notices*. The Government will not remove any authorized copyright notices placed on data pursuant to this paragraph (c), and will include such notices on all reproductions of the data.

(d) *Release, publication, and use of data*. The Contractor shall have the right to use, release to others, reproduce, distribute, or publish any data first produced or specifically used by the Contractor in the performance of this contract, except—

(1) As prohibited by Federal law or regulation (e.g., export control or national security laws or regulations);

(2) As expressly set forth in this contract; or

(3) If the Contractor receives or is given access to data necessary for the performance of this contract that contain restrictive markings, the Contractor shall treat the data in accordance with such markings unless specifically authorized otherwise in writing by the Contracting Officer.

(e) Unauthorized marking of data.

(1) Notwithstanding any other provisions of this contract concerning inspection or acceptance, if any data delivered under this contract are marked with the notices specified in paragraph (g)(3) or (g) (4) if included in this clause, and use of the notices is not authorized by this clause, or if the data bears any other restrictive or limiting markings not authorized by this contract, the Contracting Officer may at any time either return the data to the Contractor, or cancel or ignore the markings. However, pursuant to 41 U.S.C. 4703, the following procedures shall apply prior to canceling or ignoring the markings.

(i) The Contracting Officer will make written inquiry to the Contractor affording the Contractor 60 days from receipt of the inquiry to provide written justification to substantiate the propriety of the markings;

(ii) If the Contractor fails to respond or fails to provide written justification to substantiate the propriety of the markings within the 60-day period (or a longer time approved in writing by the Contracting Officer for good cause shown), the Government shall have the right to cancel or ignore the markings at any time after said period and the data will no longer be made subject to any disclosure prohibitions.

(iii) If the Contractor provides written justification to substantiate the propriety of the markings within the period set in paragraph (e)(1)(i) of this clause, the Contracting Officer will consider such written justification and determine whether or not the markings are to be cancelled or ignored. If the Contracting Officer determines that the markings are authorized, the Contractor will be so notified in writing. If the Contracting Officer determines, with concurrence of the head of the contracting activity, that the markings are not authorized, the Contracting Officer will furnish the Contractor a written determination, which determination will become the final agency decision regarding the appropriateness of the markings unless the Contractor files suit in a court of competent jurisdiction within 90 days of receipt of the Contracting Officer's decision. The Government will continue to abide by the markings under this paragraph (e)(1)(iii) until final resolution of the matter either by the Contracting Officer's determination becoming final (in which instance the Government will thereafter have the right to cancel or ignore the markings at any time and the data will no longer be made subject to any disclosure prohibitions), or by final disposition of the matter by court decision if suit is filed.

(2) The time limits in the procedures set forth in paragraph (e)(1) of this clause may be modified in accordance with agency regulations implementing the Freedom of Information Act (5 U.S.C. 552) if necessary to respond to a request thereunder.

(3) Except to the extent the Government's action occurs as the result of final disposition of the matter by a court of competent jurisdiction, the Contractor is not precluded by paragraph (e) of the clause from bringing a claim, in accordance with the Disputes clause of this contract, that may arise as the result of the Government removing or ignoring authorized markings on data delivered under this contract.

(f) Omitted or incorrect markings.

(1) Data delivered to the Government without any restrictive markings shall be deemed to have been furnished with unlimited rights. The Government is not liable for the disclosure, use, or reproduction of such data.

(2) If the unmarked data has not been disclosed without restriction outside the Government, the Contractor may request, within 6 months (or a longer time approved by the Contracting Officer in writing for good cause shown) after delivery of the data, permission to have authorized notices placed on the data at the Contractor's expense. The Contracting Officer may agree to do so if the Contractor—

(i) Identifies the data to which the omitted notice is to be applied;

(ii) Demonstrates that the omission of the notice was inadvertent;

(iii) Establishes that the proposed notice is authorized; and

(iv) Acknowledges that the Government has no liability for the disclosure, use, or reproduction of any data made prior to the addition of the notice or resulting from the omission of the notice.

(3) If data has been marked with an incorrect notice, the Contracting Officer may—

(i) Permit correction of the notice at the Contractor's expense if the Contractor identifies the data and demonstrates that the correct notice is authorized; or

(ii) Correct any incorrect notices.

(g) Protection of limited rights data and restricted computer software.

(1) The Contractor may withhold from delivery qualifying limited rights data or restricted computer software that are not data identified in paragraphs (b)(1)(i), (ii), and (iii) of this clause. As a condition to this withholding, the Contractor shall—

(i) Identify the data being withheld; and

(ii) Furnish form, fit, and function data instead.

(2) Limited rights data that are formatted as a computer database for delivery to the Government shall be treated as limited rights data and not restricted computer software.

(3) [Reserved]

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 81 of 153

(h) *Subcontracting*. The Contractor shall obtain from its subcontractors all data and rights therein necessary to fulfill the Contractor's obligations to the Government under this contract. If a subcontractor refuses to accept terms affording the Government those rights, the Contractor shall promptly notify the Contracting Officer of the refusal and shall not proceed with the subcontract award without authorization in writing from the Contracting Officer.

(i) *Relationship to patents or other rights*. Nothing contained in this clause shall imply a license to the Government under any patent or be construed as affecting the scope of any license or other right otherwise granted to the Government.

(End of Clause)

### C.12 52.232-40 PROVIDING ACCELERATED PAYMENTS TO SMALL BUSINESS SUBCONTRACTORS (DEC 2013)

(a) Upon receipt of accelerated payments from the Government, the Contractor shall make accelerated payments to its small business subcontractors under this contract, to the maximum extent practicable and prior to when such payment is otherwise required under the applicable contract or subcontract, after receipt of a proper invoice and all other required documentation from the small business subcontractor.

(b) The acceleration of payments under this clause does not provide any new rights under the Prompt Payment Act.

(c) Include the substance of this clause, including this paragraph (c), in all subcontracts with small business concerns, including subcontracts with small business concerns for the acquisition of commercial items.

(End of Clause)

### C.13 VAAR 852.203-70 COMMERCIAL ADVERTISING (JAN 2008)

The bidder or offeror agrees that if a contract is awarded to him/her, as a result of this solicitation, he/she will not advertise the award of the contract in his/her commercial advertising in such a manner as to state or imply that the Department of Veterans Affairs endorses a product, project or commercial line of endeavor.

(End of Clause)

### C.14 VAAR 852.203-71 DISPLAY OF DEPARTMENT OF VETERAN AFFAIRS HOTLINE POSTER (DEC 1992)

(a) Except as provided in paragraph (c) below, the Contractor shall display prominently, in common work areas within business segments performing work under VA contracts, Department of Veterans Affairs Hotline posters prepared by the VA Office of Inspector General.

(b) Department of Veterans Affairs Hotline posters may be obtained from the VA Office of Inspector General (53E), P.O. Box 34647, Washington, DC 20043-4647.

(c) The Contractor need not comply with paragraph (a) above if the Contractor has established a mechanism, such as a hotline, by which employees may report suspected instances of improper conduct, and instructions that encourage employees to make such reports.

(End of Clause)

### C.15 VAAR 852.215-71 EVALUATION FACTOR COMMITMENTS (DEC 2009)

The offeror agrees, if awarded a contract, to use the service-disabled veteran-owned small businesses or veteran-owned small businesses proposed as subcontractors in accordance with 852.215-70, Service-Disabled Veteran-Owned and Veteran-Owned Small Business Evaluation Factors, or to substitute one or more service-disabled veteran-owned small businesses or veteran-owned small businesses for subcontract work of the same or similar value.

(End of Clause)

### C.16 VAAR 852.232-72 ELECTRONIC SUBMISSION OF PAYMENT REQUESTS (NOV 2012)

(a) *Definitions.* As used in this clause—

(1) *Contract financing payment* has the meaning given in FAR 32.001.
(2) *Designated agency office* has the meaning given in 5 CFR 1315.2(m).
(3) *Electronic form* means an automated system transmitting information electronically according to the

Accepted electronic data transmission methods and formats identified in paragraph (c) of this clause. Facsimile, email, and scanned documents are not acceptable electronic forms for submission of payment requests.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 82 of 153

(4) *Invoice payment* has the meaning given in FAR 32.001.

(5) *Payment request* means any request for contract financing payment or invoice payment submitted by the contractor under this contract.

(b) *Electronic payment requests.* Except as provided in paragraph (e) of this clause, the contractor shall submit payment requests in electronic form. Purchases paid with a Government-wide commercial purchase card are considered to be an electronic transaction for purposes of this rule, and therefore no additional electronic invoice submission is required.

(c) *Data transmission.* A contractor must ensure that the data transmission method and format are through one of the following:

(1) VA's Electronic Invoice Presentment and Payment System. (See Web site at *http://www.fsc.va.gov/einvoice.asp*.)

(2) Any system that conforms to the X12 electronic data interchange (EDI) formats established by the Accredited Standards Center (ASC) and chartered by the American National Standards Institute (ANSI). The X12 EDI Web site (*http://www.x12.org*) includes additional information on EDI 810 and 811 formats.

(d) *Invoice requirements.* Invoices shall comply with FAR 32.905.

(e) *Exceptions.* If, based on one of the circumstances below, the contracting officer directs that payment requests be made by mail, the contractor shall submit payment requests by mail through the United States Postal Service to the designated agency office. Submission of payment requests by mail may be required for:

(1) Awards made to foreign vendors for work performed outside the United States;

(2) Classified contracts or purchases when electronic submission and processing of payment requests could compromise the safeguarding of classified or privacy information;

(3) Contracts awarded by contracting officers in the conduct of emergency operations, such as responses to national emergencies;

(4) Solicitations or contracts in which the designated agency office is a VA entity other than the VA Financial Services Center in Austin, Texas; or

(5) Solicitations or contracts in which the VA designated agency office does not have electronic invoicing capability as described above.

(End of Clause)

### C.17 VAAR 852.237-7 INDEMNIFICATION AND MEDICAL LIABILITY INSURANCE (JAN 2008)

(a) It is expressly agreed and understood that this is a non- personal services contract, as defined in Federal Acquisition Regulation (FAR) 37.101, under which the professional services rendered by the Contractor or its health-care providers are rendered in its capacity as an independent contractor. The Government may evaluate the quality of professional and administrative services provided but retains no control over professional aspects of the services rendered, including by example, the Contractor's or its health-care providers' professional medical judgment, diagnosis, or specific medical treatments. The Contractor and its health-care providers shall be liable for their liability-producing acts or omissions. The Contractor shall maintain or require all health-care providers performing under this contract to maintain, during the term of this contract, professional liability insurance issued by a responsible insurance carrier of not less than the following amount(s) per specialty per occurrence: *__________________. However, if the Contractor is an entity or a subdivision of a State that either provides for self-insurance or limits the liability or the amount of insurance purchased by State entities, then the insurance requirement of this contract shall be fulfilled by incorporating the provisions of the applicable State law.

* Amounts are listed below:

(b) An apparently successful offeror, upon request of the Contracting Officer, shall, prior to contract award, furnish evidence of the insurability of the offeror and/or of all health- care providers who will perform under this contract. The submission shall provide evidence of insurability concerning the medical liability insurance required by paragraph (a) of this clause or the provisions of State law as to self-insurance, or limitations on liability or insurance.

(c) The Contractor shall, prior to commencement of services under the contract, provide to the Contracting Officer Certificates of Insurance or insurance policies evidencing the required insurance coverage and an endorsement stating that any cancellation or material change adversely affecting the Government's interest shall not be effective

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 83 of 153

until 30 days after the insurer or the Contractor gives written notice to the Contracting Officer. Certificates or policies shall be provided for the Contractor and/or each health- care provider who will perform under this contract.

(d) The Contractor shall notify the Contracting Officer if it, or any of the health-care providers performing under this contract, change insurance providers during the performance period of this contract. The notification shall provide evidence that the Contractor and/or health-care providers will meet all the requirements of this clause, including those concerning liability insurance and endorsements. These requirements may be met either under the new policy, or a combination of old and new policies, if applicable.

(e) The Contractor shall insert the substance of this clause, including this paragraph (e), in all subcontracts for health-care services under this contract. The Contractor shall be responsible for compliance by any subcontractor or lower-tier subcontractor with the provisions set forth in paragraph (a) of this clause.

* Amounts from paragraph (a) above:

$1,000,000 per occurrence

(End of Clause)

### C.18 VAAR 852.237-70 CONTRACTOR RESPONSIBILITIES (APR 1984)

The contractor shall obtain all necessary licenses and/or permits required to perform this work. He/she shall take all reasonable precautions necessary to protect persons and property from injury or damage during the performance of this contract. He/she shall be responsible for any injury to himself/herself, his/her employees, as well as for any damage to personal or public property that occurs during the performance of this contract that is caused by his/her employees fault or negligence, and shall maintain personal liability and property damage insurance having coverage for a limit as required by the laws of the State of Wisconsin. Further, it is agreed that any negligence of the Government, its officers, agents, servants and employees, shall not be the responsibility of the contractor hereunder with the regard to any claims, loss, damage, injury, and liability resulting there from.

(End of Clause)

### C.19 52.212-5 CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS—COMMERCIAL ITEMS (JAN 2017)

(a) The Contractor shall comply with the following Federal Acquisition Regulation (FAR) clauses, which are incorporated in this contract by reference, to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

(1) 52.203-19, Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (JAN 2017) (section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235) and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions)).

(2) 52.209-10, Prohibition on Contracting with Inverted Domestic Corporations (NOV 2015).

(3) 52.233-3, Protest After Award (Aug 1996) (31 U.S.C. 3553).

(4) 52.233-4, Applicable Law for Breach of Contract Claim (Oct 2004) (Public Laws 108-77 and 108-78 (19 U.S.C. 3805 note)).

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

[X] (1) 52.203-6, Restrictions on Subcontractor Sales to the Government (Sept 2006), with Alternate I (Oct 1995) (41 U.S.C. 4704 and 10 U.S.C. 2402).

[] (2) 52.203-13, Contractor Code of Business Ethics and Conduct (OCT 2015) (41 U.S.C. 3509).

[] (3) 52.203-15, Whistleblower Protections under the American Recovery and Reinvestment Act of 2009 (JUN 2010) (Section 1553 of Pub. L. 111-5). (Applies to contracts funded by the American Recovery and Reinvestment Act of 2009.)

[X] (4) 52.204–10, Reporting Executive Compensation and First-Tier Subcontract Awards (OCT 2016) (Pub. L. 109–282) (31 U.S.C. 6101 note).

[] (5) [Reserved]

[] (6) 52.204–14, Service Contract Reporting Requirements (OCT 2016) (Pub. L. 111–117, section 743 of Div. C).

[X] (7) 52.204–15, Service Contract Reporting Requirements for Indefinite-Delivery Contracts (OCT 2016) (Pub. L. 111–117, section 743 of Div. C).

[X] (8) 52.209-6, Protecting the Government's Interest When Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment. (OCT 2015) (31 U.S.C. 6101 note).

[X] (9) 52.209-9, Updates of Publicly Available Information Regarding Responsibility Matters (Jul 2013) (41 U.S.C. 2313).

[] (10) [Reserved]

[] (11)(i) 52.219-3, Notice of HUBZone Set-Aside or Sole-Source Award (NOV 2011) (15 U.S.C. 657a).

[] (ii) Alternate I (NOV 2011) of 52.219-3.

[] (12)(i) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (OCT 2014) (if the offeror elects to waive the preference, it shall so indicate in its offer) (15 U.S.C. 657a).

[] (ii) Alternate I (JAN 2011) of 52.219-4.

[] (13) [Reserved]

[X] (14)(i) 52.219-6, Notice of Total Small Business Set-Aside (NOV 2011) (15 U.S.C. 644).

[] (ii) Alternate I (NOV 2011).

[] (iii) Alternate II (NOV 2011).

[] (15)(i) 52.219-7, Notice of Partial Small Business Set-Aside (June 2003) (15 U.S.C. 644).

[] (ii) Alternate I (Oct 1995) of 52.219-7.

[] (iii) Alternate II (Mar 2004) of 52.219-7.

[X] (16) 52.219-8, Utilization of Small Business Concerns (NOV 2016) (15 U.S.C. 637(d)(2) and (3)).

[] (17)(i) 52.219-9, Small Business Subcontracting Plan (JAN 2017) (15 U.S.C. 637(d)(4)).

[] (ii) Alternate I (NOV 2016) of 52.219-9.

[] (iii) Alternate II (NOV 2016) of 52.219-9.

[] (iv) Alternate III (NOV 2016) of 52.219-9.

[] (v) Alternate IV (NOV 2016) of 52.219-9.

[X] (18) 52.219-13, Notice of Set-Aside of Orders (NOV 2011) (15 U.S.C. 644(r)).

[X] (19) 52.219-14, Limitations on Subcontracting (JAN 2017) (15 U.S.C. 637(a)(14)).

[] (20) 52.219-16, Liquidated Damages—Subcontracting Plan (Jan 1999) (15 U.S.C. 637(d)(4)(F)(i)).

[] (21) 52.219-27, Notice of Service-Disabled Veteran-Owned Small Business Set-Aside (NOV 2011) (15 U.S.C. 657f).

[X] (22) 52.219-28, Post Award Small Business Program Rerepresentation (Jul 2013) (15 U.S.C 632(a)(2)).

[] (23) 52.219-29, Notice of Set-Aside for, or Sole Source Award to, Economically Disadvantaged Women-Owned Small Business Concerns (DEC 2015) (15 U.S.C. 637(m)).

[] (24) 52.219-30, Notice of Set-Aside for, or Sole Source Award to, Women-Owned Small Business Concerns Eligible Under the Women-Owned Small Business Program (DEC 2015) (15 U.S.C. 637(m)).

[X] (25) 52.222-3, Convict Labor (June 2003) (E.O. 11755).

[] (26) 52.222–19, Child Labor—Cooperation with Authorities and Remedies (OCT 2016) (E.O. 13126).

[X] (27) 52.222-21, Prohibition of Segregated Facilities (APR 2015).

[X] (28) 52.222–26, Equal Opportunity (SEP 2016) (E.O. 11246).

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 85 of 153

[X] (29) 52.222-35, Equal Opportunity for Veterans (OCT 2015) (38 U.S.C. 4212).

[X] (30) 52.222-36, Equal Opportunity for Workers with Disabilities (JUL 2014) (29 U.S.C. 793).

[X] (31) 52.222-37, Employment Reports on Veterans (FEB 2016) (38 U.S.C. 4212).

[X] (32) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (DEC 2010) (E.O. 13496).

[X] (33)(i) 52.222-50, Combating Trafficking in Persons (MAR 2015) (22 U.S.C. chapter 78 and E.O. 13627).

[] (ii) Alternate I (MAR 2015) of 52.222-50 (22 U.S.C. chapter 78 and E.O. 13627).

[X] (34) 52.222-54, Employment Eligibility Verification (OCT 2015). (E. O. 12989). (Not applicable to the acquisition of commercially available off-the-shelf items or certain other types of commercial items as prescribed in 22.1803.)

[] (35) 52.222-59, Compliance with Labor Laws (Executive Order 13673) (OCT 2016). (Applies at $50 million for solicitations and resultant contracts issued from October 25, 2016 through April 24, 2017; applies at $500,000 for solicitations and resultant contracts issued after April 24, 2017).

**Note to paragraph (b)(35):** By a court order issued on October 24, 2016, 52.222-59 is enjoined indefinitely as of the date of the order. The enjoined paragraph will become effective immediately if the court terminates the injunction. At that time, DoD, GSA, and NASA will publish a document in the **Federal Register** advising the public of the termination of the injunction.

[X] (36) 52.222-60, Paycheck Transparency (Executive Order 13673) (OCT 2016).

[] (37)(i) 52.223-9, Estimate of Percentage of Recovered Material Content for EPA-Designated Items (May 2008) (42 U.S.C.6962(c)(3)(A)(ii)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

[] (38) 52.223-11, Ozone-Depleting Substances and High Global Warming Potential Hydrofluorocarbons (JUN 2016) (E.O. 13693).

[] (39) 52.223-12, Maintenance, Service, Repair, or Disposal of Refrigeration Equipment and Air Conditioners (JUN 2016) (E.O. 13693).

[] (ii) Alternate I (MAY 2008) of 52.223-9 (42 U.S.C. 6962(i)(2)(C)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

[] (40)(i) 52.223-13, Acquisition of EPEAT®-Registered Imaging Equipment (JUN 2014) (E.O.s 13423 and 13514).

[] (ii) Alternate I (OCT 2015) of 52.223-13.

[] (41)(i) 52.223-14, Acquisition of EPEAT®-Registered Televisions (JUN 2014) (E.O.s 13423 and 13514).

[] (ii) Alternate I (JUN 2014) of 52.223-14.

[] (42) 52.223-15, Energy Efficiency in Energy-Consuming Products (DEC 2007)(42 U.S.C. 8259b).

[] (43)(i) 52.223-16, Acquisition of EPEAT®-Registered Personal Computer Products (OCT 2015) (E.O.s 13423 and 13514).

[] (ii) Alternate I (JUN 2014) of 52.223-16.

[X] (44) 52.223-18, Encouraging Contractor Policies to Ban Text Messaging While Driving (AUG 2011)

[] (45) 52.223-20, Aerosols (JUN 2016) (E.O. 13693).

[] (46) 52.223-21, Foams (JUN 2016) (E.O. 13693).

[] (47) (i) 52.224-3, Privacy Training (JAN 2017) (5 U.S.C. 552a).

[] (ii) Alternate I (JAN 2017) of 52.224-3.

[] (48) 52.225-1, Buy American—Supplies (MAY 2014) (41 U.S.C. chapter 83).

[] (49)(i) 52.225-3, Buy American—Free Trade Agreements—Israeli Trade Act (MAY 2014) (41 U.S.C. chapter 83, 19 U.S.C. 3301 note, 19 U.S.C. 2112 note, 19 U.S.C. 3805 note, 19 U.S.C. 4001 note, Pub. L. 103-182, 108-77, 108-78, 108-286, 108-302, 109-53, 109-169, 109-283, 110-138, 112-41, 112-42, and 112-43.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 86 of 153

[] (ii) Alternate I (MAY 2014) of 52.225-3.

[] (iii) Alternate II (MAY 2014) of 52.225-3.

[] (iv) Alternate III (MAY 2014) of 52.225-3.

[] (50) 52.225–5, Trade Agreements (OCT 2016) (19 U.S.C. 2501, et seq., 19 U.S.C. 3301 note).

[X] (51) 52.225-13, Restrictions on Certain Foreign Purchases (JUN 2008) (E.O.'s, proclamations, and statutes administered by the Office of Foreign Assets Control of the Department of the Treasury).

[] (52) 52.225–26, Contractors Performing Private Security Functions Outside the United States (OCT 2016) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008; 10 U.S.C. 2302 Note).

[] (53) 52.226-4, Notice of Disaster or Emergency Area Set-Aside (Nov 2007) (42 U.S.C. 5150).

[] (54) 52.226-5, Restrictions on Subcontracting Outside Disaster or Emergency Area (Nov 2007) (42 U.S.C. 5150).

[] (55) 52.232-29, Terms for Financing of Purchases of Commercial Items (Feb 2002) (41 U.S.C. 4505, 10 U.S.C. 2307(f)).

[] (56) 52.232-30, Installment Payments for Commercial Items (JAN 2017) (41 U.S.C. 4505, 10 U.S.C. 2307(f)).

[X] (57) 52.232-33, Payment by Electronic Funds Transfer—System for Award Management (Jul 2013) (31 U.S.C. 3332).

[] (58) 52.232-34, Payment by Electronic Funds Transfer—Other than System for Award Management (Jul 2013) (31 U.S.C. 3332).

[] (59) 52.232-36, Payment by Third Party (MAY 2014) (31 U.S.C. 3332).

[] (60) 52.239-1, Privacy or Security Safeguards (Aug 1996) (5 U.S.C. 552a).

[] (61) 52.242-5, Payments to Small Business Subcontractors (JAN 2017)(15 U.S.C. 637(d)(12)).

[] (62)(i) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631).

[] (ii) Alternate I (Apr 2003) of 52.247-64.

(c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

[] (1) 52.222-17, Nondisplacement of Qualified Workers (MAY 2014) (E.O. 13495).

[] (2) 52.222-41, Service Contract Labor Standards (MAY 2014) (41 U.S.C. chapter 67).

[] (3) 52.222-42, Statement of Equivalent Rates for Federal Hires (MAY 2014) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

| Employee Class | Monetary Wage-Fringe Benefits |
| --- | --- |

[] (4) 52.222-43, Fair Labor Standards Act and Service Contract Labor Standards—Price Adjustment (Multiple Year and Option Contracts) (MAY 2014) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

[] (5) 52.222-44, Fair Labor Standards Act and Service Contract Labor Standards—Price Adjustment (MAY 2014) (29 U.S.C 206 and 41 U.S.C. chapter 67).

[] (6) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment—Requirements (MAY 2014) (41 U.S.C. chapter 67).

[] (7) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services—Requirements (MAY 2014) (41 U.S.C. chapter 67).

[] (8) 52.222-55, Minimum Wages Under Executive Order 13658 (DEC 2015).

[] (9) 52.222-62, Paid Sick Leave Under Executive Order 13706 (JAN 2017) (E.O. 13706).

[] (10) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (MAY 2014) (42 U.S.C. 1792).

[] (11) 52.237-11, Accepting and Dispensing of $1 Coin (SEP 2008) (31 U.S.C. 5112(p)(1)).

(d) Comptroller General Examination of Record. The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, and does not contain the clause at 52.215-2, Audit and Records—Negotiation.

(1) The Comptroller General of the United States, or an authorized representative of the Comptroller General, shall have access to and right to examine any of the Contractor's directly pertinent records involving transactions related to this contract.

(2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR Subpart 4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e)(1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), (c), and (d) of this clause, the Contractor is not required to flow down any FAR clause, other than those in this paragraph (e)(1) in a subcontract for commercial items. Unless otherwise indicated below, the extent of the flow down shall be as required by the clause—

(i) 52.203-13, Contractor Code of Business Ethics and Conduct (OCT 2015) (41 U.S.C. 3509).

(ii) 52.203-19, Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (JAN 2017) (section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235) and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions)).

(iii) 52.219-8, Utilization of Small Business Concerns (NOV 2016) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities.

(iv) 52.222-17, Nondisplacement of Qualified Workers (MAY 2014) (E.O. 13495). Flow down required in accordance with paragraph (l) of FAR clause 52.222-17.

(v) 52.222-21, Prohibition of Segregated Facilities (APR 2015).

(vi) 52.222–26, Equal Opportunity (SEP 2016) (E.O. 11246).

(vii) 52.222-35, Equal Opportunity for Veterans (OCT 2015) (38 U.S.C. 4212).

(viii) 52.222-36, Equal Opportunity for Workers with Disabilities (JUL 2014) (29 U.S.C. 793).

(ix) 52.222-37, Employment Reports on Veterans (FEB 2016) (38 U.S.C. 4212).

(x) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (DEC 2010) (E.O. 13496). Flow down required in accordance with paragraph (f) of FAR clause 52.222-40.

(xi) 52.222-41, Service Contract Labor Standards (MAY 2014) (41 U.S.C. chapter 67).

(xii)(A) 52.222-50, Combating Trafficking in Persons (MAR 2015) (22 U.S.C. chapter 78 and E.O. 13627).

(B) Alternate I (MAR 2015) of 52.222-50 (22 U.S.C. chapter 78 and E.O. 13627).

(xiii) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment—Requirements (MAY 2014) (41 U.S.C. chapter 67).

(xiv) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services—Requirements (MAY 2014) (41 U.S.C. chapter 67).

(xv) 52.222-54, Employment Eligibility Verification (OCT 2015) (E. O. 12989).

(xvi) 52.222-55, Minimum Wages Under Executive Order 13658 (DEC 2015).

(xvii) 52.222-59, Compliance with Labor Laws (Executive Order 13673) (OCT 2016) (Applies at $50 million for solicitations and resultant contracts issued from October 25, 2016 through April 24, 2017; applies at $500,000 for solicitations and resultant contracts issued after April 24, 2017).

**Note to paragraph (e)(1)(xvii):** By a court order issued on October 24, 2016, 52.222-59 is enjoined indefinitely as of the date of the order. The enjoined paragraph will become effective immediately if the court terminates the injunction. At that time, DoD, GSA, and NASA will publish a document in the **Federal Register** advising the public of the termination of the injunction.

(xviii) 52.222-60, Paycheck Transparency (Executive Order 13673) (OCT 2016)).

(xix) 52.222-62 Paid Sick Leave Under Executive Order 13706 (JAN 2017) (E.O. 13706).

(xx)(A) 52.224-3, Privacy Training (JAN 2017) (5 U.S.C. 552a).

(B) Alternate I (JAN 2017) of 52.224-3.

(xxi) 52.225–26, Contractors Performing Private Security Functions Outside the United States (OCT 2016) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008; 10 U.S.C. 2302 Note).

(xxii) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (MAY 2014) (42 U.S.C. 1792). Flow down required in accordance with paragraph (e) of FAR clause 52.226-6.

(xxiii) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631). Flow down required in accordance with paragraph (d) of FAR clause 52.247-64.

(2) While not required, the Contractor may include in its subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(End of Clause)

***(End of Addendum to 52.212-4)***

## C.20 52.212-5 CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS—COMMERCIAL ITEMS (JAN 2017) ALTERNATE II (JAN 2017)

(a) The Contractor shall comply with the following Federal Acquisition Regulation (FAR) clauses, which are incorporated in this contract by reference, to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

(1) 52.203-19, Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (JAN 2017) (section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235) and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions)).

(2) 52.209-10, Prohibition on Contracting with Inverted Domestic Corporations (NOV 2015).

(3) 52.233-3, Protest After Award (Aug 1996) (31 U.S.C. 3553).

(4) 52.233-4, Applicable Law for Breach of Contract Claim (Oct 2004) (Public Laws 108-77 and 108-78 (19 U.S.C. 3805 note)).

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

[X] (1) 52.203-6, Restrictions on Subcontractor Sales to the Government (Sept 2006), with Alternate I (Oct 1995) (41 U.S.C. 4704 and 10 U.S.C. 2402).

[] (2) 52.203-13, Contractor Code of Business Ethics and Conduct (OCT 2015) (41 U.S.C. 3509).

[] (3) 52.203-15, Whistleblower Protections under the American Recovery and Reinvestment Act of 2009 (JUN 2010) (Section 1553 of Pub. L. 111-5). (Applies to contracts funded by the American Recovery and Reinvestment Act of 2009.)

[X] (4) 52.204–10, Reporting Executive Compensation and First-Tier Subcontract Awards (OCT 2016) (Pub. L. 109–282) (31 U.S.C. 6101 note).

[] (5) [Reserved]

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 89 of 153

[] (6) 52.204–14, Service Contract Reporting Requirements (OCT 2016) (Pub. L. 111–117, section 743 of Div. C).

[X] (7) 52.204–15, Service Contract Reporting Requirements for Indefinite-Delivery Contracts (OCT 2016) (Pub. L. 111–117, section 743 of Div. C).

[X] (8) 52.209-6, Protecting the Government's Interest When Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment. (OCT 2015) (31 U.S.C. 6101 note).

[X] (9) 52.209-9, Updates of Publicly Available Information Regarding Responsibility Matters (Jul 2013) (41 U.S.C. 2313).

[] (10) [Reserved]

[] (11)(i) 52.219-3, Notice of HUBZone Set-Aside or Sole-Source Award (NOV 2011) (15 U.S.C. 657a).

[] (ii) Alternate I (NOV 2011) of 52.219-3.

[] (12)(i) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (OCT 2014) (if the offeror elects to waive the preference, it shall so indicate in its offer) (15 U.S.C. 657a).

[] (ii) Alternate I (JAN 2011) of 52.219-4.

[] (13) [Reserved]

[X] (14)(i) 52.219-6, Notice of Total Small Business Set-Aside (NOV 2011) (15 U.S.C. 644).

[] (ii) Alternate I (NOV 2011).

[] (iii) Alternate II (NOV 2011).

[] (15)(i) 52.219-7, Notice of Partial Small Business Set-Aside (June 2003) (15 U.S.C. 644).

[] (ii) Alternate I (Oct 1995) of 52.219-7.

[] (iii) Alternate II (Mar 2004) of 52.219-7.

[X] (16) 52.219-8, Utilization of Small Business Concerns (NOV 2016) (15 U.S.C. 637(d)(2) and (3)).

[] (17)(i) 52.219-9, Small Business Subcontracting Plan (JAN 2017) (15 U.S.C. 637(d)(4)).

[] (ii) Alternate I (NOV 2016) of 52.219-9.

[] (iii) Alternate II (NOV 2016) of 52.219-9.

[] (iv) Alternate III (NOV 2016) of 52.219-9.

[] (v) Alternate IV (NOV 2016) of 52.219-9.

[X] (18) 52.219-13, Notice of Set-Aside of Orders (NOV 2011) (15 U.S.C. 644(r)).

[X] (19) 52.219-14, Limitations on Subcontracting (JAN 2017) (15 U.S.C. 637(a)(14)).

[] (20) 52.219-16, Liquidated Damages—Subcontracting Plan (Jan 1999) (15 U.S.C. 637(d)(4)(F)(i)).

[] (21) 52.219-27, Notice of Service-Disabled Veteran-Owned Small Business Set-Aside (NOV 2011) (15 U.S.C. 657f).

[X] (22) 52.219-28, Post Award Small Business Program Rerepresentation (Jul 2013) (15 U.S.C 632(a)(2)).

[] (23) 52.219-29, Notice of Set-Aside for, or Sole Source Award to, Economically Disadvantaged Women-Owned Small Business Concerns (DEC 2015) (15 U.S.C. 637(m)).

[] (24) 52.219-30, Notice of Set-Aside for, or Sole Source Award to, Women-Owned Small Business Concerns Eligible Under the Women-Owned Small Business Program (DEC 2015) (15 U.S.C. 637(m)).

[X] (25) 52.222-3, Convict Labor (June 2003) (E.O. 11755).

[] (26) 52.222–19, Child Labor—Cooperation with Authorities and Remedies (OCT 2016) (E.O. 13126).

[X] (27) 52.222-21, Prohibition of Segregated Facilities (APR 2015).

[X] (28) 52.222–26, Equal Opportunity (SEP 2016) (E.O. 11246).

[X] (29) 52.222-35, Equal Opportunity for Veterans (OCT 2015) (38 U.S.C. 4212).

[X] (30) 52.222-36, Equal Opportunity for Workers with Disabilities (JUL 2014) (29 U.S.C. 793).

[X] (31) 52.222-37, Employment Reports on Veterans (FEB 2016) (38 U.S.C. 4212).

[X] (32) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (DEC 2010) (E.O. 13496).

[X] (33)(i) 52.222-50, Combating Trafficking in Persons (MAR 2015) (22 U.S.C. chapter 78 and E.O. 13627).

[] (ii) Alternate I (MAR 2015) of 52.222-50 (22 U.S.C. chapter 78 and E.O. 13627).

[X] (34) 52.222-54, Employment Eligibility Verification (OCT 2015). (E. O. 12989). (Not applicable to the acquisition of commercially available off-the-shelf items or certain other types of commercial items as prescribed in 22.1803.)

[] (35) 52.222-59, Compliance with Labor Laws (Executive Order 13673) (OCT 2016). (Applies at $50 million for solicitations and resultant contracts issued from October 25, 2016 through April 24, 2017; applies at $500,000 for solicitations and resultant contracts issued after April 24, 2017).

**Note to paragraph (b)(35):** By a court order issued on October 24, 2016, 52.222-59 is enjoined indefinitely as of the date of the order. The enjoined paragraph will become effective immediately if the court terminates the injunction. At that time, DoD, GSA, and NASA will publish a document in the **Federal Register** advising the public of the termination of the injunction.

[X] (36) 52.222-60, Paycheck Transparency (Executive Order 13673) (OCT 2016).

[] (37)(i) 52.223-9, Estimate of Percentage of Recovered Material Content for EPA-Designated Items (May 2008) (42 U.S.C.6962(c)(3)(A)(ii)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

[] (ii) Alternate I (MAY 2008) of 52.223-9 (42 U.S.C. 6962(i)(2)(C)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

[] (38) 52.223-11, Ozone-Depleting Substances and High Global Warming Potential Hydrofluorocarbons (JUN 2016) (E.O. 13693).

[] (39) 52.223-12, Maintenance, Service, Repair, or Disposal of Refrigeration Equipment and Air Conditioners (JUN 2016) (E.O. 13693).

[] (40)(i) 52.223-13, Acquisition of EPEAT®-Registered Imaging Equipment (JUN 2014) (E.O.s 13423 and 13514).

[] (ii) Alternate I (OCT 2015) of 52.223-13.

[] (41)(i) 52.223-14, Acquisition of EPEAT®-Registered Televisions (JUN 2014) (E.O.s 13423 and 13514).

[] (ii) Alternate I (JUN 2014) of 52.223-14.

[] (42) 52.223-15, Energy Efficiency in Energy-Consuming Products (DEC 2007)(42 U.S.C. 8259b).

[] (43)(i) 52.223-16, Acquisition of EPEAT®-Registered Personal Computer Products (OCT 2015) (E.O.s 13423 and 13514).

[] (ii) Alternate I (JUN 2014) of 52.223-16.

[X] (44) 52.223-18, Encouraging Contractor Policies to Ban Text Messaging While Driving (AUG 2011)

[] (45) 52.223-20, Aerosols (JUN 2016) (E.O. 13693).

[] (46) 52.223-21, Foams (JUN 2016) (E.O. 13693).

[] (47)(i) 52.224-3, Privacy Training (JAN 2017) (5 U.S.C. 552a).

[] (ii) Alternate I (JAN 2017) of 52.224-3.

[] (48) 52.225-1, Buy American—Supplies (MAY 2014) (41 U.S.C. chapter 83).

[] (49)(i) 52.225-3, Buy American—Free Trade Agreements—Israeli Trade Act (MAY 2014) (41 U.S.C. chapter 83, 19 U.S.C. 3301 note, 19 U.S.C. 2112 note, 19 U.S.C. 3805 note, 19 U.S.C. 4001 note, Pub. L. 103-182, 108-77, 108-78, 108-286, 108-302, 109-53, 109-169, 109-283, 110-138, 112-41, 112-42, and 112-43.

[] (ii) Alternate I (MAY 2014) of 52.225-3.

[] (iii) Alternate II (MAY 2014) of 52.225-3.

[] (iv) Alternate III (MAY 2014) of 52.225-3.

[] (50) 52.225–5, Trade Agreements (Oct 2016) (19 U.S.C. 2501, et seq., 19 U.S.C. 3301 note).

[X] (51) 52.225-13, Restrictions on Certain Foreign Purchases (JUN 2008) (E.O.'s, proclamations, and statutes administered by the Office of Foreign Assets Control of the Department of the Treasury).

[] (52) 52.225–26, Contractors Performing Private Security Functions Outside the United States (OCT 2016) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008; 10 U.S.C. 2302 Note).

[] (53) 52.226-4, Notice of Disaster or Emergency Area Set-Aside (Nov 2007) (42 U.S.C. 5150).

[] (54) 52.226-5, Restrictions on Subcontracting Outside Disaster or Emergency Area (Nov 2007) (42 U.S.C. 5150).

[] (55) 52.232-29, Terms for Financing of Purchases of Commercial Items (Feb 2002) (41 U.S.C. 4505, 10 U.S.C. 2307(f)).

[] (56) 52.232-30, Installment Payments for Commercial Items (JAN 2017) (41 U.S.C. 4505, 10 U.S.C. 2307(f)).

[X] (57) 52.232-33, Payment by Electronic Funds Transfer—System for Award Management (Jul 2013) (31 U.S.C. 3332).

[] (58) 52.232-34, Payment by Electronic Funds Transfer—Other than System for Award Management (Jul 2013) (31 U.S.C. 3332).

[] (59) 52.232-36, Payment by Third Party (MAY 2014) (31 U.S.C. 3332).

[] (60) 52.239-1, Privacy or Security Safeguards (Aug 1996) (5 U.S.C. 552a).

[] (61) 52.242-5, Payments to Small Business Subcontractors (JAN 2017)(15 U.S.C. 637(d)(12)).

[] (62)(i) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631).

[] (ii) Alternate I (Apr 2003) of 52.247-64.

(c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

[] (1) 52.222-17, Nondisplacement of Qualified Workers (MAY 2014) (E.O. 13495).

[] (2) 52.222-41, Service Contract Labor Standards (MAY 2014) (41 U.S.C. chapter 67).

[] (3) 52.222-42, Statement of Equivalent Rates for Federal Hires (MAY 2014) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

| Employee Class | Monetary Wage-Fringe Benefits |
| --- | --- |

[] (4) 52.222-43, Fair Labor Standards Act and Service Contract Labor Standards—Price Adjustment (Multiple Year and Option Contracts) (MAY 2014) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

[] (5) 52.222-44, Fair Labor Standards Act and Service Contract Labor Standards—Price Adjustment (MAY 2014) (29 U.S.C 206 and 41 U.S.C. chapter 67).

[] (6) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment—Requirements (MAY 2014) (41 U.S.C. chapter 67).

[] (7) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services—Requirements (MAY 2014) (41 U.S.C. chapter 67).

[] (8) 52.222-55, Minimum Wages Under Executive Order 13658 (DEC 2015).

[] (9) 52.222-62, Paid Sick Leave Under Executive Order 13706 (JAN 2017) (E.O. 13706).

[] (10) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (MAY 2014) (42 U.S.C. 1792).

[] (11) 52.237-11, Accepting and Dispensing of $1 Coin (SEP 2008) (31 U.S.C. 5112(p)(1)).

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 92 of 153

(d) Comptroller General Examination of Record. The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, and does not contain the clause at 52.215-2, Audit and Records—Negotiation.

(1) The Comptroller General of the United States, an appropriate Inspector General appointed under section 3 or 8G of the Inspector General Act of 1978 (5 U.S.C. App.), or an authorized representative of either of the foregoing officials shall have access to and right to—

(i) Examine any of the Contractor's or any subcontractors' records that pertain to, and involve transactions relating to, this contract; and

(ii) Interview any officer or employee regarding such transactions.

(2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR Subpart 4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e)(1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), and (c), of this clause, the Contractor is not required to flow down any FAR clause in a subcontract for commercial items, other than—

(i) Paragraph (d) of this clause. This paragraph flows down to all subcontracts, except the authority of the Inspector General under paragraph (d)(1)(ii) does not flow down; and

(ii) Those clauses listed in this paragraph (e)(1). Unless otherwise indicated below, the extent of the flow down shall be as required by the clause—

(A) 52.203-13, Contractor Code of Business Ethics and Conduct (OCT 2015) (41 U.S.C. 3509).

(B) 52.203-15, Whistleblower Protections Under the American Recovery and Reinvestment Act of 2009 (JUN 2010) (Section 1553 of Pub. L. 111-5).

(C) 52.219-8, Utilization of Small Business Concerns (OCT 2014) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $700,000 ($1.5 million for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(D) 52.222-21, Prohibition of Segregated Facilities (APR 2015).

(E) 52.222-26, Equal Opportunity (APR 2015) (E.O. 11246).

(F) 52.222-35, Equal Opportunity for Veterans (OCT 2015) (38 U.S.C. 4212).

(G) 52.222-36, Equal Opportunity for Workers with Disabilities (JUL 2014) (29 U.S.C. 793).

(H) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (DEC 2010) (E.O. 13496). Flow down required in accordance with paragraph (f) of FAR clause 52.222-40.

(I) 52.222-41, Service Contract Labor Standards (MAY 2014) (41 U.S.C. chapter 67).

(J)(1) 52.222-50, Combating Trafficking in Persons (MAR 2015) (22 U.S.C. chapter 78 and E.O. 13627).

(2) Alternate I (MAR 2015) of 52.222-50 (22 U.S.C. chapter 78 and E.O. 13627).

(K) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment—Requirements (MAY 2014) (41 U.S.C. chapter 67).

(L) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services—Requirements (MAY 2014) (41 U.S.C. chapter 67).

(M) 52.222-54, Employment Eligibility Verification (OCT 2015) (Executive Order 12989).

(N) 52.222-55, Minimum Wages Under Executive Order 13658 (DEC 2015).

(O) 52.225–26, Contractors Performing Private Security Functions Outside the United States (OCT 2016) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008; 10 U.S.C. 2302 Note).

(P) 52.222-59, Compliance with Labor Laws (Executive Order 13673) (OCT 2016).

**Note to paragraph (e)(1)(ii)(P):** By a court order issued on October 24, 2016, 52.222-59 is enjoined indefinitely as of the date of the order. The enjoined paragraph will become effective immediately if the court terminates the injunction. At that time, DoD, GSA, and NASA will publish a document in the **Federal Register** advising the public of the termination of the injunction.

(Q) 52.222-60, Paycheck Transparency (Executive Order 13673) (OCT 2016).

(R) 52.222-62 Paid Sick Leave Under Executive Order 13706 (JAN 2017) (E.O. 13706).

(S)(1) 52.224-3, Privacy Training (JAN 2017) (5 U.S.C. 552a).

(2) Alternate I (JAN 2017) of 52.224-3.

(T) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations. (MAY 2014) (42 U.S.C. 1792). Flow down required in accordance with paragraph (e) of FAR clause 52.226-6.

(U) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631). Flow down required in accordance with paragraph (d) of FAR clause 52.247-64.

(2) While not required, the Contractor may include in its subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(End of Clause)

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 94 of 153

**EXHIBIT 8**

FILED UNDER SEAL PER COURT ORDER. (SEE MINUTES OF PROCEEDINGS DATED 3/5/2019 (ECF NO. 103)

**EXHIBIT 8**

FILED UNDER SEAL PER COURT ORDER.  (SEE MINUTES OF PROCEEDINGS DATED 3/5/2019 (ECF NO. 103)

**EXHIBIT 9**

Walker's emails to Intelli-heart regarding their late, 90 day, payment

**EXHIBIT 9**

**EXHIBIT 9**

 **Terrance Walker <walkerbillion@gmail.com>**

# Fw: JAMES WINTERS COMMISSIONS FROM JULY TO PRESENT

**Terrance Walker** <walkerbillion@gmail.com> Fri, Nov 10, 2017 at 9:32 PM
To: James Winters <jameswinters12345@yahoo.com>, vparsons@intelli-heart.com, Intelli-Heart <jwinters@intelli-heart.com>, Hilary Peckos <hpeckos@intelli-heart.com>, Danny Weisberg <dweisberg@intelli-heart.com>

James,

Can your people read? The contract You signed states they are supposed to pay you with 30 days!!

45 days is no where in the contract. What are they trying to hold them money for 90 days for??

They are causing a breach of contract and I'd advise you to check them before we all end up in court.

In fact, they should be paying you for October NOW!! They're late again!!

Regards

On Fri, Nov 10, 2017 at 9:09 PM, James Winters <jameswinters12345@yahoo.com> wrote:

> ----- Forwarded Message -----
> **From:** Vanessa Parsons <vparsons@intelli-heart.com>
> **To:** James Winters <jameswinters12345@yahoo.com>; Intelli-Heart <jwinters@intelli-heart.com>; Hilary Peckos <hpeckos@intelli-heart.com>; Danny Weisberg <dweisberg@intelli-heart.com>
> **Sent:** Friday, November 10, 2017, 10:13:52 PM CST
> **Subject:** JAMES WINTERS COMMISSIONS FROM JULY TO PRESENT
>
> Hi James:
>
> As discussed, we've got you paid up 45 days in advance as we pay our reps as of now for July on Oct. 30, but as we've verified that ALL VAs are paid up as of today. See attached.
>
> Hilary, please make check and give to Danny as he will deposit directly.
>
> Thanks, Vanessa
>
> Vanessa A. Parsons
> **Intelli-Heart Services, Inc.**
> 10850 Wilshire Blvd., Ste 740
> Los Angeles, Ca 90024
> 310-470-9470
> Toll Free: 877-898-8680
>
> This communication may contain information that is legally privileged confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or return e-mail and delete it from their computer.

 **Distributor -James Winters.docx**

50K

**EXHIBIT 10**

Walker's emails to Intelli-heart regarding low (and nonpayments)
and threats to pursue legal action

**EXHIBIT 10**

**EXHIBIT 10**

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 100 of 153

**Terrance Walker <walkerbillion@gmail.com>**

# The numbers for the VA contracts (based on what they're paying you) are way UNDER what you're supposed to be getting

**Terrance Walker** <walkerbillion@gmail.com> Fri, Dec 15, 2017 at 4:52 AM
To: James Winters <Jameswinters12345@yahoo.com>, Hilary Peckos <hpeckos@intelli-heart.com>, Danny Weisberg <dweisberg@intelli-heart.com>, Vanessa Parsons <vparsons@intelli-heart.com>

James,

I don't know why they're taking so long to provide you the detailed payment data so that you can fulfill your consulting role on the VA contracts, but they're inhibiting you by suppressing these discrepancies AND preventing you from earning what you're supposed to be earning.

You can't wait 4 months to make sure that a government contract is being fulfilled correctly.

These are the projected numbers based upon historical usage data (put in the solicitations) and the current contract values (which can be seen on FPDS.GOV):

| | 1st year | monthly |
|---|---|---|
| Lexington | $46,500 | $3875 |
| Iowa City | $64,750 | $5395.83 |
| Richmond | $61,500 | $5125 |
| Milwaukee | $123,450 | $10,287.50 |
| Capt Lov.FHCC | $104,240 | $8686.67 |
| Ed Hines | $141,200 | $11,766.67 |
| Green Bay | $59,000 | $4916.67 |
| Tomah | $29,900 | $2491.67 |
| Madison | $119,445 | $9953.75 |
| Oscar Johnson | $33,725 | $2810.41 |
| Jesse Brown | $134,585 | $11,215.42 |

i) the monthly projected total: $76,524.56

the projected monthly total due you (10%): $7,652.46

what they paid this month : $4836.00 ( a difference of $2816.46 or -36%)
--------------------
----------------------
ii) Even if Lexington and Iowa City (new hospitals) were excluded from this months pay

the projected monthly total due you (10%) $6,725.38

what they paid his month $4836.00 ( a difference of $1889.38 or -28%)

-------------------------------

In sum, over three years you're talking about a NEGATIVE $100k at these numbers ($1 million for Intelli-heart) !!

(-28% to -36% discrepancies are not even close)

So, I don't know why they're hiding the numbers from you -- it makes no sense.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 101 of 153

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 102 of 153

**EXHIBIT 11**

Walker's emails to Intelli-heart regarding low (and nonpayments)
and threats to pursue legal action

**EXHIBIT 11**

**EXHIBIT 11**



Terrance Walker <walkerbillion@gmail.com>

# NOTICE of violation of FAR part 52.242-5 Payments to Small Business Subcontractors and 52.232-40 (c)Providing Accelerated Payments to Small Business Subcontractors.

**Terrance Walker** <walkerbillion@gmail.com> Tue, Jan 23, 2018 at 5:28 PM
To: "walkerbillion@gmail.com" <walkerbillion@gmail.com>, James Winters <Jameswinters12345@yahoo.com>, Vanessa Parsons <vparsons@intelli-heart.com>, Hilary Peckos <hpeckos@intelli-heart.com>, Danny Weisberg <dweisberg@intelli-heart.com>

**You are now in violation of 52.242-5 Payments to Small Business Subcontractors and 52.232-40 (c)Providing Accelerated Payments to Small Business Subcontractors. (see below)**

**Your payment is late and is subject to federal government penalties. You've been warned**

**-----------------**
**52.232-40 (c)Providing Accelerated Payments to Small Business Subcontractors.**

[ Prompt Payment Act (31 U.S.C. 3903) and prompt payment regulations at 5 CFR part 1315]

**(a)** Upon receipt of accelerated payments from the Government, the Contractor shall make accelerated payments to its small business subcontractors under this contract, to the maximum extent practicable and prior to when such payment is otherwise required under the applicable contract or subcontract, after receipt of a proper invoice and all other required documentation from the small business subcontractor.

**(b)** The acceleration of payments under this clause does not provide any new rights under the Prompt PaymentAct.

**(c)** Include the substance of this clause, including this paragraph (c), in all subcontracts with small business concerns, including subcontracts with small business concerns for the acquisition of commercial items.

--------------------------
**PAYMENTS TO SMALL BUSINESS SUBCONTRACTORS**
FAR clause, 52.242-5, which states:

(b) Notice. The Contractor shall notify the Contracting Officer, in writing, not later than 14 days after-

(1) A small business subcontractor was entitled to payment under the terms and conditions of the subcontract; and

(2) The Contractor-

(i) Made a reduced or untimely payment to the small business subcontractor; or

(ii) Failed to make a payment, which is now untimely.

----------------------------------------------

**EXHIBIT 12**

Walker's emails to Intelli-heart regarding low (and nonpayments)
and threats to pursue legal action

**EXHIBIT 12**

**EXHIBIT 12**

**Terrance Walker <walkerbillion@gmail.com>**

# NOTICE of violation of FAR part 52.242-5 Payments to Small Business Subcontractors and 52.232-40 (c)Providing Accelerated Payments to Small Business Subcontractors.

**Terrance Walker** <walkerbillion@gmail.com> Wed, Jan 31, 2018 at 9:31 AM
To: "Davis, Lance A." <Lance.Davis2@va.gov>, Vanessa Parsons <vparsons@intelli-heart.com>, Hilary Peckos <hpeckos@intelli-heart.com>, Danny Weisberg <dweisberg@intelli-heart.com>, James Winters <Jameswinters12345@yahoo.com>

They know EXACTLY who I am as we have been in contact for several months on this payment issue. This is one of the games they play (like the check is in the mail for 3 weeks game) and just to put everything out there I will CC everyone. For instance, (see attached email where I am specifically telling them that they CANNOT hold on to federal money -- partly due to small business subcontractor James Winters --- for 90 days under the guise that that's how "other" non-federal contracting reps are paid). Note, they talk of payment for July PAID in November!! Currently, there are payments that similarly late and I know it doesn't take 60 days for the federal government to pay a submitted (another game they like to play).

I understand FULLY my rights and responsibilities under the law (and under the contracts) and I am enforcing them. I am a 2nd tier subcontractor under James Winters who has been consulting him in the bidding and contracting process (and he prepares the bids for Intelli-heart). I am alerting you to help save them from serious penalties as they refuse to listen to sound advice. I've given them numerous chances but either they are either: 1) stupid 2) financially insolvent 3) incapable of implementing financial management controls to comport with federal law.

How this is relevant to you and the contract you manage is because veterans lives are at stake and as a contracting officer you still have to make sure the company is up to par and report them if they are not. (see below)

Just so you can alert them (and know that I know the law):

*a prime contractor can be said to have "used" a small business in preparing its bid or proposal when: (1) the offeror references the small business as a subcontractor in the bid or proposal, or associated small business subcontracting plan; (2) t<u>he offeror has a subcontract or agreement in principle to subcontract with a small business to perform a portion of the specific contract; or (3) the small business drafted a portion of the bid or proposal, or the offeror used the small business's pricing or cost information, or technical expertise, in preparing the bid or proposal, and there is written evidence of an intent or understanding that the small business would be awarded a subcontract for the related work if the offeror is awarded the contract.</u> See Small Bus. Admin., Small Business Subcontracting: Final Rule, 79 Federal Register 42390, 42405 (July 16, 2013) (codified at 13 C.F.R. §125.3(c)(3)(i)- (iii)).*

*52.203-99 PROHIBITION ON CONTRACTING WITH ENTITIES THAT REQUIRE CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS (DEVIATION) (FEB 2015) (a) The Contractor shall not require employees or contractors seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or subcontractors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.*

*Agencies are generally required to evaluate contractors' performance on all contracts valued in excess of $150,000 when the contract is completed or on an interim basis, in the case of multi-year contracts. 48 C.F.R. §42.1502(b) (general requirement); 48 C.F.R. §42.1502(e) (construction contracts); 48 C.F.R. §42.1502(f) (architect-engineer contracts). For more on evaluations of contractors' performance, see CRS Report R41562, Evaluating the "Past Performance" of Federal Contractors: Legal Requirements and Issues, by Kate M. Manuel.*

*In November 2013, the Obama Administration amended the Federal Acquisition Regulation (FAR) to implement the accelerated payment policy as to small business subcontractors. See Dep't of Defense, Gen. Servs. Admin. & Nat'l Aeronautics & Space Admin., Federal Acquisition Regulation: Accelerated Payment to Small Business Subcontractors: Final Rule, 78 Federal Register 70477 (November 25, 2013). This includes* those for the acquisition of commercial items, thereby binding themselves to make accelerated payments to their subcontractors (codified at 48 C.F.R. §52.232-40(c) ; See FAR part 52.232-40(c) which is incorporated into each contract automatically).

Note commentary from expert contracting officer, Vern Edwards, http://www.wifcon.com/discussion/index.php?/topic/2847-52232-40-and-prompt-payments-as-a-prime/
"FAR 52.232-40 requires that ***if*** the government provides accelerated payments to the prime, ***then*** the prime must provide accelerated payments to its ***small business*** subs. The clause does not provide for accelerated payments to the primes.It is government policy, as stated in the OMB memos, to provide accelerated payments to ***small business*** primes."

*Furthermore, withholding federal payments that are due can constitute FRAUD. SEE https://www.uscfc.uscourts.gov/sites/default/files/opinions/CMILLER.DUVAL081109.pdf*

I am drafting my complaint right now and will forward you everything shortly if I am not paid TODAY.

Again, thanks for your time.

[Quoted text hidden]

**Gmail - Fw_ JAMES WINTERS COMMISSIONS FROM JULY TO PRESENT.pdf**
56K

**EXHIBIT 13**

Walker's emails to Intelli-heart regarding low (and nonpayments)
and threats to pursue legal action

**EXHIBIT 13**

**EXHIBIT 13**

Terrance Walker <walkerbillion@gmail.com>

## the cost of LAX contract management

**Terrance Walker** <walkerbillion@gmail.com> Sat, Jan 13, 2018 at 9:19 AM
To: Vanessa Parsons <vparsons@intelli-heart.com>, Danny Weisberg <dweisberg@intelli-heart.com>, James Winters <Jameswinters12345@yahoo.com>, Hilary Peckos <hpeckos@intelli-heart.com>

Payment is LATE AGAIN.

We are required to get prompt payment per federal law. https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2014/m-14-10.pdf
Anyone that I've worked with has NEVER been paid past 30 days on a federal contract. I don't know what these people are smoking but it doesn't bode well for their chances
in court.

per Prompt pay regulations the Government does has 7 days to accept or reject the invoice, this means that the FBMS COR has 7 days from the date of the invoice to accept or reject the invoice without being subject to interest. We need to know what hospital is late to get the interest also due us.

This is bullshit that the hospital is late paying. If they, were in fact, late paying WE ARE OWED interest.

No interest. Lawsuit time.
[Quoted text hidden]

**EXHIBIT 14**

Walker's emails to Intelli-heart regarding low (and nonpayments)
and threats to pursue legal action

**EXHIBIT 14**

**EXHIBIT 14**

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 111 of 153

Terrance Walker <walkerbillion@gmail.com>

# the cost of LAX contract management

**Terrance Walker** <walkerbillion@gmail.com> Thu, Dec 21, 2017 at 11:49 PM
To: Vanessa Parsons <vparsons@intelli-heart.com>, Danny Weisberg <dweisberg@intelli-heart.com>, James Winters <Jameswinters12345@yahoo.com>

James,

You are in a position to save Intelli-heart from an potential lawsuit. You best warn them. Their business proposition "it is what it is" is not working for me.
Their mismanagement is making us potentially lose $100k over 3 years. That losing position is not what I signed up (to help you help them). It is not a position acceptable to me.

Under California law, I can sue them directly. I am VERY serious about this. These are not idle threats.
Business is business. They need to understand that and stop pissing off hard-earned work. I've done sales and consulting
for many national and multi-national firms and no one plays these sort of games I work with.

This is what I suggest :
1) figure out what the HELL is going on with the orders being short at particular hospitals and why they're 10-70% short and if they're ordering from someone else.

i) tell them that they need to put their requested changes to the quantities in writing and let them know it represents a change to the terms that were bid on.

NOTE: on a GAO case which contemplated "fixed-unit-price, indefinite-delivery, indefinite quantity" award, they held that it is fundamental obligation of an agency to conduct a competition on the basis of the most accurate or realistic estimates of the total quantity of goods or services likely to be ordered. Federal Acquisition Regulation (FAR) § 16.503(a)(1); Hoechst Marion Roussel, Inc., B-279073, May 4, 1998, 98-1 CPD ¶ 127 at 3" http://www.gao.gov/assets/670/663635.pd
agencies may not properly award a contract on a basis that is fundamentally different from the basis upon which the competition for the requirement was conducted. United Telephone Co. of the Northwest, B-246977, Apr. 20, 1992, 92-1 CPD ¶ 374 at 7-10, aff'd. Dept. of Energy--Recon.; Westinghouse Hanford Co.—Recon.; United Telephone Co. of the Northwest, B-246977.2, et al. July 14, 1992, 92-2 CPD ¶ 20. Where, for example, there is a significant change in the government's quantity requirements, the appropriate course of action is for the agency to apprise the offerors of its revised requirements Id.

The minimum and maximum inquiry is not an end to an analysis of whether the agency is sticking to its contract. Furthermore, if the VA is engaged in some form of improper self-dealing for its own benefit or to benefit another contractor, it can be liable TigerSwan, 110 Fed. Cl. at 347. They need to be made aware of this.

ii) propose a price increase if this is going to be a continuing pattern because their estimates were WAY off and this is not what was envisioned in the bid in this requirements type of contract.

2) figure out what the HELL is going on with the demands of the service at the VA

i) tell them that they need to put their requested changes in writing and let them know it represents a change to the terms that were bid on.

NOTE FAR 16.504(A)(4) (iii) requires "a statement of work, specifications, or other description, that reasonably describes the general scope, nature, complexity, and purpose of the supplies or services the Government will acquire under the contract in a manner that will enable a prospective offeror to decide whether to submit an offer".

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 112 of 153

ii) demand a contract modification and a price increase if the VA is going to demand a higher level of service than they did with Lifewatch and/or different with the contract bidded upon.

BOTTOM LINE, there has to be SOME contract management (e.g. demands for the government to abide by its terms) going on from the contractor's side....it sounds as if there is VERY LITTLE. This sit and wait and see approach is not working.

On Fri, Dec 22, 2017 at 1:28 PM, Terrance Walker <walkerbillion@gmail.com> wrote:

> **From a contract management/procurement/consultant firm from a guy doing EXACTLY what we are doing -- but with**
> **STEEP up front costs.**
>
> **See**
>
> **http://joebreen.com/services/government-contract-management-administration/**
>
> "Contract Management is also an important factor in growth. The contract administrator will review not only your current contract vehicle, but will look for other contracts that may be profitable for your company to pursue. This can tie in directly with comprehensive research programs we provide that look years in advance to recurring contracts coming up, to include current contract holders, government points of contacts, as well as purchasing trends within an identified federal agency.
>
> An outdated contract, or contract that had not been properly maintained **can cost a company millions in dollars over the term of the contract**. As part of our service package, the Breen Consulting Group assigns a highly skilled contract administrator to manage your contract and to ensure all contracts are current, and that all reporting functions are properly addressed. All contract **modifications, additions, and submittals** are included in this program."
>
> In other words it is a NORMAL function for the contract administrator to make sure the terms of the contract are in compliance, up to date.....AND to request MODS if not (FOR INSTANCE, in our instance, PRICE increase MOD if the estimates are 40% off)

**2 attachments**

**FederalCivilRightscaseComplaint-new.docx**
32K

**Complaint.pdf**
233K

Case 3:18-cv-00132-MMD-CLB Document 186 Filed 04/09/19 Page 113 of 153
Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 113 of 153

**EXHIBIT 15**

Walker's assertions of nonpayment regarding
VA Contract VA24617C0183 to VA's Larry Lapp and Marchelle Peyton

**EXHIBIT 15**

**EXHIBIT 15**

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 115 of 153



Terrance Walker <twalker41mg@gmail.com>

# VA24617C0183 : federal payments due subcontractors

**Terrance Walker** <twalker41mg@gmail.com> Thu, Feb 1, 2018 at 4:58 PM
To: larry.lapp@va.gov

Greetings Mr. Cochran,

I am a 2nd tier subcontractor under James Winters (a 1st tiered small business subcontractor) who has been consulting him in the bidding and contracting process (and he prepares the bids for Intelli-heart).

Under award ID VA24617C0183, there are payments that late and, from plenty of experience, I know it doesn't take 60 days for the federal government to pay a submitted invoice. In the past Intelli-heart has held on to payments for up to 90 days and I warned them this does not comport with federal law. (see attached).

I am alerting you to help save Intelli-heart from serious penalties as they refuse to listen to sound advice. I've given them numerous chances but either they are either: 1) stupid 2) financially insolvent 3) incapable of implementing financial management controls to comport with federal law.

How this is relevant to you and the contract you manage is because veterans lives are at stake and as a contracting officer you still have to make sure the company is up to par and report them if they are not. (see below)

Just so you can alert them (and know that I know the law):

*a prime contractor can be said to have "used" a small business in preparing its bid or proposal when: (1) the offeror references the small business as a subcontractor in the bid or proposal, or associated small business subcontracting plan; (2) the offeror has a subcontract or agreement in principle to subcontract with a small business to perform a portion of the specific contract; or (3) the small business drafted a portion of the bid or proposal, or the offeror used the small business's pricing or cost information, or technical expertise, in preparing the bid or proposal, and there is written evidence of an intent or understanding that the small business would be awarded a subcontract for the related work if the offeror is awarded the contract. See Small Bus. Admin., Small Business Subcontracting: Final Rule, 79 Federal Register 42390, 42405 (July 16, 2013) (codified at 13 C.F.R. §125.3(c)(3)(i)- (iii)).*

*52.203-99 PROHIBITION ON CONTRACTING WITH ENTITIES THAT REQUIRE CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS (DEVIATION) (FEB 2015) (a) The Contractor shall not require employees or contractors seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or subcontractors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.*

*Agencies are generally required to evaluate contractors' performance on all contracts valued in excess of $150,000 when the contract is completed or on an interim basis, in the case of multi-year contracts. 48 C.F.R. §42.1502(b) (general requirement); 48 C.F.R. §42.1502(e) (construction contracts); 48 C.F.R. §42.1502(f) (architect-engineer contracts). For more on evaluations of contractors' performance, see CRS Report R41562, Evaluating the "Past Performance" of Federal Contractors: Legal Requirements and Issues, by Kate M. Manuel.*

*In November 2013, the Obama Administration amended the Federal Acquisition Regulation (FAR) to implement the accelerated payment policy as to small business subcontractors. See Dep't of Defense, Gen. Servs. Admin. & Nat'l Aeronautics & Space Admin., Federal Acquisition Regulation: Accelerated Payment to Small Business Subcontractors: Final Rule, 78 Federal Register 70477 (November 25, 2013). This includes* those for the acquisition of commercial items, thereby binding themselves to make accelerated payments to their subcontractors (codified at 48 C.F.R. §52.232-40(c) ; See FAR part 52.232-40(c) which is incorporated into each contract automatically).

Note commentary from expert contracting officer, Vern Edwards, http://www.wifcon.com/discussion/index.php?/topic/2847-52232-40-and-prompt-payments-as-a-prime/
"FAR 52.232-40 requires that ***if*** the government provides accelerated payments to the prime, ***then*** the prime must provide accelerated payments to its ***small business*** subs. The clause does not provide for accelerated payments to the primes.It is government policy, as stated in the OMB memos, to provide accelerated payments to ***small business*** primes."

*Furthermore, a contractor withholding federal payments that are due can constitute FRAUD.*
*SEE https://www.uscfc.uscourts.gov/sites/default/files/opinions/CMILLER.DUVAL081109.pdf*

I have already drafted my complaint with another contracting officer and will send one to you shortly.

We also need an escrow account set up so we can get paid, individually, and/or a situation whereas we get paid separately from Intelli-heart.

There is 10% of the monthly total invoice of Intelli-heart due James Winters. We split that total 50-50. Thus, 5% and 5% of the monthly total invoice from intelliheart is due each of us subcontractors for the months of November and December 2017. We have received nothing showing payment from your particular hospital has been received since November 2017 (for September activity). You have the authority to suspend payments under the threat that they pay us. See below

"Under the new clause at FAR 52.232-40, Providing Accelerated Payments to Small Business Subcontractors (DEC 2013), when a prime contractor receives an accelerated payment from the government, it will be required to similarly make an accelerated payment to its small business subcontractors upon receipt of the subcontractors' invoices and supporting documentation. This clause trumps any contrary terms that may be included in the parties' subcontract agreement. This new clause will apply to all solicitations and contracts issued on or after December 26, including commercial item contracts. The rule is not limited to first-tier subcontracts, and thus also requires higher-tier subcontractors that receive accelerated payments to make accelerated payments to their lower-tier small business subcontractors.

In the event that a prime contractor fails to make an accelerated payment, the government may stop making accelerated payments to the prime."

https://www.mccarter.com/New-Rules-Assist-Federal-Small-Business-Subcontractors-12-11-2013/

Regards,
Terrance
775-391-6113

---

**Gmail - Fw_ JAMES WINTERS COMMISSIONS FROM JULY TO PRESENT.pdf**
56K

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 117 of 153

**EXHIBIT 16**

Walker's assertions of nonpayment regarding
VA Contract VA24617C0183 to VA's Larry Lapp and Marchelle Peyton

**EXHIBIT 16**

**EXHIBIT 16**

 Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 118 of 153

Terrance Walker <twalker41mg@gmail.com>

# NOTICE OF NON-COMPLIANCE WITH VA24617C0183 : federal payments due subcontractors FAR part 52.232-40

**Terrance Walker** <twalker41mg@gmail.com> Thu, Feb 8, 2018 at 1:56 PM
To: "Lapp, Larry D NCO 6" <larry.lapp@va.gov>, "Mcbride, John J." <john.mcbride4@va.gov>, "Peyton, Marchelle VISN6" <MARCHELLE.PEYTON@va.gov>

I am a second-tier subcontractor **covered** under FAR part 52 (not a direct subcontractor) due accelerated payment under award VA24617C0183. We are asking for your office to act according to Congressional law (under Presidential guidance on this) and enforce this contract. We will continue to provide notice until we are paid.

The Administration amended the Federal Acquisition Regulation (FAR) to implement the accelerated payment policy as to small business subcontractor Dep't of Defense, Gen. Servs. Admin. & Nat'l Aeronautics & Space Admin., Federal Acquisition Regulation: Accelerated Payment to Small Business Subcontractors: Final Rule, 78 Federal Register 70477 (November 25, 2013).

The administration put teeth in these regulations.
See paragraph 9 Response on the final comments of the rule ( FAR 52.232-40 and Far part 32.009-1) on the federal register website.
https://www.federalregister.gov/documents/2013/11/25/2013-28053/federal-acquisition-regulation-accelerated-payments-to-small-business-subcontractors
"The rule is **not** limited to first-tier subcontractors, because that is inconsistent with the OMB memo that this rule implements, and would reduce the number of small entities that may benefit from this rule."

As such, We want (and will continue to demand) enforcement of this provision with your agency until we are paid. Review contractor payments and enforcement of their payments is what we are requesting by threat of halting payments to the prime.

See paragraph 4 Response on the final comments of the rule (Far part 32.009-1) on the federal register website.

https://www.federalregister.gov/documents/2013/11/25/2013-28053/federal-acquisition-regulation-accelerated-payments-to-small-business-subcontractors

"the Government may discontinue accelerated payments to the prime contractor. The Government may review prime contractor payments and procedures to ensure the required accelerated payments to small business subcontractors are made to the maximum extent practicable. This flexibility is intended to accommodate varying prime contractor capabilities to make accelerated payments."

Regards,
Terrance
775-391-6113

EXHIBIT 17

Winter's email concerning Intelli-heart's unilateral contract breach

EXHIBIT 17

EXHIBIT 17

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 120 of 153

**Terrance Walker <walkerbillion@gmail.com>**

## Subcontractor payment

**Terrance Walker** <walkerbillion@gmail.com> Fri, Feb 9, 2
To: James Winters <jameswinters12345@yahoo.com>
Cc: "larry.lapp@va.gov" <larry.lapp@va.gov>, Vanessa Parsons <vparsons@intelli-heart.com>, Danny Weisberg <dweisberg@intelli-heart.com>

In light of apparent wilfull NON-COMPLIANCE WITH VA24617C0183 : federal payments due subcontractors FAR part 52.232-40, I request your agency.

" discontinue accelerated payments to the prime contractor" (para. 4)

https://www.federalregister.gov/documents/2013/11/25/2013-28053/federal-acquisition-regulation-accelerated-payments-to-small-business-subcontractors

Regards
Terrance

On Fri, Feb 9, 2018 at 6:47 AM, James Winters <jameswinters12345@yahoo.com> wrote:

**Lapp, Larry D NCO 6** Feb 2 (7 days ago)

to jwinters, Marchelle

Mr. Winters,

It has been brought to my attention that there may be monies owned to a lower tier subcontractor or yours. Mr. Terrance Walker has provide a complaint of non-payment of services rende you please contact Mr. Walker and clear up this matter as soon as possible. Please inform me when this complaint is resolved.

Thank you,

Larry D. Lapp
Sr. Contract Specialist (Contractor)
Parker Tide Corporation
Network Contracting Office 6 – SAO East
Building 27, Averill Drive
Hampton, VA 23667
Office: (757) 315-3988
Email: larry.lapp@va.gov

Mr. Lapp,

Per your request to confirm resolution of non-payment to sub-contractors, as of yesterday, February 8, 2018 payment has not been received from Intelli-Heart.

Intelli-Heart informed me, verbally, that they would not being sending payment as they will need to use those dollars for an attorney based on Terrence Walker's correspondence. They have also sent correspondence to me (February 8, 2018) to terminate our distributor agreement/contract to circumvent their payment obligations.

As my only recourse is to sue Intelli-Heart for payment of services rendered, this matter will not be resolved in the near future.

I will be working with my Iowa attorney to find local representation as I reside in Texas as of January 1, 2017.

Respectfully,

James Winters
515-681-4144

**EXHIBIT 18**

March 12, 2018 statement of the VA's Marchelle Peyton

**EXHIBIT 18**

**EXHIBIT 18**

PROTEST OF WALKER DEVELOPMENT and TRADING GROUP, LLC. – B-416052

CONTRACTING OFFICER'S NARRATIVE STATEMENT

March 12, 2018

On December 7, 2016, I issued a Request for Proposals VA246-17-R-0167 ("RFP") on the Federal Business Opportunities ("FBO") website as a Small Business set-aside for the provision of remote cardiac outpatient telemetry and wireless cardiac event monitoring services for the Hunter Holmes McGuire VA Medical Center (Richmond VAMC). The RFP anticipated the award of a fixed price contract, with a base year and four one-year options. The RFP included FAR clause 52.232-40, Providing Accelerated Payments To Small Business Subcontractors (DEC 2013). No Amendments to the RFP were issued. Protester did not submit a proposal in response to the RFP.

On March 22, 2017, I awarded Contract VA246-17-C-0183 to Intelli-Heart Services, Inc. ("Contractor") in the amount of $323,750.00. The Contract had an effective start date of April 1, 2017, with one base period and four options years. The ultimate end date of the Contract is September 30, 2021. The Contract included FAR clause 52.232-40, Providing Accelerated Payments To Small Business Subcontractors (DEC 2013).

There was a typographical error in the Contract pricing schedule which erroneously stated the fourth option year as "1 Oct 2021 – 30 Sep 2022". The term of the Contract is correctly stated on page 8, paragraph 3 as "1 April 2017 through 30 September 2017 with four (1) year option periods." When reporting the award to FPDS on March 22, 2018, I made an error by entering the wrong ultimate completion date. I entered the ultimate completion date as

Exhibit 1

September 30, 2022, but it should have been September 30, 2021. I did a modification to correct the Contract Pricing Schedule. I also corrected the entry in FPDS. There has been no modification to extend this contract past its ultimate completion date of September 30, 2021.

The Walker Development and Trading Group was not at any time a subcontractor to Intelli-heart. This was confirmed by an e-mail on February 8, 2018 from the President of Intelli-heart, in which he substantiates that fact.

Respectfully,
Marchelle D. Peyton 413024
Digitally signed by Marchelle D. Peyton 413024
Date: 2018.03.12 14:57:05 -04'00'
Marchelle D. Peyton
Contracting Officer

**EXHIBIT 19**

Walker's assertion of nonpayment regarding VA Contract VA26317D0109 to the VA's Ms. Fay Chiappione Arlene Jorgensen-Hilestad

**EXHIBIT 19**

**EXHIBIT 19**

 Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 125 of 153
Gmail - VA26317D0109 : federal payments due subcontractors

**Terrance Walker <twalker41mg@gmail.com>**

# VA26317D0109 : federal payments due subcontractors

**Chiappone, Fay C.** <Fay.Chiappone@va.gov> Fri, Feb 2, 2018 at 11:04 AM
To: Terrance Walker <twalker41mg@gmail.com>
Cc: "Jorgensen Hillestad, Arlene A." <Arlene.JorgensenHillestad@va.gov>

Terrance,

Thank you for your email detailing what issues you have been having in connection with the IntelliHeart contract. We will be back in touch with you shortly in regards to this matter.

Fay Chiappone

Contract Specialist

Network Contracting Office 23 (NCO 23)

Department of Veterans Affairs

Warren E. Burger Federal Building

and U.S. Courthouse Room 506

316 Robert Street N.

St. Paul, MN 55101

651-293-3016 – Phone

651-293-3060 – Fax

Fay.Chiappone@va.gov

**Telework days are Monday and Friday - please contact me via email or skype.**

"INTEGRITY, COMMITMENT, ADVOCACY, RESPECT, AND EXCELLENCE – these are our goals." As our client, please take a few moments and let us know how we did by completing the attached **SURVEY**.

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 126 of 153

This message (and any attachments) is intended only for the use of the person or office to which it is addressed and may contain information that is privileged, confidential or protected by law. All others are hereby notified that receipt of this message does not waive any applicable privilege or exemption from disclosure and that any dissemination, distribution or copying of this communication is prohibited under Federal law. If you received this communication in error, please notify me immediately at the e-mail address shown at the top of the message. Thank you.

**From:** Terrance Walker [mailto:twalker41mg@gmail.com]
**Sent:** Friday, February 02, 2018 12:45 PM
**To:** Chiappone, Fay C. <Fay.Chiappone@va.gov>
**Subject:** [EXTERNAL] VA26317D0109 : federal payments due subcontractors

Greetings Ms Chiappone,

I am a 2nd tier subcontractor under James Winters (a 1st tiered small business subcontractor) who has been consulting him in the bidding and contracting process (and he prepares the bids for Intelli-heart).

Under award ID VA26317D0109 , there are payments that late and, from plenty of experience, I know it doesn't take 60 days for the federal government to pay a submitted invoice. In the past Intelli-heart has held on to payments for up to 90 days and I warned them this does not comport with federal law. (see attached).

I am alerting you to help save Intelli-heart from serious penalties as they refuse to listen to sound advice. I've given them numerous chances but either they are either: 1) stupid 2) financially insolvent 3) incapable of implementing financial management controls to comport with federal law.

How this is relevant to you and the contract you manage is because veterans lives are at stake and as a contracting officer you still have to make sure the company is up to par and report them if they are not. (see below)

Just so you can alert them (and know that I know the law):

*a prime contractor can be said to have "used" a small business in preparing its bid or proposal when: (1) the offeror references the small business as a subcontractor in the bid or proposal, or associated small business subcontracting plan; (2) t<u>he offeror has a subcontract or agreement in principle to subcontract with a small business to perform a portion of the specific contract; or (3) the small business drafted a portion of the bid or proposal, or the offeror used the small business's pricing or cost information, or technical expertise, in preparing the bid or proposal, and there is written evidence of an intent or understanding that the small business would be awarded a subcontract for the related work if the offeror is awarded the contract.</u> See Small Bus. Admin., Small Business Subcontracting: Final Rule, 79 Federal Register 42390, 42405 (July 16, 2013) (codified at 13 C.F.R. §125.3(c)(3)(i)- (iii)).*

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 127 of 153

*52.203-99 PROHIBITION ON CONTRACTING WITH ENTITIES THAT REQUIRE CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS (DEVIATION) (FEB 2015)*

*(a) The Contractor shall not require employees or contractors seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or subcontractors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.*

*Agencies are generally required to evaluate contractors' performance on all contracts valued in excess of $150,000 when the contract is completed or on an interim basis, in the case of multi-year contracts. 48 C.F.R. §42.1502(b) (general requirement); 48 C.F.R. §42.1502(e) (construction contracts); 48 C.F.R. §42.1502(f) (architect-engineer contracts). For more on evaluations of contractors' performance, see CRS Report R41562, Evaluating the "Past Performance" of Federal Contractors: Legal Requirements and Issues, by Kate M. Manuel.*

*In November 2013, the Obama Administration amended the Federal Acquisition Regulation (FAR) to implement the accelerated payment policy as to small business subcontractors. See*

*Dep't of Defense, Gen. Servs. Admin. & Nat'l Aeronautics & Space Admin., Federal Acquisition Regulation: Accelerated Payment to Small Business Subcontractors: Final Rule, 78 Federal Register 70477 (November 25, 2013). This includes*

those for the acquisition of commercial items, thereby binding themselves to make accelerated payments to their subcontractors (codified at 48 C.F.R. §52.232-40(c) ; See FAR part *5*

2.232-40(c) which is incorporated into each contract automatically).

Note commentary from expert contracting officer, Vern Edwards,

http://www.wifcon.com/discussion/index.php?/topic/2847-52232-40-and-prompt-payments-as-a-prime/

"FAR 52.232-40 requires that ***if*** the government provides accelerated payments to the prime, ***then*** the prime must provide accelerated payments to its ***small business*** subs. The clause does not provide for accelerated payments to the primes.It is government policy, as stated in the OMB memos, to provide accelerated payments to ***small business*** primes."

*Furthermore, a contractor withholding federal payments that are due can constitute FRAUD. SEE https://www.uscfc.uscourts.gov/sites/default/files/opinions/CMILLER.DUVAL081109.pdf*

I have already drafted my complaint with another contracting officer.

I attached correspondence with everyone involved and screenshots of my sporadic payments which have NOT been made monthly pursuant to the VA contracts,our subcontracts, and prompt pay requirements.

We also need an escrow account set up so we can get paid, individually, and/or a situation whereas we get paid separately from Intelli-heart.

There is 10% of the monthly total invoice of Intelli-heart due James Winters.  We split that total 50-50.  Thus, 5% and 5% of the monthly total invoice from intelliheart is due each of us subcontractors for the months of October, November, and December 2017.   We have received nothing showing payment from your particular hospital has been received since November 2017 (for September activity).  You have the authority to suspend payments under the threat that they pay us.  See below

"Under the new clause at FAR 52.232-40, Providing Accelerated Payments to Small Business Subcontractors (DEC 2013), when a prime contractor receives an accelerated payment from the government, it will be required to similarly make an accelerated payment to its small business subcontractors upon receipt of the subcontractors' invoices and supporting documentation. This clause trumps any contrary terms that may be included in the parties' subcontract agreement. This new clause will apply to all solicitations and contracts issued on or after December 26, including commercial item contracts. The rule is not limited to first-tier subcontracts, and thus also requires higher-tier subcontractors that receive accelerated payments to make accelerated payments to their lower-tier small business subcontractors.

In the event that a prime contractor fails to make an accelerated payment, the government may stop making accelerated payments to the prime."

https://www.mccarter.com/New-Rules-Assist-Federal-Small-Business-Subcontractors-12-11-2013/

Regards,

Terrance

775-391-6113

**EXHIBIT** 20

The VA's Arlene Jorgensen-Hilestad email to Walker

**EXHIBIT** 20

**EXHIBIT** 20

 Terrance Walker <twalker41mg@gmail.com>

---

## VA26317D0109 : federal payments due subcontractors

---

**Jorgensen Hillestad, Arlene A.** <Arlene.JorgensenHillestad@va.gov> Thu, Feb 8, 2018 at 12:13 PM
To: Terrance Walker <twalker41mg@gmail.com>
Cc: "Chiappone, Fay C." <Fay.Chiappone@va.gov>

Mr. Walker,

It has come to our attention that you or your organization are not, according to the contractor, a subcontractor of the contractor. Accordingly, we regard this matter as closed.

Sincerely,

*Arlene Jorgensen Hillestad*

Branch Chief, Medical Sharing Team 2

U.S. Department of Veterans Affairs

Network 23 Contracting Office (NCO 23)

Warren E. Burger Federal Building and U.S. Courthouse,

316 Robert Street North, Suite 506

St. Paul, MN 55101

Phone - 651-293-3028/ Fax - 651-293-3060

arlene.jorgensenhillestad@va.gov

This message (and any attachments) is intended only for the use of the person or office to which it is addressed and may contain information that is privileged, confidential or protected by law. All others are hereby notified that receipt of this message does not waive any applicable privilege or exemption from disclosure and that any dissemination, distribution or copying of this communication is prohibited under Federal law. If you received this communication in error, please notify me immediately at the e-mail address shown at the top of the message. Thank you.

"INTEGRITY, COMMITMENT, ADVOCACY, RESPECT, and EXCELLENCE – these are our Core Values."

As our client, please take a few moments and let us know how we did by completing the attached SURVEY.



"Delivering Client Centered Acquisition Solutions"

**From:** Terrance Walker [mailto:twalker41mg@gmail.com]
**Sent:** Tuesday, February 06, 2018 2:40 PM
**To:** Jorgensen Hillestad, Arlene A. <Arlene.JorgensenHillestad@va.gov>
**Cc:** Chiappone, Fay C. <Fay.Chiappone@va.gov>

[Quoted text hidden]

[Quoted text hidden]

**EXHIBIT 21**

The VA's Arlene Jorgensen-Hilestad's certified statement

**EXHIBIT 21**

**EXHIBIT 21**



**DEPARTMENT OF VETERANS AFFAIRS**
**Network Contracting Office 23 (NCO 23)**
**Warren E. Burger Federal Building and U.S. Courthouse**
**316 Robert St. N, Suite 506**
**St Paul, MN 55101**

Date: 2/23/2018

To: Contract File

From: Arlene Jorgensen Hillestad, Contracting Officer

Subject: Contracting Officer's Narrative in Response to GAO Protest B-416064 filed by Walker Development & Trading Group Inc.; VA263-17-D-0109

Contracting Officer's Narrative:

1) On August 4, 2016, I issued Request for Proposals VA263-16-R-0636 ("RFP") on the Federal Business Opportunities ("FBO") website.
2) The RFP was issued as a small business set-aside.
3) The RFP was issued for the provision of remote cardiac outpatient telemetry and wireless cardiac event monitoring services for the Iowa City Veterans Healthcare System.
4) The RFP anticipated the award of an IDIQ fixed price contract for a base year and four one-year options.
5) The RFP included FAR clause 52.232-40, Providing Accelerated Payments To Small Business Subcontractors (DEC 2013).
6) No Amendments to the RFP were issued.
7) I received two proposals by the August 15, 2016 due date.
8) Walker Development & Trading Group Inc. did not submit a proposal in response to the RFP.
9) On October 1, 2017, I awarded IDIQ Contract VA263-17-D-0109 to Intelli-Heart Services, Inc. in the amount of $323,750.00.
10) On the same day, I issued Task Order VA263-17-J-1324 to Intelli-Heart Services, Inc. in the amount of $64,750.00 for services to be performed from October 1, 2017 to September 30, 2018.
11) The IDIQ Contract included FAR clause 52.232-40, Providing Accelerated Payments To Small Business Subcontractors (DEC 2013).
12) I have issued no modifications to the IDIQ Contract or to the Task Order for the base year.
13) I have not removed FAR clause 52.232-40, Providing Accelerated Payments To Small Business Subcontractors (DEC 2013) from the IDIQ Contract.
14) I have verified with Intelli-Heart Services, Inc. that Walker Development is not one of its subcontractors. In addition, I have verified with Intelli-Heart Services, Inc. that James Winters is not a current subcontractor. Intelli-Heart Services, Inc. indicated that Mr. Winters has no authority to act on behalf of Intelli-Heart Services with respect to the IDIQ Contract and Task Order.

Arlene A. Jorgensen Hillestad 435040 Digitally signed by Arlene A. Jorgensen Hillestad 435040 Date: 2018.02.23 13:02:27 -06'00'

Arlene Jorgensen Hillestad
Contracting Officer

**EXHIBIT** 22

Walker's assertion of nonpayment to the VA's Patrice Bond

**EXHIBIT** 22

**EXHIBIT** 22

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 135 of 153

**Terrance Walker <twalker41mg@gmail.com>**

---

## Notice of Prime's NON-COMPLIANCE on VA69D17D0167 with federal payments due subcontractors FAR part 52.232-40 and request " discontinue accelerated payments to the prime contractor"

---

**Terrance Walker** <twalker41mg@gmail.com> Mon, Feb 12, 2018 at 1:52 PM
To: "Baltutis, Jason R." <Jason.Baltutis2@va.gov>
Cc: "Bond, Patrice" <Patrice.Bond@va.gov>

Ms. Bond,

Please find my contract with Mr. Winters (Exhibit 2) in which I acted with (and on) his behalf as a subcontractor (to help him and Intelli-heart) secure bids and payment.

ALso note, under contract, FAR part 52.203-7 we provided procurement related services which constitutes "services" of "any kind" "in connection" with a "prime contract" and fits the definition of a "subcontractor"
https://www.acquisition.gov/far/html/52_200_206.html#wp1137631

We are asking for your office to make a determination on whether the prime is in violation of FAR 52.232-40, ensure compliance with FAR 52.232-40, and effectuate the appropriate relief.

[Note: FAR 1.602-1 -- Authority, states

"(a) Contracting officers have authority to enter into, administer, or terminate contracts and make related determinations and findings

Also See FAR part **1.602-2 -- Responsibilities, states**

"Contracting officers are responsible for ensuring performance of all necessary actions for effective contracting, ensuring compliance with the terms of the contract, and safeguarding the interests of the United States in its contractual relationships."]

See also the commissions paid from July 2017 in November 2017 to Mr. Winters. Note my late transaction screenshot of my bank account shows 50% of the totals (as stated in my contract) paid in November 2017.

Regards,
Terrance

[Quoted text hidden]

---

**3 attachments**

**late-transactions-Intelliheart (1).png**
148K

**Nov2017commission-MrWinters.pdf**
74K

**Exhibit2-JamesWinters_TerranceWalker-Contract-.pdf**
2092K

**EXHIBIT 23**

The VA's Patrice Bond's email

**EXHIBIT 23**

**EXHIBIT 23**

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 138 of 153

**Terrance Walker <twalker41mg@gmail.com>**

---

## Notice of Prime's NON-COMPLIANCE on VA69D17D0167

---

**Bond, Patrice** <Patrice.Bond@va.gov> Wed, Mar 7, 2018 at 11:44 AM
To: Terrance Walker <twalker41mg@gmail.com>
Cc: "Cincotta, Becky" <Becky.Cincotta@va.gov>

Mr. Walker:

I have reviewed your request and have determined that the matter best be resolved in a private action between you, as a second tier subcontractor, and Mr. Winters, a first tier subcontractor. You indicated below that our prime contractor, Intelli-Heart, severed ties with Mr. Winters; I have spoken to Intelli-Heart and confirmed its separation from Mr. Winters. Additionally, I have confirmed that all payments due to Mr. Winters have been made by Intelli-Heart and that they were made in a timely manner. The action you have asked me to take with respect to Intelli-Heart ("discontinue accelerated payments to the prime contractor") therefore does not appear to be appropriate. Because we have no interest in any dispute you may have with Mr. Winters, I have determined that a contract action against Intelli-Heart is not warranted. The FAR citation you have cited indicates that I have discretion in this matter and I am exercising it by not intervening.

We hope you are able to resolve your issues with the subcontractor; but to reiterate, we do not plan to take any action at this time and we consider the matter closed.

**Patrice R. Bond**

**Branch Chief - Medical Sharing Contract Team**

**Contracting Officer**

Great Lakes Acquisition Center (NCO 12)

115 South 84th Street, Suite 101

Milwaukee, WI 53214-1476

Phone: (414) 844-4806 Fax: (414) 844-4891

**Cell: (414) 379-2540 - Call if an immediate response is required.**

**"Delivering Client Centered Acquisition Solutions"**

"INTEGRITY, COMMITMENT, ADVOCACY, RESPECT, AND EXCELLENCE – these are our goals."

As our client, please take a few moments and let us know how we did by completing the attached SURVEY

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 139 of 153

**EXHIBIT 24**

The VA's Patrice Bond's certified statement

**EXHIBIT 24**

**EXHIBIT 24**



**DEPARTMENT OF VETERANS AFFAIRS**
**Network Contracting Office 12 (NCO 12)**
**Great Lakes Acquisition Center (GLAC)**
**115 South 84th Street, Suite 101**
**Milwaukee, WI 53214**

Date: 3/15/2018

To: Contract File

From: Patrice R. Bond, Branch Chief, Contracting Officer

Subject: Contracting Officer's Narrative in Response to GAO Protest B-416114 filed by Walker Development & Trading Group Inc.; VA69D-17-D-0167

Contracting Officer's Narrative:

1) On March 14, 2017, Request for Quotation (RFQ) VA69D-17-Q-0725 was posted on the Federal Business Opportunities ("FBO") website.
2) The RFQ was issued as a small business set-aside.
3) The RFQ was issued for the provision of Cardiac Arrhythmia Monitoring Services for the VA Great Lakes Health Care System. The following facilities were including: Jesse Brown VAMC, Captain James A. Lovell Federal Health Care Center, Edward Hines VA Hospital, Oscar G. Johnson VAMC, William S. Middleton VA Hospital, Tomah VAMC, Clement J. Zablocki VAMC, and the Milo C. Huempfner Health Care Center/CBOC.
4) The RFQ anticipated the award of an IDIQ fixed price contract for a three-year ordering period.
5) The RFQ included FAR clause 52.232-40, Providing Accelerated Payments To Small Business Subcontractors (DEC 2013).
6) Amendment A00001 was issued to the RFQ on March 23, 2017 in responses to potential offerors questions. There were no questions regarding FAR clauses.
7) The Contracting Officer received six quotes by the April 7, 2017 due date.
8) Walker Development & Trading Group Inc. did not submit a quote in response to the RFQ.
9) On July 24, 2017, IDIQ Contract VA69D-17-D-0167 was awarded to Intelli-Heart Services, Inc. in the amount of $2,325,675.00.
10) On the same day, Task Orders VA69D-17-J-5196, VA69D-17-J-5211, VA69D-17-J-5224, VA69D-17-J-5238, VA69D-17-J-5239, VA69D-17-J-5240, VA69D-17-J-5241 and VA69D-17-J-5242 were issued to Intelli-Heart Services, Inc. for services to be performed from July 24, 2017 to July 23, 2018.
11) The IDIQ Contract included FAR clause 52.232-40, Providing Accelerated Payments To Small Business Subcontractors (DEC 2013).
12) Modification P00001 was issued to the IDIQ Contract to change quantities to CLINs 1002, 2002 and 3002. No modifications were issued to the Task Orders.
13) FAR clause 52.232-40, Providing Accelerated Payments To Small Business Subcontractors (DEC 2013) was not removed from the IDIQ Contract.
14) I have verified with Intelli-Heart Services, Inc. that (1) Walker Development is not one of its subcontractors. (2) James Winters no longer works for Intelli-Heart Services, Inc. (3) Mr. Winters has no authority to act on behalf of Intelli-Heart Services with respect to the IDIQ Contract and Task Orders. (4) Mr. Winters has been paid for all services performed while working for Intelli-Heart Services, Inc.

Patrice R Bond 322020

Digitally signed by Patrice R Bond 322020
Date: 2018.03.15 19:10:01 -05'00'

PATRICE R. BOND
Contracting Officer

**EXHIBIT 25**

Email tree of Cochran to Parson's regarding Walker's non-payment

**EXHIBIT 25**

**EXHIBIT 25**

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 142 of 153

**Terrance Walker <walkerbillion@gmail.com>**

---

## RE: [EXTERNAL] Re: Kick-Off Meeting

---

**Cochran, Kevin** <Kevin.Cochran2@va.gov> Tue, Feb 6, 2018 at 10:24 AM
To: Vanessa <vparsonslaw@gmail.com>
Cc: "vparsons@intelli-heart.com" <vparsons@intelli-heart.com>, "hpeckos@intelli-heart.com" <hpeckos@intelli-heart.com>, Danny Weisberg <dweisberg@intelli-heart.com>, Claudia Jacobs <cjacobs@intelli-heart.com>, "walkerbillion@gmail.com" <walkerbillion@gmail.com>

Vanessa,

Can you please provide me with provide a payment status on the attached email from Mr. Terrance Walker.

Vr

Kevin J. Cochran

Contracting Specialist

Network Contracting Office 9

1639 Medical Center Parkway, Suite 400

Murfreesboro, TN 37129

Phone: 615-225-6479

Fax: 615-849-3769

Kevin.cochran2@va.gov

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 143 of 153

**"Delivering Client Centered Acquisition Solutions"**
***FY18 Back to Basics – Achieving Better Contracts***
***B2B – ABC***

"INTEGRITY, COMMITMENT, ADVOCACY, RESPECT, and EXCELLENCE – these are our Core Values."

As our client, please take a few moments and let us know how we did by completing the attached SURVEY

---

**From:** Vanessa [mailto:vparsonslaw@gmail.com]
**Sent:** Monday, October 02, 2017 9:42 AM
**To:** Cochran, Kevin
**Cc:** vparsons@intelli-heart.com; hpeckos@intelli-heart.com; Danny Weisberg; Claudia Jacobs
**Subject:** [EXTERNAL] Re: Kick-Off Meeting

Hi Kevin,

Sure, would you like to set up a conference call? Also, we were planning to reach out to poc today to arrange an in-service date. Would you like to wait till tomorrow and have everything coordinated then?

Vanessa

Sent from my iPhone

On Oct 2, 2017, at 7:15 AM, Cochran, Kevin <Kevin.Cochran2@va.gov> wrote:

> Vanessa,
>
> Would Intelli-Heart be open to having a quick kick-off meeting tomorrow around 10:30am CT?
>
> Please advise.
>
> V/r
>
> Kevin J. Cochran
>
> Contracting Specialist
>
> Network Contracting Office 9

1639 Medical Center Parkway, Suite 400

Murfreesboro, TN 37129

Phone: 615-225-6479

Fax: 615-849-3769

Kevin.cochran2@va.gov

<image001.png>

<image002.jpg>**"Delivering Client Centered Acquisition Solutions"**

"INTEGRITY, COMMITMENT, ADVOCACY, RESPECT, AND EXCELLENCE – these are our goals."

As our client, please take a few moments and let us know how we did by completing the attached

**SURVEY**

How was my customer service today? Please e-mail your comments to Weston.Worsham@va.gov

---------- Forwarded message ----------
From: Terrance Walker <walkerbillion@gmail.com>
To: "Cochran, Kevin" <Kevin.Cochran2@va.gov>, "Smith, Christina B." <Christina.Smith7@va.gov>
Cc:
Bcc:
Date: Mon, 5 Feb 2018 13:19:56 +0000
Subject: [EXTERNAL] Re: award VA24918C10329

> Here is a screenshot of the sporadiac payments (that are supposed to be made monthly)
>
> Regards,
> Terrance
> 775-391-6113
>
> On Fri, Feb 2, 2018 at 8:38 AM, Terrance Walker <walkerbillion@gmail.com> wrote:
>> Mr Cochran,
>>
>> I am copying Ms. Smith on this email (as she appears to be working on this contract as well).
>>
>> Regards,
>> Terrance
>> 775-391-6113
>>
>> On Thu, Feb 1, 2018 at 10:32 AM, Terrance Walker <walkerbillion@gmail.com> wrote:

Case 3:18-cv-00132-MMD-CBC Document 73-1 Filed 02/22/19 Page 145 of 153

Mr. Cochran,

There is 10% of the monthly total invoice of Intelli-heart due James Winters. We split that total 50-50. Thus, 5% and 5% of the monthly total invoice from intelliheart is due us subcontractors. You have the authority to suspend payments under the threat that they pay us. See

"Under the new clause at FAR 52.232-40, Providing Accelerated Payments to Small Business Subcontractors (DEC 2013), when a prime contractor receives an accelerated payment from the government, it will be required to similarly make an accelerated payment to its small business subcontractors upon receipt of the subcontractors' invoices and supporting documentation. This clause trumps any contrary terms that may be included in the parties' subcontract agreement. This new clause will apply to all solicitations and contracts issued on or after December 26, including commercial item contracts. The rule is not limited to first-tier subcontracts, and thus also requires higher-tier subcontractors that receive accelerated payments to make accelerated payments to their lower-tier small business subcontractors.

In the event that a prime contractor fails to make an accelerated payment, the government may stop making accelerated payments to the prime."

https://www.mccarter.com/New-Rules-Assist-Federal-Small-Business-Subcontractors-12-11-2013/

Regards,
Terrance

On Thu, Feb 1, 2018 at 10:01 AM, Terrance Walker <walkerbillion@gmail.com> wrote:

Greetings Mr. Cochran,

I am a 2nd tier subcontractor under James Winters (a 1st tiered small business subcontractor) who has been consulting him in the bidding and contracting process (and he prepares the bids for Intelli-heart).

Under award ID VA24918C10329, there are payments that late and, from plenty of experience, I know it doesn't take 60 days for the federal government to pay a submitted invoice. In the past Intelli-heart has held on to payments for up to 90 days and I warned them this does not comport with federal law.

I am alerting you to help save Intelli-heart from serious penalties as they refuse to listen to sound advice. I've given them numerous chances but either they are either: 1) stupid 2) financially insolvent 3) incapable of implementing financial management controls to comport with federal law.

How this is relevant to you and the contract you manage is because veterans lives are at stake and as a contracting officer you still have to make sure the company is up to par and report them if they are not. (see below)

Just so you can alert them (and know that I know the law):

*a prime contractor can be said to have "used" a small business in preparing its bid or proposal when: (1) the offeror references the small business as a subcontractor in the bid or proposal, or associated small business subcontracting plan; (2) t*<u>*he offeror has a subcontract or agreement in principle to subcontract with a small business to perform a portion of the specific contract; or (3) the small business drafted a portion of the bid or proposal, or the offeror used the small business's pricing or cost information, or technical expertise, in preparing the bid or proposal, and there is written evidence of an intent or understanding that the small business would be awarded a subcontract for the related work if the offeror is awarded the contract.*</u> *See Small Bus. Admin., Small Business Subcontracting: Final Rule, 79 Federal Register 42390, 42405 (July 16, 2013) (codified at 13 C.F.R. §125.3(c)(3)(i)- (iii)).*

*52.203-99 PROHIBITION ON CONTRACTING WITH ENTITIES THAT REQUIRE CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS (DEVIATION) (FEB 2015) (a) The Contractor shall not require employees or contractors seeking to report fraud, waste, or abuse to sign or*
*comply with internal confidentiality agreements or statements prohibiting or otherwise restricting such employees*
*or subcontractors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.*

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 146 of 153

*Agencies are generally required to evaluate contractors' performance on all contracts valued in excess of $150,000 when the contract is completed or on an interim basis, in the case of multi-year contracts. 48 C.F.R. §42.1502(b) (general requirement); 48 C.F.R. §42.1502(e) (construction contracts); 48 C.F.R. §42.1502(f) (architect-engineer contracts). For more on evaluations of contractors' performance, see CRS Report R41562, Evaluating the "Past Performance" of Federal Contractors: Legal Requirements and Issues, by Kate M. Manuel.*

*In November 2013, the Obama Administration amended the Federal Acquisition Regulation (FAR) to implement the accelerated payment policy as to small business subcontractors. See Dep't of Defense, Gen. Servs. Admin. & Nat'l Aeronautics & Space Admin., Federal Acquisition Regulation: Accelerated Payment to Small Business Subcontractors: Final Rule, 78 Federal Register 70477 (November 25, 2013). This includes* those for the acquisition of commercial items, thereby binding themselves to make accelerated payments to their subcontractors (codified at 48 C.F.R. §52.232-40(c) ; See FAR part 5 2.232-40(c) which is incorporated into each contract automatically).

Note commentary from expert contracting officer, Vern Edwards, http://www.wifcon.com/discussion/index.php?/topic/2847-52232-40-and-prompt-payments-as-a-prime/
"FAR 52.232-40 requires that ***if*** the government provides accelerated payments to the prime, ***then*** the prime must provide accelerated payments to its ***small business*** subs. The clause does not provide for accelerated payments to the primes.It is government policy, as stated in the OMB memos, to provide accelerated payments to ***small business*** primes."

*Furthermore, a contractor withholding federal payments that are due can constitute FRAUD. SEE https://www.uscfc.uscourts.gov/sites/default/files/opinions/CMILLER.DUVAL081109.pdf*

I have already drafted my complaint with another contracting officer and will send one to you shortly.

We need an escrow account set up so we can get paid, individually.

Regards,
Terrance
775-391-6113

**2 attachments**

**late-transactions-Intelliheart (1).png**
148K

**noname.eml**
248K

**EXHIBIT 26**

Email tree of Cochran to Walker of Weisburg's email response

**EXHIBIT 26**

**EXHIBIT 26**

3/24/2018 Gmail - VA24918C10329: Notification of subcontractor payment more than 90 days past due & proof that ALL subcontract ARE NOT required O…

Gmail

Terrance Walker <walkerbillion@gmail.com>

**VA24918C10329: Notification of subcontractor payment more than 90 days past due & proof that ALL subcontract ARE NOT required OVER $700k**

**Cochran, Kevin** <Kevin.Cochran2@va.gov> Fri, Mar 16, 2018 at 6:15 AM
To: Terrance Walker <walkerbillion@gmail.com>, "Worsham, Charles W." <Weston.Worsham@va.gov>

Mr. Walker,

Please see he attached email.

Vr

Kevin J. Cochran

Contracting Specialist

Network Contracting Office 9

1639 Medical Center Parkway, Suite 400

Murfreesboro, TN 37129

Phone: 615-225-6479

Fax: 615-849-3769

Kevin.cochran2@va.gov

UNITED STATES
AIR FORCE
MADE IN THE U.S.A.

https://mail.google.com/mail/u/0/?ui=2&ik=e0c5f52c11&jsver=lr-NdqmOTUs.en.&view=pt&msg=1622ef3b457bc6f8&q=kevin.cochran2%40va.gov&qs=t… 1/3

"Delivering Client Centered Acquisition Solutions"
*FY18 Back to Basics – Achieving Better Contracts*
*B2B – ABC*

"INTEGRITY, COMMITMENT, ADVOCACY, RESPECT, and EXCELLENCE – these are our Core Values."

As our client, please take a few moments and let us know how we did by completing the attached SURVEY

**From:** Terrance Walker [mailto:walkerbillion@gmail.com]
**Sent:** Friday, March 16, 2018 2:14 AM
**To:** Cochran, Kevin; Worsham, Charles W.
**Subject:** [EXTERNAL] VA24918C10329: Notification of subcontractor payment more than 90 days past due & proof that ALL subcontract ARE NOT required OVER $700k

[Quoted text hidden]

---------- Forwarded message ----------
From: Danny Weisberg <dweisberg@intelli-heart.com>
To: "Cochran, Kevin" <Kevin.Cochran2@va.gov>
Cc:
Bcc:
Date: Wed, 21 Feb 2018 16:55:33 +0000
Subject: [EXTERNAL] Fwd: Extortionist type tactics by Intelli-heart on awards VA24918C10329, VA24918C10329, VA26317D0109
Good afternoon.

Earlier today we were copied on the email below which was sent to you from an individual named Terrance Walker. Mr. Walker apparently contends that he is an agent or subcontractor for Intelli-Heart Services, Inc. ("Intelli-Heart"). Please be advised that Mr. Walker is not now, nor has he ever been, a distributor, contractor, agent, or representative of Intelli-Heart. Moreover, Mr. Walker has no contract or agreement of any kind with Intelli-Heart. In fact, until a few weeks ago, we had never heard of Terrance Walker, when he began sending communications to the VA. While we sincerely regret this unpleasant situation, we cannot prevent him from attempting to contact you. However, we request that you avoid corresponding or communicating with him as it will only encourage him to continue to harass and annoy our customers.

Again, we apologize for this inconvenience. If you have any questions, please do not hesitate to contact me.

Best, Danny Weisberg

---------- Forwarded message ----------
From: **Terrance Walker** <walkerbillion@gmail.com>
Date: Fri, Feb 9, 2018 at 12:17 PM
Subject: Extortionist type tactics by Intelli-heart on awards VA24918C10329, VA24918C10329, VA26317D0109
To: James Winters <jameswinters12345@yahoo.com>, "Cochran, Kevin" <kevin.cochran2@va.gov>, "Lapp, Larry D NCO 6" <larry.lapp@va.gov>, arlene.jorgensenhillestad@va.gov, Vanessa Parsons <vparsons@intelli-heart.com>, Danny Weisberg <dweisberg@intelli-heart.com>, Hilary Peckos <hpeckos@intelli-heart.com>

To the CO's /CS's emailed with awards VA24918C10329, VA24918C10329, VA26317D0109 ,

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 150 of 153

Notice of COERCION attempt by Intelli-heart to get subcontractors to waive their federal rights under the Prompt Payment Act.

Now they are attempting, Extortionist type tactics regarding payments owed to subs on awards VA24918C10329, VA24918C10329, VA26317D0109

As of today no payment has been received, though promises to pay have been made multiple times over the past month.

Be on notice, attempts to shackle this federal subcontractor will be unsuccessful.

The rights and obligations under the existing contracts are clear -- pay every thirty days or less.

There are no "terminate" provisions in either subcontract simply because Intelli-heart does not want to pay its subs or is aggravated they are being reported for their non-compliance with federal law/regulations.

Our federal rights as subcontractors to seek payments owed are NOT negotiable, CO's please proceed with haste on halting payments
if Intelli-heart continues on it's extortionist tactics described in the email below and doesn't pay.

Terrance

On Fri, Feb 9, 2018 at 10:35 AM, James Winters <jameswinters12345@yahoo.com> wrote:

> I just got off the phone with an attorney representing Intelli-Heart Services Inc.
>
> If I can get a contract in place with assured payments moving forward in the future will you back off from corresponding to the VA's?
>
> Can payments owed from past present and future get you to stop all correspondence now and in the future as long as all payments are sent in a timely, transparent fashion.
>
> Let me know. If agreed to do so, we can draw something up contractually so that everyone is on the same page with a commission payment schedule and not end up losing the contracts.
>
> James Winters
> jameswinters12345@yahoo.com

--
**Danny Weisberg**
*Intelli-Heart Services, Inc*
10850 Wilshire Blvd., Ste 740
Los Angeles, CA 90024
Phone: 877-898-8680
Fax: 310-470-0477

---

**noname.eml**
26K

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 151 of 153

**EXHIBIT** 27

Email Informing VA prime violated FCA

**EXHIBIT** 27

**EXHIBIT** 27

 Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 152 of 153

**Terrance Walker <walkerbillion@gmail.com>**

# Assertion of Non-payment of subcontractors (OVER 90 days) on Your Intelli-heart contracts

**Terrance Walker** <walkerbillion@gmail.com> Fri, Mar 16, 2018 at 10:55 AM
To: "Jorgensen Hillestad, Arlene A." <arlene.jorgensenhillestad@va.gov>, "Lapp, Larry D NCO 6" <larry.lapp@va.gov>, patrice.bond@va.gov

James Winters and Intell-heart have a contract (see attached Exhibit 3) which was used to secure the VA contract you administer.

There is a contract between myself and James Winters (who is "another subcontractor" of Intelli-heart) (see attached Exhibit 2).

James Winters used my services to secure the VA contract you administer.

As as subcontractor of James Winters (who has helped with consulting services on this contract you administer), I am subcontractor (though 2nd tier) for Intelli-heart. As such, Intelli-heart's statements (in disregard of FAR part 44.101) have no bearing on this because BY DEFINITION I am a subcontractor of a subcontractor (which is a subcontractor)

FAR part 44.101, states :

“'Subcontractor' means any supplier, distributor, vendor, or firm that furnishes supplies or services to or for a prime contractor or another subcontractor."

I have been made aware that there is a Danny Weisburg who is denying the FAR provisions above.

Did you know that Danny Weisburg is NOT on the FAR report as an authorized representative the company and is not on the secretary of state listing? (see FAR report attached)

The President of the company is Vanessa Parsons. (see California secretary of state report, attached) Also, search for yourself

https://businesssearch.sos.ca.gov/CBS/SearchResults?SearchType=CORP&SearchCriteria=Intelli-heart&SearchSubType=Keyword

The people of this company know who I am. They tried this same falsehood in January on contracting Officer Lance Davis (see Gmails attached).

You need to contract Mr. Winters on this. He'll tell you exactly what's going on, as you can see from the email from Mr. Winters, they're trying to

hide the fact that they've been paying "60, 90, or 120 days and then pay the sub without any interest"

Note that: "When Congress became aware that the government was essentially making interest-free loans to prime contractors, it passed a statute, now implemented at FAR 32.112-1, that allows the subcontractor to contact the contracting officer. In such event, the contracting officer may take one of the following actions: encourage the prime to

Case 3:18-cv-00132-MMD-CBC Document 79-1 Filed 02/22/19 Page 153 of 153

get current with the sub; withhold further payments to the prime until it becomes current with the sub; or refer the matter to other appropriate authorities. These authorities may be criminal investigators, on the basis that the prime's failure to pay the sub violates its certifications of payment to the government and constitutes a false claim."

https://www.jamsadr.com/files/uploads/documents/articles/nagle-prime-contractor-winter-2011.pdf (page 15)

Also note that when FAR 52.232-40 was implemented a few years later, during the administrative rules comment stage, the far council stated that the same remedy under FAR 32.112 would apply for its violation ("The rule does not create any new remedies for subcontractor payment issues. Subcontractors would utilize existing remedies for non-payment similar, but not limited, to FAR 32.112. ", paragraph 4, See https://www.federalregister.gov/documents/2013/11/25/2013-28053/federal-acquisition-regulation-accelerated-payments-to-small-business-subcontractors)

Thus, it is time to act. You have MORE than three alternatives 1) encourage the prime to get current with the sub; 2) withhold further payments to the prime until it becomes current with the sub; or 3) refer the matter to other appropriate authorities.

Fail to act at your peril. You're now covering a criminal act if you do not act.

Regards,

Terrance Walker

---

**6 attachments**

**Gmail - NOTICE of violation 52.232-40 (c)Providing Accelerated Payments to Small Business Subcontractors_.pdf**
114K

**Gmail - NOTICE of violation52.232-40 (c)Providing Accelerated Payments to Small Business Subcontractors_.pdf**
119K

**Intelli-heart-Officers-secretaryofstate.pdf**
62K

**INTELLI-HEART SERVICES, INC. -FAR-Report.pdf**
87K

**Exhibit2-JamesWinters_TerranceWalker-Contract- (1) (1).pdf**
2092K

**Exhibit3-james-winters-intelli-heart-contract.pdf**
149K