**Terrance Walker,** *in propria persona*
212 Hillcrest Drive # 1
Reno, NV  89509
Tel: +1.775.971.8679
Email: walkerbillion@gmail.com

## IN THE UNITED STATES DISTRICT COURT FOR NEVADA

| | |
|---|---|
| Terrance Walker | :   **CIVIL CASE NO.** 3:18-CV-0132-MMD(CBC) |
| Plaintiff, | : |
| vs. | : MOTION FOR PARTIAL SUMMARY JUDGMENT |
| Intelli-heart Services Inc.,  et. Al. | : ORAL ARGUMENT REQUESTED |
| Defendants. | : |

COMES NOW Plaintiff Terrance Walker ("Walker") moves for summary adjudication.

**PLEASE TAKE NOTICE** that as soon as is convenient to the Court so that counsel may be heard before the Honorable Miranda Du, Plaintiff Terrance Walker will and hereby does move for an Order granting partial summary judgment or, in as to the issues of tortious interference claim alleged in the Second Amended Complaint ("Complaint") filed by Plaintiff Terrance Walker, on the grounds that there is no genuine issue as to any material fact and, therefore, Walker is entitled to summary judgment as a matter of law.

This motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP") and Local Rules 7-2, 7-3, and 56-1.

Alternatively, if for any reason summary judgment cannot be had, Walker moves for an order pursuant to FRCP 56 adjudicating that the following issues in this action, or any of them, are established without substantial controversy; that no further proof shall be required or permitted at the trial of this action on these issues; and that any final judgment in this action, in addition to any matters determined at trial, be based upon these issues so established:

COUNT IV Cause of Action: The cause of action for tortious interference[1] (under Nevada law) on the succeeds, as a matter of law, on the grounds [ (1,2, and 4) of the count] that:

A.  Walker asserts a federal question state-law tort claim

---

[1] Nevada law, in <u>J.J. Indus., LLC vs Bennett</u>, 119 Nev. 269, 273, 71 P. 3dd 1264, 1267 (2003) has held that five prongs to prove tortious interference/intentional interference with a contract are: "(1) a ***valid*** and existing[enforceable] ***contract***; (2) **the defendant's knowledge of the contract**; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) **actual disruption of the contract**; and (5) resulting damage." (issues subject to this motion in bold)

1

(1) Walker and James Winters ("Winters") had a *valid* and *enforceable* contract:

    (a)    Winters had a right to assign rights under the IHS-Winters contract to Walker (for consultation) in exchange for partial commission in the absence of an anti-assignment clause (under Nevada law)

    (b)    Winters did not have to give IHS notice of his assignment/subcontract to Walker in the absence of an anti-assignment clause

    (c)    Walker was a 2nd tier subcontractor of IHS under FAR part 52.232-40  prior to Feb. 8, 2018 (and had a right to report IHS to federal agencies (including the U.S. Dept. of Veteran Affairs, "VA") for late payments and gain enforcement thereunder

    (d)    Walker was a 2nd tier subcontractor of IHS under FAR part 52.203-19 prior to Feb. 8, 2018 and had a right to report IHS to federal agencies (including the U.S. Dept. of Veteran Affairs) and gain enforcement thereunder FAR part 52.232-40

    (e)    Walker did not have to have privity of contract with IHS or assert third party beneficiary with Winters to have standing under this prong

    (f)    Walker is not bound by Winter's agreement with IHS to establish this prong

    (g)    The confidentiality clause in Winter's agreement with IHS was void and invalid after Jan. 2017 under FAR part 52.203-19 and has no bearing on this prong

    (h)    IHS cannot restrain Winters from subcontracting to Walker for other reasons

(2)  IHS had knowledge of Walker and Winter's contract prior to Feb. 8, 2018

(4) IHS actually disrupted Walker's contract/contractual rights with Winters in, inter alia,

    (a) not paying Winters monthly so that Walker could get paid monthly (e.g. the December 2017/January 2018 payments due) ,

    (b) investigating Walker in December 2017—January 2018 for having a valid contract with Winters, and

    (c) halting all payments when suspending and terminating Winter's contract in Feb. 2018.

    (d) asserting to federal agencies (e.g. VA) that Walker was never a "subcontractor" "in any way"  -- thwarting the VA from enforcing Walker's rights under FAR part 52.232-40

(5) Walker suffered damages.

TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES………………..…………..10

I.    INTRODUCTION………………………………………………..…………10

II. STATEMENT OF UNDISPUTED FACTS …………………………………10

    A.  WALKER IS A RESIDENT (AND SMALL BUSINESS) IN NEVADA….10

    B.  IHS IS A RESIDENT OF CALIFORNIA WITH SMALL
        BUSINESS VA CONTRACTS…………………………………………10

    C.  IHS HAD NO ANTI-ASSIGNMENT PROVISION IN ITS 2014
        CONTRACT WITH WINTERS…………………………………………..11

    D.  WINTERS SUBCONTRACTED WITH(ASSIGNED) WALKER
        UNDER  NEVADA LAW IN OCT. 2014 TO PROVIDE CONSULTING
        ASSISTANCE IN LANDING FEDERAL (e.g. VA) CONTRACTS
        FOR HALF OF WINTER'S COMMISSIONS, , INCLUDING
        THOSE FROM IHS' VA CONTRACTS…………………………...……….11

    E.  WALKER HELPED WINTERS LAND THE VA  HEART
        MONITORING CONTRACTS  FOR IHS……………………..…………11

    F.  IHS SIGNED FEDERAL, VA, CONTRACTS, INCLUDED
        PROTECTIONS FOR, EVEN, 2nd TIER SUBCONTRACTORS
        -- FAR part 52.203-19 and Far part 52.232-40……………………...……11

    G.  PAYMENTS WERE REQUIRED TO BE MADE TO WINTERS
        MONTHLY SO THAT WALKER COULD BE PAID MONTHLY……...12

    H.  IHS RECEIVED PAYMENTS EVERY MONTH IN 2017 ON THE VA
        CONTRACTS………………………………………………...……12

    I.   IHS' PAYMENTS MADE TO WINTERS (and, thus, WALKER)
        WERE NOT MONTHLY………………………….………………...……..12

    J.  WALKER THREATENED TO SUE IHS FOR LATE PAYMENTS
        IN DEC 2017 AND REPORTED IHS TO THE VA IN FEB. 2018……..…13

    K.  IHS DID NOT ISSUE A LITIGATION HOLD AFTER WALKER'S
        THREATS TO SUE THEM………………………………………..…… .13

L. IHS TOLD VA OFFICIALS THAT WALKER HAD NEVER BEEN A SUBCONTRACTOR, NOR AFFILIATED WITH IHS IN ANY WAY, AND NEVER MADE A LATE PAYMENT…..…….……13

M. IHS HAD KNOWLEDGE OF WALKER'S CONTRACT WITH WINTERS AT LEAST AS EARLY AS NOV. 2017 BUT BEFORE THEY TERMINATED WINTER'S CONTRACT………………….…..14

N. IHS TERMINATED WINTERS CONTRACT IN A MERE MATTER OF DAYS BETWEEN THE TIME WHEN WALKER REPORTED IHS TO THE VA FOR LATE PAYMENTS ---AND HAS NOT PAID SINCE DEC. 2017 --- AND HAS WARNED WINTERS AGAINST COMMUNICATING WITH THE VA……….……………………….…14

O. WINTERS EMAILED THE VA and WALKER STATING THAT IHS WAS SIMPLY TRYING TO GET OUT OF ITS PAYMENT OBLIGATIONS IN TERMINATING THEIR CONTRACT WITH HIM..15

P. IHS' TERMINATION REASON FOR WINTERS "not servicing his accounts [at the VA hospitals]" CONFLICTS WITH A 2015 EMAIL FORWARDED FROM WINTERS (on his CONTRACT) THAT STATED HE DID NOT HAVE TO HAVE ANY "boots on the ground"……………………………………………………………..15

Q. NONE OF THE CONTRACTUAL DEFICIENCIES MENTIONED IN THE FEB. 8, 2018 TERMINATION OF WINTER'S CONTRACT HAVE SHOWN UP IN CONTEMPORANEOUS DOCUMENTATION OF HIS…………………………………….....15

R. WALKER STOOD TO GAIN ANOTHER $154,916 HAD WINTER'S CONTRACT NOT BEEN TERMINATED……………………15

III. ARGUMENT ……………………………………………………………16

A. SUMMARY JUDGMENT STANDARD……………………………………16

B. INTERPRETING NEVADA LAW…..……………………………………18

C. WALKER'S CLAIM (COUNT IV), IN PART, SUCCEEDS…………………..18

1.  WALKER ESTABLISHES A FEDERAL QUESTION NEVADA
    TORTIOUS INTERFERENCE CLAIM, IN PART,
    UNDER FAR Part 52.232-40 and FAR Part 52.203-19.
    IN THE ALTERNATIVE WALER ESTABLISHES
    DIVERSITY JURISDICTION………………………………………...…….19

2.  WALKER HAD A VALID AND EXISTING/ENFORCEABLE
    CONTRACT WITH WINTERS……………………………………………….20

a.  Winters had a right to assign his rights to partial commission in
    exchange for Walker's consultation under his (contract with
    Intelli-heart Service Inc, ("IHS")) to Walker, as a subcontractor,
    under Nevada law (in the absence of an anti-assignment clause)…………21

b.  Winters did not have to give IHS notice (or get consent) of his
    assignment/subcontract to Walker in the absence of an
    anti-assignment clause…………………………………………...……..21

c.  Walker was a 2nd tier subcontractor of IHS under FAR part 52.232-40
    prior to Feb. 8, 2018 (and had a right to report IHS to federal agencies
    (including the U.S. Dept. of Veteran Affairs, "VA") for late payments
    and gain enforcement thereunder ……………………………….…22

d.  Walker was a 2nd tier subcontractor of IHS under FAR part 52.203-19
    prior to Feb. 8, 2018 and had a right to report IHS to federal agencies
    (including the U.S. Dept. of Veteran Affairs) for late payments and
    gain enforcement thereunder …………………………………...……..……22

e.  Walker does not have to establish privity with IHS or prove he's a
    third party beneficiary to prove validity of his contract …………………23

f.  Walker was not bound by Winter's agreement with IHS so the validity
    and enforceability of Walker's contract with Winters is unaffected …….…23

g.  The confidentiality clause in Winter's agreement with IHS was void
    and invalid after Jan. 2017 under FAR part 52.203-19 and has no
    bearing on the validity and enforceability of Walker-Winters contract....24

3.  IHS HAD KNOWLEDGE OF WALKER'S CONTRACT WITH WINTERS AS EARLY AS NOVEMBER 2017 AND DEFINITIVELY IN FEB. 2018 AS EVIDENCED BY THEIR 3. REFERENCE TO WALKER IN THEIR TERMINATION OF WINTER'S CONTRACT WITH THEM………………………………………………………24

4.  IHS ACTUALLY DISRUPTED WALKER'S CONTRACT/CONTRACTUAL RIGHTS BY:……………………………25

a.  not paying Winters monthly so that Walker could get paid monthly (e.g. the December 2017/January 2018 payments due)………….25

b.  investigating Walker and Winters in December 2017—January 2018 for having a valid contract with Winters, ………………………………….25

c.  halting all current and future payments when suspending Winters in Dec. 2017 and terminating Winter's contract in Feb. 2018………..….26

d.  asserting to federal agencies (e.g. VA) that Walker was never a "subcontractor" "in any way" --- thwarting the VA from enforcing Walker's rights under FAR part 52.232-40……………….27

5.  WALKER SUFFERED DAMAGES…………………………………………..27

IV. CONCLUSION …………………………………………………………………28

**TABLE OF AUTHORITIES**

**FEDERAL CASES**                                                                 **page(s)**

Addisu v. Fred Meyer, Inc.,

    198 F.3d 1130 (9th Cir. 2000) …………………………………..…….…**17**

Anderson v. Liberty Lobby, Inc.,

    477 U.S. 242 (1986) ………………………………………………**16**

Brobeck, Phleger Harrison v. Telex Corp.,

    602 F.2d 866, 871 (9th Cir.), *cert. denied*, 444 U.S. 981 (1979) ……..……..…**17,20**

Boyle v. United Techs. Corp.,

    487 U.S. 500, 504, 507 (1988) ……………………………………………**20**

Burrola v. U.S. Sec. Assocs., Inc.,

    Case No.: 3:18-cv-00595-BEN-JLB, at *4 (S.D.Cal. Feb. 7, 2019) ……..……..**24**

C.S. Sewell, M.D. P.C. and Christopher Sewell, M.D., v.  Amerigroup Tennessee,

    Inc. d/b/a Amerigroup Community Care

    No. 2:17-cv-00062 (M.D. Tenn Dec. 14, 2018) ………………………..…….**19**

Celotex Corp. v. Catrett,

    477 U.S. 317 (1986) ……………………………………………..…**16,17**

Chiron Corp. v. Ortho Diagnostic Sys., Inc.,

    207 F.3d 1126 (9th Cir. 2000);  ……...……………………………………**23**

Comer v. Micor Inc

    436 F. 3d 1098 (9th Cir 2016) …………………………………...………**24**

Daldumyan v. World Fin. Grp. Ins. Agency, Inc.,

    B277973 at *64 (Cal. Ct. App. Apr. 17, 2018) …………………...…………**25-27**

Deauville Corp.,

    756 F.2d 1183 (5th Cir 1985) …………………………………….…………**19**

Erection Co. v. Archer W. Contractors, LLC,

No. 2:12-CV-00612-MMD-NJ, 2015 WL 926782, at *7–8 (D. Nev. Mar. 4, 2015)…**21,22**

Great Am. Ins. Co. v. N. Am. Specialty Ins. Co.,

    542 F.Supp.2d 1203 (D. Nev. 2008) …………………………………......**18,19**

**TABLE OF AUTHORITIES (continued)**

**FEDERAL CASES**                                                    page(s)

Green v. Interstate United Mgmt. Servs. Corp.,

    748 F.2d 827 (3d Cir. 1984) ……………………………………………19

Gunn v. Minton,

    568 U.S. 251, 133 S.Ct. 1059, 185 L.Ed.2d 72 (2013) ……………………..19

Granite Rock Co. v. Int'l Bhd. of Teamsters,

    561 U.S. 287,, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010) …………….….…..23

Hemmings v. Tidyman's Inc.,

    285 F.3d 1174 (9th Cir. 2002) …………………………………….…...18

Henry v. Gill Indus., Inc.,

    983 F.2d 943  (9th Cir. 1993) ……………………………………………17

International Ass'n of Machinists, AFL-CIO v. Central Airlines, Inc.,

    372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963) ………………………..20

Knapp v. Cardwell,

    667 F.2d 1253 (9th Cir. 1982) …………………………………….…....18

Lies v. Farrell Lines, Inc.,

    641 F.2d 765 (9th Cir. 1981) …………………………………....………16

Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,

    475 U.S. 574 (1986) …………………………………………….…..16,17

Max Foote Construction Company, LLC v. MWH Constructors, Inc ,

    No. 18- 2584.(October 25, 2018 E.D Louisiana ) …………………….…..23

Nat'l Right to Life P.A. Com. v. Friends of Bryan,

    741 F.Suppp. 807 (D. Nev. 1998) …………………………………………18

Orr v. Bank of America, NT & SA,

    285 F.3d 764 (9th Cir. 2002)…………………………………….………17

Ponomarenko v. Shapiro

    287 F. Supp. 3d 816 (N.D. Cal. 2018). ……………………...…………19

**TABLE OF AUTHORITIES** (continued)

**FEDERAL CASES**                                                                                          page(s)

Russell Road Food and Beverage, LLC v. Spencer

    829 F.3d 1152 (9th Cir. 2016) …………………………………………………..21

Sherman v. Mutual Benefit Life Ins. Co.,

    633 F.2d 782 (9th Cir. 1980). ……………………………………………17,20

Swoger v. Rare Coin Wholesalers

    803 F.3d 1045 (9th Cir 2015) …………………………………………….17,18

T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.,

    809 F.2d 626 (9th Cir. 1987) ……………………………………………17

Wool v. Tandem Computers, Inc.,

    818 F.2d 1422 (9th Cir. 1987) …………………………………………...17

Sass v. California Bd. of Prison Terms,

    461 F.3d 1123 (9th Cir. 2006) …………………………………..………18

United Steelworkers v. Warrior & Gulf Navigation Co.,

    363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)…………………………24

**OTHER CASES**

Caranci v. Howard,

    708 A.2d 1321 (R.I. 1998) …………………………...…..………………19

Easton Bus. Opp. V. Town Exec. Suites,

    126 Nev. 119, 230 P.3d 827 (2010)……………………...……………..20-22

.J. Indus., LLC vs Bennett,

    119 Nev. 269, 273, 71 P. 3dd 1264 (2003) …………………………...1,28

Smith v. Cumberland Grp., Ltd.,

    687 A.2d 1167 (Pa. Super. Ct. 1997) ……………………………………..22

Stalk v. Mushkin,

    125 Nev. 21, 199 P.3d 838 (Nev. 2009) ……………………………………25

**FEDERAL: STATUTES, RULES, REGULATIONS, PROVISIONS**

28 U.S.C. § 1331…………………………………………………………………20

**TABLE OF AUTHORITIES (continued)**

**FEDERAL: STATUTES, RULES, REGULATIONS, PROVISIONS**          **page(s)**

28 U.S.C. § 1332………………………………………………………………………..**20**

FAR part 32.112 (48 CFR § 32.112)…......…………………………………………**22**

FAR part 52.203-19 (48 CFR § 52.203-19) ………………………………………**20,22**

FAR part 52.232-40  (48 CFR § 52.232-40) ………………………………..……..**20,22**

Fed. R. Civ. P. 56………………………………………………………..……………..**16**

**OTHER: AUTHORITIES**

Restatement (Second) Torts § 766………………………………………………….**19,25**

**MEMORANDUM OF LAW  -- POINTS AND AUTHORITIES**

    **I.**       **INTRODUCTION**

Walker asserts a federal question[2] tort violation of his state contractual rights assigned to him by James Winters as well as rights (e.g. to payment) as a 2nd tier subcontractor  (Far part 52.232-40; Far part 52.203-19). (See e.g. EFC 136, ¶¶ 21-30)

      The gravamen of Walker's claim in this matter is that IHS tortiously interfered (EFC 136, ¶ 117-118) with Walker and Winter's contract. As were their rights, Walker and James Winter (Hereinafter "Winters") entered a contract in about Oct. 2014 (EFC 4, Ex. 1) for Walker to consult Winters on government contracts ("Winters-Walker contract"). Next, Winters entered into a contract with IHS ("IHS-Winters" contract) to sell their heart monitoring services to the VA (EFC 136, ¶ 33).

      Per federal law (See FAR Part 52.203-19 (a) which states that a "consultant" of "another subcontractor" is a subcontractor), Winters was a (first-tier) subcontractor under IHS. Walker was a (second-tier) subcontractor under Winters. IHS was/is a prime contractor under the federal government (i.e. U.S. Dept. of Veteran Affairs, "VA") for heart monitoring contracts Winters helped IHS land (with Walker's assistance as a consultant - See EFC 4, Ex. 1).

---

[2] Federal question jurisdiction over state-law claims will lie if a federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disturbing the federal-state balance approved by Congress." <u>Gunn v. Minton</u>, 568 U.S. 251, 258, 133 S.Ct. 1059, 185 L.Ed.2d 72 (2013))

## II.   STATEMENT OF THE UNDISPUTED FACTS ARE:

### A.  WALKER IS A RESIDENT (AND SMALL BUSINESS) IN NEVADA

Walker, from 2014 until now, was domiciled in Nevada and small business under the NAICS codes of the VA contracts of HIS (EFC 136 , ¶ 6, 7, 20)

### B.  IHS IS A RESIDENT OF CALIFORNIA WITH SMALL BUSINESS  VA CONTRACTS

IHS is a domiciled in California and received the small business set-aside VA Contracts that Walker helped Winters land for them. (EFC 136 , ¶ 9, 16)

### C.  IHS HAD NO ANTI-ASSIGNMENT PROVISION IN ITS 2014 CONTRACT WITH WINTERS

IHS admits that it had no anti-assignment clause (EFC 115-1, pg 8) in its contract with Winters that was signed, as best as we know, in 2014.  (EFC 57-3, IHS-00177- IHS-00189) (Also See EFC 57-1, pg 23, Response to Request For Production #42)

### D.  WINTERS SUBCONTRACTED WITH(ASSIGNED) WALKER UNDER NEVADA LAW IN OCT. 2014 TO PROVIDE CONSULTING ASSISTANCE IN LANDING FEDERAL (e.g. VA) CONTRACTS FOR HALF OF WINTER'S COMMISSIONS, INCLUDING THOSE FROM IHS' VA CONTRACTS

Winters and Walker signed a contract in Oct. 2014 for a 5 year period, renewed upon each new deal.  Walker was to provide Winters consulting on landing federal contracts in exchange for half of Winters' commissions. (EFC 136, ¶¶ 33-34, 37)   (EFC 136, Exhibit 1)

### E.  WALKER HELPED WINTERS LAND THE VA HEART MONITORING CONTRACTS FOR IHS

Walker and Winters landed millions of dollars in heart monitoring contracts for about eleven (11) VA hospitals in 2017 (VA69D17D01673 , VA26317D01094 , VA24617C01835, VA24918C103296 ("VA Contracts" or "VA Contract")(EFC 136, ¶¶ 13, 54, 61, 69, 75) (See EFC 136, fn 3-7) and over a dozen other contracts (EFC 136, ¶ 38)

### F.  IHS SIGNED FEDERAL, VA CONTRACTS, WITH PROTECTIONS FOR, EVEN, 2nd TIER SUBCONTRACTORS -FAR part 52.203-19 and Far part 52.232-40

11

IHS signed federal contracts which set forth federal protections for subcontractors  (See EFC 136, Ex. 7, page 7,23,31)  who reported fraud, abuse, or late payments (from prime contractors) to the government. See Far part 52.232-40.

IHS signed federal contracts which set forth federal protections (against internal confidentiality agreements) for subcontractors who report fraud, waste, and abuse to agencies. See Far part 52.203-19 ((c) "The Contractor shall notify current employees and subcontractors that prohibitions and restrictions of any preexisting internal confidentiality agreements or statements covered by this clause, to the extent that such prohibitions and restrictions are inconsistent with the prohibitions of this clause, are no longer in effect.").

IHS was/is to comply with all applicable Federal, State and local laws, executive orders, rules and regulations (EFC 136, ¶¶ 22-30)  in its VA contracts. (EFC 136, ¶ 17) (See EFC 136, Ex. 7, page 7,23,31)  to each of the VA contracts in question (See e.g. EFC 136, Exhibit 7, pg 2).

## G. PAYMENTS WERE REQUIRED TO BE MADE TO WINTERS MONTHLY SO THAT WALKER COULD GET MONTHLY PAYMENTS

Under federal law, and the VA contracts, IHS was to pay Winters (it's subcontractor) within 15-30 Days ("accelerated payments" under FAR part 52.232-40, EFC 136, Exhibit 7, pg 31) so that Winters could pay subcontractor Walker within 15-30 days IHS did not pay Winters **monthly** from 2015. Prompt payment provisions and FAR 52.232-40 require accelerated payments to subcontractors within 15 days: "OMB policy now requires agencies to pay prime contractors as soon as possible with the goal of paying within 15 days of receiving a proper invoice OMB M-11-32 OMB M-14-10" See https://www.fiscal.treasury.gov/fsservices/gov/pmt/promptPayment/accelerated_payments.htm

Under their VA federal contracts, IHS was to invoice monthly on the 10th (and be paid) monthly ("accelerated payments" under FAR part 52.232-40, EFC 4, Exhibit 7, pg 31).

Also under the terms of Winter's contract with IHS, Winters was to be paid (10 percent gross commission) from IHS monthly for services that IHS was paid (by the VA) from the previous month's service (EFC 136, Exhibit 2 "blank version")(EFC 57-3, IHS00177-IHS189). The contract of Walker and Winters dictated Walker was to be paid 50% of Winter's take 10 days afterward. (EFC 4, Exhibit 1)

**H. IHS RECEIVED PAYMENTS EVERY MONTH IN 2017 ON THE VA CONTRACTS**

IHS was being paid monthly from the VA in 2017 on the VA contracts in question ( See e.g. EFC 57-3, pg 110-111, IHS00191-IHS00192)

**I. IHS' PAYMENTS MADE TO WINTERS (and, thus, WALKER) WERE NOT MONTHLY**

IHS did not make payments monthly to Winters (Also EFC 136, ¶¶ 40-43), which made Walker's payments late. The payments, for the VA Contracts, to Winters grew to nearly 4 months apart in 2017 (EFC 4, Ex. 8)(Same, EFC 136, Ex. 8 "redacted")

**J. WALKER THREATENED TO SUE IHS FOR LATE PAYMENTS IN DEC 2017 AND REPORTED IHS TO THE VA IN FEB. 2018**

Walker threatened to sue IHS in Dec. 2017 (EFC 136, ¶ 48) (SEE EFC 150, Exhibit 1, IHS00231-IHS00232, IHS00233-IHS00235, IHS00305- IHS00306, IHS00307-IHS00309, , IHS00315-IHS00316, , IHS00317-IHS00318) After one of the many times Walker did not get his payment on time  (in Jan. 2018), he complained to the VA(EFC 136, ¶¶. 55, 64-65, 71-72, 79-83), as was his right as a federal 2nd tier subcontractor (EFC 136, ¶¶ 22-30) under FAR 52.232-40  and FAR 52.203-19

**K. IHS DID NOT ISSUE A LITIGATION HOLD AFTER WALKER'S THREATS TO SUE THEM**

IHS did not issue a litigation hold after Walker's threats to sue (EFC 57-1, pg 16,Response to Request for Production #28)

**L. IHS TOLD VA OFFICIALS THAT WALKER HAD NEVER BEEN A SUBCONTRACTOR, NOR AFFILIATED WITH IHS IN ANY WAY, NEVER MADE LATE PAYMENTS**

When responding to the VA Contracting Officers about the matter, IHS made misrepresentations stating they did not know who Walker was and that he had no affiliation at all with Intelli-heart (disregarding Walker's 2nd tier contracting status of which they were made known) (EFC 136, ¶¶. 59, 66-67,72-73,80-83). To cover their tracks (and avoid their payment obligations), IHS had Daniel Germain (they called "pal" ; See IHS-00161 in ECF 57-3 )(listed as

working for the firm Rosman & Germain LLP 16311 Ventura Boulevard Suite 1200 Encino, CA 91436-2152 (IHS-00160 in 57-3)) to do make most of these representations for them to the VA (IHS 0089, IHS-00144, IHS-00147, IHS-00159-IHS-00161 in 57-3)(stating that Walker was not a "subcontractor" of IHS , nor had never been "in any way", EFC 150, Exhibit 1, IHS00315 as evidenced by a search of the document). Also, HHS stated that Walker had never had any affiliation whatsoever with IHS-heart, that Walker had never been  a subcontractor of IHS (EFC 136, ¶¶ 59, 66-67,72-73,80-83), and that they never made late payments to subcontractors. (EFC 136, ¶. 76)

**M. IHS HAD KNOWLEDGE OF WALKER'S CONTRACT WITH WINTERS AT LEAST AS EARLY AS NOV. 2017 BUT BEFORE IT TERMINATED WINTER'S CONTRACT**

IHS knew Walker was Winter's subcontractor before terminating Winter's contract. IHS had knowledge of Winter's contract with Walker in November 2017 (EFC 74-1, Interrogatory Response 10, pg 24. ll. 8-23  "Vanessa Parsons informed James Winters it was a problem that he had a 'secret' business relationship…an investigating needed to be done……James Winters was not properly cooperating with IHS' investigation…and was terminated"). IHS does not deny that the driving force behind terminating Winters contract (which effected Walker's business interest thereunder) (EFC 57-3, IHS00176, terminating Winters on Feb. 8, 2018 for, inter alia, most "egregiously" "engaging" a "subcontractor" "Walker").

**N. IHS TERMINATED WINTERS CONTRACT IN A MERE MATTER OF DAYS BETWEEN THE TIME WHEN WALKER REPORTED IHS TO THE VA FOR LATE PAYMENTS ---AND HAS NOT PAID SINCE  DEC 2017--- AND HAS WARNED WINTERS AGAINST COMMUNICATING WITH THE VA**

There is a marked temporal proximity between the Feb. 8, 2018 termination of Winter's distributor agreement AND Walker's Feb. 6, 2018 assertion of non-payment(EFC 136, ¶¶. 59, 66,72-73,80-83)  made under FAR part 52.232-40. [Note: IHS scrambled to have employees find Winter's distributor agreement a mere day before it was terminated, took it home to drum up

14

termination reasons (IHS-00139 in EFC 57-3), though Winters had not received any 30 day notices of contractual deficiencies.]

IHS sanctioned Winter's and Walker's after they reported of IHS' abuse of authority and late payments, terminating Winter's contract, depriving both Walker and Winters of any monetary downflow from the VA, thereafter. (See IHS-00176 in EFC 57-3). IHS told Winters that he could not communicate with their "customers"; federal government (VA) (See IHS-00176 in EFC 57-3).

**O. NONE OF THE CONTRACTUAL DEFICIENCIES MENTIONED IN THE FEB. 8, 2018 TERMINATION OF WINTER'S CONTRACT HAVE SHOWN UP IN CONTEMPORANEOUS DOCUMENTATION OF IHS**

None of the alleged contractual deficiencies alleged of Winters (EFC 57-3, IHS-00176) have shown up in any other, prior, contemporaneous documents produced by IHS (EFC 74-1, pg 19-23). Nor has IHS produced any cure notices (or "30 day" notices as dictated by Winter's agreement with IHS) (EFC 136, Ex 2, "blank" version of Winter's contract) (EFC 57-3, IHS00177-IHS189)

**P. WINTERS EMAILED THE VA and WALKER STATING THAT IHS WAS SIMPLY TRYING TO GET OUT OF ITS PAYMENT OBLIGATIONS IN TERMINATING THEIR CONTRACT WITH HIM**

Winters emailed Walker and VA (through Contracting Officer Larry Lapp) on about Feb. 8, 2018 and stated of IHS' termination of their bilateral contract, that IHS was simply trying to get out of its payment obligations to Winters and Walker (EFC 136, ¶¶ 56-57)

**Q. IHS' TERMINATION REASON FOR WINTERS "not servicing his accounts [at the VA hospitals]" CONFLICTS WITH A 2015 EMAIL FORWARDED FROM WINTERS (on his CONTRACT) THAT STATED HE DID NOT HAVE TO HAVE ANY "boots on the ground"**

In early 2015, Winters forwarded Walker an email from Vanessa Parsons with proposed contract and statements regarding relaxed contract terms with IHS. Vanessa Parsons

15

specifically imparted to Winters that he no longer was required to have "boots on the ground" to manage his VA Contracts and that IHS would take care of that. (Declaration of Terrance Walker, attached, #1)

**R.  WALKER STOOD TO GAIN ANOTHER $154,916 HAD WINTER'S CONTRACT WITH IHS NOT BEEN TERMINATED**

Walker stood to gain another $154,916 under the Contract he had with Winters due to his consulting on landing the VA Contracts of HIS (EFC 136 ¶ 96) had IHS not terminated the IHS-Winters contract.

**III.     ARGUMENT**

**A.  SUMMARY JUDGMENT STANDARD**

The purpose of summary adjudication "is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56(a); see also Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted).

Summary adjudication (i.e. partial summary judgment) should only be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact. *Id.,* 477 U.S. at 323. An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

16

248 (1986); Wool v. Tandem Computers, Inc., 818 F.2d 1422, 1436 (9th Cir. 1987). A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of `the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e); Matsuhita, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsuhita, 475 U.S. at 587. The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. Id. at 586 n.11; Fed. R. Civ. P. 56(c). Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. Henry v. Gill Indus., Inc., 983 F.2d 943, 950 (9th Cir. 1993). In resolving a motion for summary judgment, the Court can only consider admissible evidence. Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e)) Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

Courts can resolve the matters of pure questions of law on summary judgment before the period discovery ends. Swoger v. Rare Coin Wholesalers 803 F.3d 1045, 1048 (9th Cir 2015)("The court also observed that since the primary issue on summary judgment was a pure question of law, further depositions were unlikely to be helpful")

Whether a document is susceptible to a particular interpretation, or to more than one interpretation, has been held to be a question of law, <u>Sherman v. Mutual Benefit Life Ins. Co.</u>, 633 F.2d 782, 784(9th Cir. 1980); which may be governed by state law. <u>Brobeck, Phleger Harrison v. Telex Corp.</u>, 602 F.2d 866, 871 (9th Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

In sum, IHS has mainly taken up issue (See generally EFC 26, EFC 80) with whether Walker and Winter contract was valid and enforceable (element (1) of Walker's tort claim  -- See footnote 1, above) Since this is a purely legal issue, capable of resolution without further discovery, the court can resolve these matters on summary judgment. <u>Swoger v. Rare Coin Wholesalers</u> 803 F.3d 1045, 1048 (9th Cir 2015)("The court also observed that since the primary issue on summary judgment was a pure question of law, further depositions were unlikely to be helpful") Since the other issues are part factual and undisputed, resolution is appropriate at this time since further discovery on the issues is "unlikely to be helpful" <u>Swoger v. Rare Coin Wholesalers</u> Id. Furthermore, since Walker is relying upon the same assertions (and exhibits) in the SAC (for Count IV) that were in the FAC, further discovery is "unlikely to be helpful" <u>Swoger v. Rare Coin Wholesalers</u> Id.

## B. INTERPRETATION OF NEVADA LAW

In interpreting Nevada law, we are bound by the pronouncements of the Supreme Court of Nevada. If that court has not addressed the particular issue, the court "must predict how the state's highest court would resolve it." <u>Hemmings v. Tidyman's Inc.</u>, 285 F.3d 1174, 1203 (9th Cir. 2002)

> "[A] [s]tate's highest court is the final judicial arbiter of the meaning of state statutes."
> <u>Sass v. California Bd. of Prison Terms</u>, 461 F.3d 1123, 1129 (9th Cir. 2006) (citation omitted); *see also* <u>Knapp v. Cardwell</u>, 667 F.2d 1253, 1260 (9th Cir. 1982) ("State courts have the final authority to interpret, and, where they see fit, to reinterpret the states' legislation.").

In the absence of state law on point, "th[e] court must predict how the Nevada Supreme Court would decide this issue `using intermediate appellate court decisions, decisions from other

18

jurisdictions, statutes, treaties, and restatements as guidance.'" <u>Great Am. Ins. Co. v. N. Am. Specialty Ins. Co</u>., 542 F.Supp.2d 1203, 1211 (D. Nev. 2008) (citation omitted)

### C. WALKER'S CLAIM (COUNT IV), IN PART, SUCCEEDS

Walker is bringing a claim under Nevada law for tortious interference.

In resolving this matter, the court must ask whether the IHS pursued an improper objective of harming the Walker or used **wrongful means** that in fact caused an injury to Walker's contractual relationship. <u>Nat'l Right to Life P.A. Com. v. Friends of Bryan</u>, 741 F.Suppp. 807 (D. Nev. 1998); <u>Ponomarenko v. Shapiro</u>287 F. Supp. 3d 816, 830 (N.D. Cal. 2018) (**wrongful** entails violating "constitutional, **statutory**, **regulatory**, **common law**, or other determinable legal standard.") Restatement defines "**wrongful means**" as "includ[ing] physical violence, **fraud** or **misrepresentation**, civil suits and criminal prosecutions, and **some degrees of economic pressure**; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract. . . ." <u>Green v. Interstate United Mgmt. Servs. Corp.</u>, 748 F.2d 827 (3d Cir. 1984); <u>Deauville Corp.</u>, 756 F.2d 1183, 1196 (5th Cir 1985). See e.g. <u>Max Foote Construction Company, LLC v. MWH Constructors, Inc</u> , No. 18- 2584.(October 25, 2018 E.D Louisiana )("the **federal <u>Prompt Pay Act</u> permits a** *subcontractor* **to bring breach-of-contract and prompt-pay claims against a contractor under state law**" ... granting a dismissal of a claim purely under federal law BUT allowing the case to proceed under a federal "prompt-pay claim brought under New Jersey law".) Also see <u>C.S. Sewell, M.D. P.C. and Christopher Sewell, M.D., v. Amerigroup Tennessee, Inc. d/b/a Amerigroup Community Care</u> No. 2:17-cv-00062 (M.D. Tenn Dec. 14, 2018)(declaring that "**tortious interference** with a business relationship, and violation of Tennessee's **Prompt Payment Act**" represented "substantive claims")[Note: as opposed to Tennessee Prompt Payment act, Walker alleged his Nevada state-law tort in conjunction with, inter alia, the Federal Prompt payment Act. These authorities are not exhaustive examples] A claim of tortious interference involves allegations of undue influence, fraud or duress, and oftentimes is proven by circumstantial evidence, as "the perpetrator of such covert coercion generally applies the forbidden pressure in **secret**." <u>Caranci v. Howard</u>, 708 A.2d 1321, 1324 (R.I. 1998).

**1.  WALKER ESTABLISHES A FEDERAL QUESTION NEVADA TORTIOUS INTERFERENCE CLAIM, IN PART,  UNDER FAR Part 52.232-40 and FAR Part 52.203-19. OR, IN THE ALTERNATIVE, WALKER ESTABLISHES DIVERSITY JURISDICTION**

Federal question jurisdiction state-law claims will lie if a federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disturbing the federal-state balance approved by Congress." Gunn v. Minton, 568 U.S. 251, 258, 133 S.Ct. 1059, 185 L.Ed.2d 72 (2013) Federal subcontracting rights [status under FAR 52.203-19 and FAR part 52.232-40] are a substantial issue that deserve uniform treatment, they are disputed (EFC 26 pg 2-4; para 22-30), and capable of resolution without disturbing any state-federal balance. Walker establishes federal question jurisdiction (28 U.S.C. § 1331) due to the VA Contracts involved and his prior 2nd tier subcontracting status under FAR 52.203-19 and FAR part 52.232-40. Also see Boyle v. United Techs. Corp., 487 U.S. 500, 504, 507 (1988) Under the Boyle framework, for example, federal law "exclusively" governs interpretive questions concerning the "obligations to and rights of the United States under its contracts." Id. at 504 (in this case to Walker as a 2nd tier subcontractor).  "[O]nly particular elements of state law are superseded." Id. (such as Walker's rights as a "subcontractor" under the definition of federal law - - FAR 52.203-19 and FAR part 52.232-40) . Also, the federal government (i.e. the VA in this instance) made special "obligations to ….. the United States under its contracts." Id. at 504 to prime contractors like IHS to pay its subcontractors and not abuse them.   When federal law applies as it does to this type of contracts that Walker was a 2nd tier subcontractor under, it follows that the question arises under federal law, and federal question jurisdiction exists. See International Ass'n of Machinists, AFL-CIO v. Central Airlines, Inc., 372 U.S. 682, 693 n. 17, 83 S.Ct. 956, 962 n. 17, 10 L.Ed.2d 67 (1963) (citing the ninth circuit American Pipe in support of holding that dispute over a contract with term requiring resolution by board of adjustment arises under federal law within the meaning of § 1331)"

In the alternative, Walker establishes diversity jurisdiction 28 U.S.C. § 1332 (Diversity Jurisdiction) (exceeds $75,000.00 and the parties are from different states) (See Div. II, A, B, and R).

### 2.   WALKER HAD A VALID AND EXISTING/ENFORCEABLE CONTRACT WITH WINTERS

Interpreting the Winters-Walker contract (EFC 136, Ex 1) is a simple matter or law Sherman v. Mutual Benefit Life Ins. Co., Id. governed, in part, by state law. Brobeck, Phleger Harrison v. Telex Corp., Id. Also, interpreting IHS' alleged restrictions on Winters' ability to contract with Walker is, likewise, a simple matter or law Sherman v. Mutual Benefit Life Ins. Co., Id. governed, in part, by state law. Brobeck, Phleger Harrison v. Telex Corp., Id. Both can be resolved by summary judgment.

**a. Winters had a right to assign rights under the IHS-Winters contract to Walker (for consultation) in exchange for partial commission in the absence of an anti-assignment clause (under Nevada law)**

As noted by the Ninth Circuit in Russell Road Food and Beverage, LLC v. Spencer 829 F.3d 1152, 1157 (9th Cir. 2016), in regards to Nevada contract law (and assignments): "Under applicable state law, **'a contractual right is assignable** unless assignment materially changes the terms of the contract or the contract expressly precludes assignment.' Easton Bus. Opp. v. Town Exec. Suites, 126 Nev. 119, 230 P.3d 827, 830 (2010)"

Easton Bus. Opp. v. Town Exec. Suites, 126 Nev. 119, 230 P.3d 827, 830 (2010), states "To be effective, [an] anti-assignment clause should contain a specific prohibition on the power to make an assignment and specifically state that any attempted assignments will be void or invalid".

Easton Bus. Opp. v. Town Exec. Suites also held there was "nothing extraordinary about the assignment of commission rights here" Id.  An anti-assignment clause pertaining to subcontracting is in Erection Co. v. Archer W. Contractors, LLC, No. 2:12-CV-00612-MMD-NJ, 2015 WL 926782, at *7–8 (D. Nev. Mar. 4, 2015) ( Where the subcontract stated "This Subcontract shall not be subcontracted or assigned in whole or in part by the subcontractor [TEC] except with the written consent of the Company [Postel]. Any attempt to effectuate a subcontract or an assignment shall be null and void ab initio")

IHS has not pointed to any evidence that it had an anti-assignment clause like that in Erection Co. v. Archer W. Contractors, LLC, Id. mentioning that subcontracting will make the contract "void or invalid". Easton Bus. Opp. v. Town Exec. Suites Id.

Just like in Easton Bus. Opp. v. Town Exec. Suites  there was "nothing extraordinary about the assignment of commission rights here" Id.  with Winters-Walker contract.

**b. Winters did not have to give IHS notice (or get consent) of his assignment/subcontract to Walker in the absence of an anti-assignment clause**

 Winters did not have to give notice of an assignment in the  Winters-Walker contract.   IHS claims Winter's had to give notice, "but this argument is a nonstarter. While failure to give notice of an assignment may affect the rights of the assignee in the event the obligor delivers performance to the obligee/assignor before being notified of the assignment, (citation omitted) it normally does not invalidate an otherwise valid assignment" Easton Bus Opp v. Town Executive Suites, 230 P.3d 827, 833 ( Nev. 2010)  Winters, further, did not have to get consent of IHS Smith v. Cumberland Grp., Ltd., 687 A.2d 1167, 1172 (Pa. Super. Ct. 1997) ("[a]bsent an express condition against assignment, the rights and duties under an executory bilateral contract...may be assigned without the consent of the other party").

**c. Walker was a 2nd tier subcontractor of IHS under FAR part 52.232-40  prior to Feb. 8, 2018 (and had a right to report IHS to federal agencies (including the U.S. Dept. of Veteran Affairs, "VA") for late payments and gain enforcement thereunder**

Walker was a subcontractor of subcontractor Winters, which (by definition) meant Walker was IHS' subcontractor (2nd tier). See FAR Council commentary on FAR part 52.232-40: https://www.federalregister.gov/documents/2013/11/25/2013-28053/federal-acquisition-regulation-accelerated-payments-to-small-business-subcontractors which states that subcontractors ("not limited to first-tier subcontractors" -- ¶ 9))

Walker also had rights to complain IHS to the VA for late payments, to get them to enforce them. FAR part 52.232-40 commentary:

 "The rule does not create any new remedies for subcontractor payment issues. Subcontractors would utilize existing remedies for non-payment ….[including, but not limited to] under FAR

part 32.112 " (See https://www.federalregister.gov/documents/2013/11/25/2013-28053/federal-acquisition-regulation-accelerated-payments-to-small-business-subcontractors which states that subcontractors ¶ 4)  [Note: FAR 32.112(c) authorizes "administrative" or other "remedial" actions if a certification for payment was false (e.g. like certifying that IHS has been making timely payments to subcontractors on invoices on VA contracts)](See Exhibit 2-VA certification[3])

**d.  Walker was a 2nd tier subcontractor of IHS under FAR part 52.203-19 prior to Feb. 8, 2018 and had a right to report IHS to federal agencies (including the U.S. Dept. of Veteran Affairs) for late payments and gain enforcement thereunder**

FAR part 52.203-19 (48 CFR § 52.203-19) states that  "Subcontractor means any supplier, distributor, vendor, or firm (including a consultant) that furnishes supplies or services to or for a prime contractor or another subcontractor. "

As a subcontractor with Winters, at least up until Feb. 8, 2018, Walker was (by definition) a subcontractor of IHS, under FAR part 52.203-19 since he was a consultant of Winters (another subcontractor) of HIS and had a right to report them for fraud and abuse of authority.

**e. Walker does not have to establish privity with IHS or prove he's a third party beneficiary to prove validity of his contract**

Walker's claim survives without a showing of contractual privity with IHS or a third-party beneficiary assertion. see Nat'l Right to Life P.A. Com. v. Friends of Bryan 741 F.Supp. 807, 811 (D Nev 1990)(Defendant "argues that because Plaintiff failed to allege an agency or third-party beneficiary theory of recovery, Plaintiff lacks standing to sue. The Court must reject Defendant's argument in this regard.........This is an action in tort, not contract, and it is clear that Defendant's actions were intended to affect Plaintiff")

**f. Walker was not bound by Winter's agreement with IHS so the validity and enforceability of Walker's contract with Winters is unaffected thereby**

Since Walker did not sign a contract with IHS, they cannot assert that Walker is bound to the

---

[3] https://www.va.gov/finance/docs/va-financialpolicyvolumeviiichapter01a.pdf  (pg 12)

Winters-IHS agreement. <u>Comer v. Micor Inc</u> 436 F. 3d 1098, 1102 (9th Cir 2016) (a party certainly cannot be *bound* to a contract it did not sign or otherwise assent to. )

Moreover, "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration anydispute which he has not agreed so to submit." <u>United Steelworkers v. Warrior & Gulf Navigation Co.</u>,363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). As such, "[a]rbitration ... is a way to resolve those disputes—but only those disputes —that the parties have agreed to submit to arbitration." <u>Granite Rock Co. v. Int'l Bhd. of Teamsters</u>,561 U.S. 287, 299, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010) (citations omitted). The court need to consider whether the arbitration agreement covers the matter in dispute <u>Chiron Corp. v. Ortho Diagnostic Sys., Inc.</u>, 207 F.3d 1126, 1130 (9th Cir. 2000);

IHS freely admitted that its arbitration clause only pertained to Winters and was limited to that forum:  "Any Winters-IHS litigation would have to be waged in arbitration. (See Distributor Agreement, § X (Arbitration Clause), at ECF 088, Ex. 3, at IHS-00214.)" (EFC 89, pg 3).  Also, arbitration provisions have no bearing on this matter since Walker had no privity of contract with IHS. <u>United Steelworkers v. Warrior & Gulf Navigation Co.</u> Id.

**g. The confidentiality clause in Winter's agreement with IHS was void and invalid after Jan. 2017 under FAR part 52.203-19 and has no bearing on the validity of Winters-Walker contract**

The confidentiality clause of the Winters-IHS agreement would have bearing on this matter as "a court will not enforce an otherwise valid contract if there exists a viable defense, such as illegality." <u>Burrola v. U.S. Sec. Assocs., Inc.</u>, Case No.: 3:18-cv-00595-BEN-JLB, at *4 (S.D. Cal. Feb. 7, 2019) and the confidentiality clauses of IHS-Winters agreement which evidence a 2014 signing date are illegal. The Winters-IHS confidentiality clause was voided by the FAR part 52-203-19; provisions mandating ALL that confidentiality clauses with federal subcontractors (such as Winters) be updated as of Jan. 2017. IHS points to no evidence that it updated its clause with Winters in keeping with FAR part 52.203-19.

**3. IHS HAD KNOWLEDGE OF WALKER'S CONTRACT WITH WINTERS AS EARLY AS NOVEMBER 2017 AND DEFINITIVELY IN FEB. 2018 AS EVIDENCED BY THEIR**

**REFERENCE TO WALKER IN THEIR TERMINATION OF WINTER'S CONTRACT WITH THEM**

IHS had knowledge of Wintes-Walker contract in November 2017 (EFC 74-1, Interrogatory Response 10, pg 24. ll. 8-23 "Vanessa Parsons informed James Winters it was a problem that he had a 'secret' business relationship…an investigating needed to be done……James Winters was not properly cooperating with IHS' investigation…and was terminated"). IHS does not deny that the driving force behind terminating Winters contract (which effected Walker's business interest thereunder) (EFC 57-3, IHS00176, terminating Winters on Feb. 8, 2018 for, inter alia, most "egregiously" "engaging" a "subcontractor" "Walker").

**4. IHS ACTUALLY DISRUPTED WALKER'S CONTRACT/CONTRACTUAL RIGHTS BY:**

IHS cannot deny Walker had a business interest in payments assigned to him from Winters (in the Winters-Walker contract) and rights endowed to him by virtue of Congress, FAR part 52.232-40 , and FAR 52.203-19.

Stalk v. Mushkin, 125 Nev. 21, 199 P.3d 838, 841 (Nev. 2009):
"Claims for intentional interference with a prospective business advantage and contractual relations seek compensation for damage to **business interests**.(citation omitted)" (bold added)

 "**Business interests** include intangible assets and inchoate rights, as well as other rights incidental to business ownership." Stalk v. Mushkin, Id.

Even assuming the IHS-Winters contract termination was justified on other grounds (which ended Winter's and, thus, Walker's payments), IHS does not point to any valid contract language which allowed it to NOT pay Winters (so that he could pay Walker pursuant to the Winters-Walker contract terms) for December 2017 and January 2018 payments from the VA. IHS does not deny that its actions interfered[4] in Walker's business interests in a variety of ways. For instance, by

---

[4] **TORTIOUS INTERFERENCE**

**Tortious interference with contract involves an individual "intentionally and improperly interfering with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract." See Restatement (Second) Torts § 766.**

**a. not paying Winters monthly so that Walker could get paid monthly (e.g. the December 2017/January 2018 payments due),**

These late payments were in direct violation of Winters and Walker's rights under FAR part 52.232-40 to be paid accelerated payments (as "subcontractors") within 15-30 days (EFC 136, ¶¶22-30). Further, IHS still has not paid Winters (so that he could pay Walker) for December 2017 and January 2018 in violation of this provision.

**b. investigating Walker and Winters in December 2017—January 2018 for having a valid contract with Winters,**

IHS does not deny they directed an investigation at Walker and Winters simply because Winters had a subcontract with Walker. (EFC 74-1, Interrogatory Response 10, pg 24. ll. 8-23 "Vanessa Parsons informed James Winters it was a problem that he had a 'secret' business relationship…an investigating needed to be done……James Winters was not properly cooperating with IHS' investigation…and was terminated"). When a purported tortfeasor, like IHS, takes disruptive actions based upon activity **not precluded under contract**, **it is directly implicated** ("....intentional acts in **investigating** and voting to **_terminate_** Daldumyan based on business activities that **_were not preclude_**d **under his contract** with the Marketing Company were **_designed to induce a breach or disruption of his contractual relationship_** with the Marketing Company, and in fact caused a breach of his contractual relationship with the Marketing Company, resulting in damages to Daldumyan"   Daldumyan v. World Fin. Grp. Ins. Agency, Inc., B277973 at *64 (Cal. Ct. App. Apr. 17, 2018)

**c. halting all payments when suspending Winters in Dec. 2017 and terminating Winter's contract in Feb. 2018, ending all current and future payments**

IHS does not deny they directed an investigation at Walker and Winters (and "suspended" Winters) simply because Winters had a subcontract with Walker. (EFC 74-1, Interrogatory Response 10, pg 24. ll. 8-23  "Vanessa Parsons informed James Winters it was a problem that he had a 'secret' business relationship…an investigating needed to be done……James Winters was not properly cooperating with IHS' investigation…and was terminated"). IHS does not deny that the driving force behind terminating Winters contract (which effected Walker's business interest thereunder) (EFC 57-3, IHS00176, terminating Winters on Feb. 8, 2018 for, inter alia, most

"egregiously" "engaging" a "subcontractor" "Walker"). IHS points to no contract language requiring Winter's participating in pretextual investigations for effectuating his right to subcontract/assign part of *Winter's* contractual duties to Walker in exchange for commission. IHS points to no contract language entitling them to "suspend" payment based upon non-compliance with an investigation.   IHS cannot deny that this "suspension" of payments effected the contract terms and business expectancies of Walker to be paid current and future payments. When a purported tortfeasor, like IHS, takes disruptive actions based upon activity **not precluded under contract**, **it is directly implicated** ("....intentional acts in **investigating** and voting to ***terminate*** Daldumyan based on business activities that ***were not preclude*d under his contract** with the Marketing Company were *designed to induce a breach or disruption of his contractual relationship* with the Marketing Company, and in fact caused a breach of his contractual relationship with the Marketing Company, resulting in damages to Daldumyan"    Daldumyan v. World Fin. Grp. Ins. Agency, Inc., B277973 at *64 (Cal. Ct. App. Apr. 17, 2018)

**d. asserting to federal agencies (e.g. VA) that Walker was never a "subcontractor" "in any way" --- thwarting the VA from enforcing Walker's rights under FAR part 52.232-40**

IHS engaged in deception to the VA, federal agency, in order to get it to NOT make them pay Walker.  To be clear, the provisions FAR part 52.232-40 give the federal authorities the ability to pursue "administrative" or "remedial" actions  (See FAR part 32.112(c), referenced by FAR part 52.232-40 commentary – See Div. III. (C)( 2)(c),  above)  if accelerated payments were not being made to subcontractors from prime contractors like IHS, as they were certifying. (EFC 136,  ¶¶. 22-30). IHS prevented this enforcement mechanism (on behalf of Walker) by misrepresenting that its had never been late paying subcontractors and that Walker had never been their subcontractor in any way.

**5. WALKER SUFFERED DAMAGES**

Walker's damages were a minimum of $156,914 (Div. II.(R), above) though he has other damages capable of proof at trial.

## IV.    CONCLUSION

When construing all inferences in favor of IHS, under reasonable interpretations of Nevada and federal acquisition law (i.e. the FAR) , Count IV of Walker's action succeeds, in part, in that Walker established that he  had  "(1) a *valid* and existing[enforceable] *contract*; (2) **the defendant's knowledge of the contract**; ………[and] (4) **actual disruption of the contract**" <u>J.J. Indus., LLC vs Bennett</u>, 119 Nev. 269, 273, 71 P. 3dd 1264, 1267 (2003).  Walker also succeeds in that he establishes federal question and/or diversity jurisdiction in connection with this count as well as the undisputed facts in Division II of this brief. For the foregoing reasons, Walker respectfully requests judgment in its favor, at least, in part.  Walker requests to be heard in oral argument.


        Respectfully submitted,

<u>By /s/  Terrance</u> Walker                                    Dated:  April. 27, 2019
Terrance Walker

### CERTIFICATE OF SERVICE

The undersigned certifies that the undersigned is over the age of 18 and that on April 27, 2019, that he personally served via the Court's electronic filing system all parties to this case one copy of this filing to the parties at the email address listed below.

/s/  TERRANCE WALKER

signed, Terrance Walker

Copy to: Kristen & Will Geddes, Esq.

THE GEDDES LAW FIRM, P.C.
8600 Technology Way, Suite 107
Reno, Nevada 89521
Phone: (775) 853-9455
Fax: (775) 853-6899
E-Mail: <u>Will@TheGeddesLawFirm.com</u>
E-Mail: <u>kristen@thegeddeslawfirm.com</u>