UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| TERRANCE WALKER,<br><br>Plaintiff,<br>v.<br><br>INTELLI-HEART SERVICES, INC., *et al.*,<br><br>Defendants. | Case No. 3:18-cv-00132-MMD-CLB<br><br>ORDER |

**I.  SUMMARY**

*Pro Se* Plaintiff Terrance Walker primarily alleges that Defendants Intelli-heart Services, Inc. ("IHS"), Danny Weisburg, Vanessa Parsons, and Daniel Germain tortiously interfered with his contract with non-party James Winters. (ECF No. 136.) Before the Court are Defendants' special motions to dismiss Plaintiff's claims against them under Nevada's anti-SLAPP statute and, alternatively, Federal Rule of Civil Procedure 12(b)(6) (ECF Nos. 159, 169),[1] and two of Plaintiff's motions for partial summary judgment (ECF Nos. 158, 171).[2] As further explained below, because the Court agrees with Defendants that Plaintiff's claims must be dismissed under Nevada's anti-SLAPP statute, the Court will grant those motions, decline to address Defendants' 12(b)(6) arguments, and deny Plaintiff's motions for partial summary judgment as moot.

**II.  BACKGROUND**

Defendant IHS is a California corporation that provides outpatient, remote heart monitoring services to hospitals and other medical institutions, so they can monitor their

---

[1]Plaintiff filed a response to both motions (ECF No. 197), and Defendants filed replies (ECF Nos. 201, 202).

[2]Defendants filed responses (ECF Nos. 198, 200), and Plaintiff filed replies (ECF Nos. 203, 204).

patients' hearts while those patients are, say, at home. (ECF No. 136 at 3-4.) "Defendant Vanessa Parsons is the Chief Executive Officer of IHS, and Defendant Danny Weisberg is the President of IHS." (ECF No. 169 at 2.) Defendant Daniel Germain represented IHS as its attorney as relevant to this case. (ECF No. 159 at 2.)

Plaintiff runs his own business based in Reno, Nevada. (ECF No. 136 at 3.) He "provides a variety of professional services such as consulting, market research, registering companies to qualify for federal contracts, finding relevant solicitations, reviewing federal solicitations, preparing bids, compliance advising, advising on procurement regulations, and contract dispute resolution for U.S. government procurements." (*Id.*)

IHS entered into a contract with non-party James Winters in which Winters would act as a regional sales distributor for IHS. (ECF No. 169 at 2; *see also* ECF No. 169-1 ("Distributor Agreement").) In pertinent part, the Distributor Agreement prohibited Winters in entering into any contracts on IHS's behalf:

> **Distributor's Inability to Contract for IHS:** In spite of anything contained in this Agreement to the contrary, Distributor shall not have the right to make any contracts or commitments for or on behalf of IHS without first obtaining the express written consent of IHS.

(ECF No. 169-1 at 8 (the "No Contracting Clause"); *see also* ECF No. 136 at 36 (same).) The Distributor Agreement further gave IHS the right to terminate the Distributor Agreement for cause, on 30 days' notice, if Winters violated certain terms of the agreement including the No Contracting Clause. (ECF No. 169-1 at 9.)

Despite the No Contracting Clause, Winters entered into a second contract with Plaintiff where Plaintiff basically agreed to help Winters win government contracts for IHS if Winters paid him 50% of the commission Winters made on any contracts Winters won with Plaintiff's help. (ECF No. 136 at 8; *see also id.* at 25-28.) According to Plaintiff, Plaintiff helped Winters win "about a dozen" contracts for remote heart-monitoring services for IHS from U.S. Department of Veterans Affairs ("VA") hospitals. (*Id.* at 8.) Plaintiff defines the VA as a "federal Cabinet-level agency that provides near-

comprehensive healthcare services to eligible military veterans at VA medical centers and outpatient clinics located throughout the country." (*Id.* at 4.)

Plaintiff alleges that IHS was paying Winters the commissions he earned from contracts with VA hospitals too slowly. (*Id.* at 8.) Plaintiff complained to Winters about these allegedly late payments, and Plaintiff was under the impression that Winters was, in turn, complaining to IHS. (*Id.*) In the fall of 2017, Plaintiff complained to Defendant Parsons by email that the payments to Winters—and therefore to him—were too slow. (*Id.* at 9.) In December 2017 and January 2018, Plaintiff says he threatened all Defendants by email with legal action if they did not pay Winters more quickly. (*Id.*)

Around this time, Plaintiff also began contacting employees at the VA, alleging that IHS was violating federal regulations by not paying Winters quickly enough. (*Id.* at 9-10.) This prompted IHS to terminate its agreement with Winters on February 8, 2018. (ECF No. 169 at 3.) In the termination letter sent to Winters by Defendant Parsons on behalf of IHS, she wrote in part:

> Most egregiously, without the knowledge or consent of IHS, you engaged a subcontractor to work on your accounts in direct violation of the terms of the Distributor Agreement. In that regard, recently, an individual named [Plaintiff] Terrance Walker, contacted both IHS and then various Veteran Administration officials claiming that he is a "2nd subcontractor under James Winter (a 1st tiered small business subcontractor)" and demanding payment for his purported services under the Distributor Agreement. When [Defendant] Mr. Weisberg confronted you about this breach, you admitted that you had employed Mr. Walker as a subcontractor.
>
> IHS hereby demands that you (and your agents—including Mr. Walker) immediately discontinue all communications with IHS customers or prospective customers. . . .

(ECF No. 169-2 at 2.)

Around the time IHS terminated Winters's Distributor Agreement, and for some time thereafter, Plaintiff sent emails to the VA employees assigned to the contracts he expected to be paid on, alleging that IHS's slow payments to Winters violated federal regulations. (ECF No. 136 at 10-13.) Plaintiff also filed related formal protests with the U.S. Government Accountability Office ("GAO"). (*Id.* at 16; *see also* ECF Nos. 169 at 4; ECF Nos. 169-3, 169-4 (formal protests).) Defendants Parsons, Weisburg, and Germain

3

1 sent emails to the various VA employees and GAO officials who investigated Plaintiff's
2 allegations to the effect that: (1) Plaintiff never worked for, or represented, IHS in any
3 capacity; (2) nobody at IHS had heard of Plaintiff until he began complaining about IHS's
4 slow payments; and (3) IHS terminated its contract with Winters once IHS learned Winters
5 had subcontracted with Plaintiff. (ECF Nos. 159 at 3-4, 169 at 3-7.)

These communications, and IHS's termination of its contract with Winters, form the basis of Plaintiff's primary claim for tortious interference in his operative Second Amended Complaint ("SAC"). (ECF No. 136 at 16; *see also id.* at 16-19.) Plaintiff's theory appears to be that Defendants interfered with Plaintiff's contract with Winters by terminating the Distributor Agreement once Defendants learned Winters had entered into the impermissible side contract with Plaintiff. Plaintiff includes other claims, also for tortious interference, but against Defendants Weisburg, Parsons, and Germain in their personal capacities. (*Id.* at 19-21.) Plaintiff also includes a claim for unjust enrichment against Defendants IHS and Parsons. (*Id.* at 21.)

### III. LEGAL STANDARD

The Nevada anti-SLAPP statute ("the Statute") permits defendants to gain early dismissal of civil claims through a special motion to dismiss. *See* NRS § 41.660. A party[3] engaging in communication, as defined by the Statute, "is immun[ized] from any civil action for claims based upon the communication." NRS § 41.650. Anti-SLAPP statutes are available to litigants in federal court. *Compare U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 972-73 (9th Cir. 1999) (noting, as a matter of first impression, that California's anti-SLAPP statute may be applied in federal diversity suits as the statute would not result in a direct collision with the Federal Rules, despite commonality of purpose in weeding out unmeritorious claims) *with Hilton v. Hallmark Cards*, 599 F.3d 894, 901 (9th Cir. 2010) (stating "a federal court can only entertain anti-

---

[3]The Statute specifically states "a person." *See* NRS § 41.650. However, a business entity may likewise file a special motion under the Statute. *See Bear Omnimedia LLC v. Mania Media LLC*, Case No. 2:17-cv-01478-MMD-CWH, 2018 WL 2323463, at *2 n.5 (D. Nev. May 22, 2018), *appeal dismissed*, Case No. 18-16079, 2018 WL 6575177 (9th Cir. Oct. 12, 2018).

4

SLAPP special motions . . . in connection with state law claims"). But here there is no doubt the Court can entertain Defendants' anti-SLAPP motions because Plaintiff only asserts state law claims. (ECF No. 136.)

"A strategic lawsuit against public participation, SLAPP for short, is a meritless lawsuit that a plaintiff initiates to chill a defendant's freedom of speech and right to petition under the First Amendment." *Pope v. Fellhauer*, 437 P.3d 171 (Table), 2019 WL 1313365, at *2 (Nev. 2019). "The purpose of a special motion to dismiss a SLAPP lawsuit . . . is to filter out unmeritorious claims in an effort to protect citizens from costly retaliatory lawsuits arising from their right to free speech under both the Nevada and Federal Constitutions." *Haack v. City of Carson City*, Case No. 3:11-cv-00353-RAM, 2012 WL 3638767, at *3 (D. Nev. Aug. 22, 2012) (internal quotation marks and citation omitted). Though called "motion[s] to dismiss," federal courts treat anti-SLAPP motions as a species of motion for summary judgment. *See, e.g.*, *id.*, at *3-*5; *Las Vegas Sands Corp. v. First Cagayan Leisure & Resort Corp.*, Case No. 2:14-cv-424-JCM-NJK, 2016 WL 4134523, at *3 (D. Nev. Aug. 2, 2016).

Evaluating a Nevada anti-SLAPP motion is a two-step process. The moving party bears the burden on the first step, and the non-moving party bears the burden on the second. *See Pope*, 2019 WL 1313365, at *2. The Statute provides:

> [T]he court shall: (a) [d]etermine whether the moving party has established, by preponderance of the evidence, that the claim is based upon *a good faith communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern*; (b) [i]f the court determines that the moving party has met the burden pursuant to paragraph (a), determine whether the plaintiff has *demonstrated with prima facie evidence a probability of prevailing on the claim*[] . . .

NRS § 41.660(3)(a), (b) (emphasis added). As noted above, the Court is required to consider evidence in making a determination under these paragraphs. *See* NRS § 41.660(3)(d). A moving party may carry its burden by establishing that its communication falls within one of four specific categories of protected speech. *See* NRS § 41.637. Among the four categories, and as relevant here, is a "[c]ommunication that is aimed at procuring

1 any governmental or electoral action, result or outcome[,] . . . which is truthful or is made
2 without knowledge of its falsehood." NRS § 41.637(1).

**IV. DISCUSSION**

The Court will analyze Defendants' special motions to dismiss together because Defendants' anti-SLAPP arguments significantly overlap. In addition, for purposes of this analysis, Defendant Germain is similarly situated to the other Defendants who filed their own motion to dismiss. The Court first addresses whether Defendants have satisfied their initial burden to show that Plaintiff's Complaint is based entirely on Defendants' good faith communications in furtherance of their right to petition or free speech in connection with an issue of public concern (the "protected activity" prong), and then addresses Plaintiff's probability of prevailing on his tortious interference and unjust enrichment claims. *See Century Sur. Co. v. Prince*, 265 F. Supp. 3d 1182, 1188-96 (D. Nev. 2017), *aff'd*, 782 F. App'x 553 (9th Cir. 2019) (taking the same two-step approach to the analysis).

**A. Protected Activity**

All Defendants argue that their communications with the VA in response to Plaintiff's allegations that IHS was violating federal regulations qualify as a protected activity under the Statute because they were aimed at procuring a governmental result or outcome. (ECF Nos. 159 at 7, 169 at 9-10.) They also argue the statements they made were either true or made without knowledge of their falsity (ECF Nos. 159 at 7, 169 at 10-12), and in the public interest because they were made in connection with a matter of reasonable concern to a government agency (ECF Nos. 159 at 7, 169 at 12-14). Plaintiff counters that Defendants were not engaged in protected activity, but does not clearly explain why. (ECF No. 197.)[4] The Court agrees with Defendants.

Defendants have met their initial burden under the Statute to show they were engaged in protected activity when they corresponded with various VA employees and officials regarding Plaintiff's allegations against them. *See* NRS § 41.660(3)(a). First, even

---

[4]Plaintiff's 43 page response violates the 24 page limit that applies to responses to motions to dismiss. *See* LR 7-3(b).

Plaintiff alleges that the VA is a cabinet-level government agency. (ECF No. 136 at 4.) Second, Plaintiff also alleges that Defendants' communications were intended to convince the VA to continue paying IHS under its contracts with the VA despite Plaintiff's allegations of IHS' noncompliance with federal regulations. (*Id.* at 14-15.) Thus, Defendants easily clear their burden to show by a preponderance of the evidence that they were engaged in protected activity by merely pointing at Plaintiff's own allegations. (ECF Nos. 159 at 7, 169 at 9-10.) These allegations sufficiently establish that Defendants' communications relevant to this case were aimed at procuring a governmental outcome within the meaning of NRS § 41.637(1).

Moreover, the Court finds that Defendants' communications were at least made without knowledge they contained any false statements. Plaintiff primarily attacks Defendants' statements to the effect that Plaintiff was not a subcontractor of IHS in his SAC. (ECF No. 136 at 11-13; *see also* ECF No. 197 at 8, 19, 33-35.) But the evidence before the Court shows that statements to this effect were true. Plaintiff is not IHS's subcontractor. There is no dispute that Plaintiff never entered into a contract with IHS. Instead, Plaintiff merely alleges that he entered into a contract with Winters (ECF No. 136 at 8), but Winters's contract with IHS forbade Winters from entering into any contracts on IHS's behalf absent IHS's written consent (ECF No. 169-1 at 8). Plaintiff has proffered no evidence of such written consent. Thus, there is no contractual evidence supporting Plaintiff's view that he was IHS's subcontractor. That means that Defendants' statements to this effect were either true, or there is at least no evidence that Defendants made any false statements. *See Century Sur. Co. v. Prince*, 782 F. App'x 553, 556 (9th Cir. 2019) (affirming the district court's granting of a special motion to dismiss and finding that the defendants met their initial burden to show they made statements without knowledge of their falsehood where the plaintiff had "not provided any evidence that the communications were untruthful or made with knowledge of falsehood.").

Finally, the Court also agrees with Defendants that their communications were made in connection with an issue of public concern—whether IHS was violating federal

1  regulations while receiving payment on government contracts with the VA. (ECF No. 169
2  at 12-14.) Plaintiff does not really dispute that Defendants have satisfied this portion of
3  the protected activity prong either. (ECF No. 197 at 42 ("Holding on to federal
4  subcontractor payments, and lying about it to the government, as [Plaintiff has alleged of
5  Defendants, can constitute criminal and tortious conduct.").) In sum, the Court finds
6  Defendants have met their initial burden to show they engaged in protected activity when
7  they communicated with VA employees and officials regarding Plaintiff's allegations of
8  misconduct. The Court therefore moves on to the second prong of the analysis—Plaintiff's
9  probability of prevailing on his claims. *See Century Sur. Co.*, 265 F. Supp. 3d at 1188-96
10 (taking this two-step approach).

### B. Plaintiff's Probability of Prevailing on His Claims

Plaintiff is very unlikely to prevail on his claims because his contract with Winters is invalid, and he has no contractual or equitable relationship with IHS. The Court first addresses Plaintiff's tortious interference claim, and then his unjust enrichment claim.[5]

#### 1. Tortious Interference

Plaintiff must establish the following elements to state a claim for tortious interference with contractual relations: "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) damages." *Silver State Broad., LLC v. Beasley FM Acquisition Corp.*, Case No. 2:11-cv-01789-MMD, 2012 WL 4049481, at *6 (D. Nev. Sept. 12, 2012) (citing *Consolidated Generator–Nevada, Inc. v. Cummins Engine Co., Inc.*, 971 P.2d 1251, 1255 (Nev. 1998)).

But Plaintiff is unlikely to succeed on this claim because he cannot show he entered into a valid contract with Winters. The No Contracting Clause of the Distributor Agreement forbade Winters from entering into a contract that would make any commitments on IHS's behalf without IHS's written consent. (ECF No. 169-1 at 8.)

---

[5]The Court does not differentiate between Plaintiff's tortious interference claims against various individual Defendants because they all share the common flaw discussed *infra*.

8

1  Winters's agreement to pay Plaintiff half of his commission is such a commitment, and
2  again, Plaintiff has proffered no evidence that IHS consented to Winters's agreement with
3  Plaintiff. Winters's agreement with Plaintiff is therefore invalid, as Winters had no authority
4  to enter into it. As Defendants argue (ECF No. 169 at 14-15), Winters's decision to enter
5  into an agreement with Plaintiff when he had no authority to was likely "fraudulent,
6  because circumstances known to both parties make the contract or agreement absolutely
7  void." *Edwards v. Carson Water Co.*, 34 P. 381, 386 (Nev. 1893). Plaintiff has no claim
8  against IHS. *See id.* ("It is a cardinal principle in the law of agency that the powers of the
9  agent are to be exercised for the benefit of the principal, and not for the agent or third
10 parties, and a person dealing with one whom they know to be an agent, and to be
11 exercising his authority for his own benefit, acquires no rights against the principal in the
12 transaction."). Plaintiff's claim for tortious interference against Defendants will thus likely
13 fail.

### 2. Unjust Enrichment

So too will Plaintiff's claim for unjust enrichment. "The phrase 'unjust enrichment' is used in law to characterize the result or effect of a failure to make restitution of, or for, property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor." *Risinger v. SOC LLC*, 936 F. Supp. 2d 1235, 1244 (D. Nev. 2013) (citation and internal quotation marks omitted). "Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is 'acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.'" *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 257 (Nev. 2012) (citation omitted).

But Plaintiff not only had no contract with IHS, the evidence before the Court suggests that IHS did not even know about Plaintiff and his arrangement with Winters until Plaintiff began complaining about slow payments—prompting IHS to quickly move to terminate Winters. (*See, e.g.*, ECF Nos. 160, 169-2.) Thus, Defendants did not, and

1 could not have, appreciated any benefit that Plaintiff conferred on them. *See Certified Fire Prot. Inc.*, 283 P.3d at 257 (explaining this is an element of an unjust enrichment claim). Moreover, IHS has no equitable obligation to Plaintiff under a contract it was not a party to, was unaware of, and purported to impose obligations upon IHS. Plaintiff's unjust enrichment claim is therefore also unlikely to succeed.

In sum, Plaintiff's SLAPP complaint is barred by the Statute. Both special motions to dismiss satisfy the two-prong statutory test because Plaintiff's SAC is based on Defendants' protected communications aimed at procuring a governmental outcome—preventing the VA from cancelling Defendant IHS's VA contracts, or otherwise penalizing IHS in the face of Plaintiff's allegations of IHS's improper non-payment. Further, Plaintiff is unlikely to prevail on his tortious interference and unjust enrichment claims.[6] The Court will therefore grant both special motions to dismiss, and dismiss this case in its entirety. The dismissal is with prejudice because it "operates as an adjudication upon the merits," NRS § 41.660(5), and any amendment would be futile (*see, e.g., Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 893 (9th Cir. 2010) (affirming district court's denial of a motion for leave to amend because amendment would be futile, noting that futility is a proper basis for denying leave to amend)).[7] The Court will thus also deny Plaintiff's motions for partial summary judgment (ECF Nos. 158, 171) as moot.

## V.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

///

---

[6]Especially considering Plaintiff bears the burden at this second step of the analysis. *See Pope*, 2019 WL 1313365, at *2.

[7]Defendants seek an award of their attorneys' fees and costs, but their request is premature, and denied without prejudice for noncompliance with LR 54-14. (ECF No. 169 at 24.)

It is therefore ordered that Defendant Daniel Germain's special motion to dismiss (ECF No. 159) is granted.

It is further ordered that Defendants Intelli-heart Services Inc., Vannessa Parsons, and Danny Weisburg's special motion to dismiss (ECF No. 169) is granted.

It is further ordered that Plaintiff's first motion for partial summary judgment (ECF No. 158) is denied as moot.

It is further ordered that Plaintiff's second motion for partial summary judgment (ECF No. 171) is denied as moot.

It is further ordered that this case is dismissed with prejudice.

The Clerk of Court is directed to enter judgment accordingly, in Defendants' favor, and close this case.

DATED THIS 4th day of March 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE